No. 18-35704

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SWINOMISH INDIAN TRIBAL COMMUNITY,
a federally recognized Indian Tribe

*Plaintiff-Appellee*

v.

BNSF RAILWAY COMPANY,
a Delaware corporation

*Defendant-Appellant.*

On Interlocutory Appeal From An Order Of The District Court
For The Western District Of Washington

# BRIEF OF AMICUS CURIAE
# ASSOCIATION OF AMERICAN RAILROADS
# IN SUPPORT OF APPELLANT BNSF RAILWAY COMPANY
# AND URGING REVERSAL

Kathryn D. Kirmayer
Timothy J. Strafford
ASSOCIATION OF AMERICAN
 RAILROADS
425 Third Street SW, Suite 1000
Washington, DC 20024
(202) 639-2100

Thomas H. Dupree Jr.
David A. Schnitzer
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

# CORPORATE DISCLOSURE STATEMENT

The Association of American Railroads has no parent company and is a nonstock corporation.

/s/ Thomas H. Dupree Jr.
Thomas H. Dupree Jr.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF AMICUS CURIAE ...................................................... 1

RELEVANT BACKGROUND .............................................................. 2

SUMMARY OF ARGUMENT ............................................................. 3

ARGUMENT ..................................................................................... 6

    I.    Allowing The Tribe To Pursue An Injunction Violates ICCTA, Undermines The Congressional Design, And Would Have Sweeping And Harmful Consequences For Rail Transportation. ........ 7

        A.    ICCTA's Remedies Are "Exclusive" And Preempt All Other Remedies Under Federal Or State Law. ......................... 7

        B.    Allowing A Single Landowner To Obtain A Judicial Injunction Halting Rail Traffic Violates ICCTA And Would Have Severe Consequences. ........................................ 13

    II.    Under Federal Oversight, Freight Rail Is An Extremely Safe And Environmentally Friendly Mode Of Surface Transportation. ............ 17

        A.    Freight Rail Is The Safest Method Of Surface Transportation. ........................................................... 18

        B.    Freight Rail Is An Environmentally Friendly Method Of Surface Transportation. ........................................ 21

CONCLUSION ................................................................................. 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ass'n of Am. R.R.s v. S. Coast Air Quality Mgmt. Dist.*,
    622 F.3d 1094 (9th Cir. 2010) ...................................................................11, 13

*Ass'n of Am. R.R.s v. S. Coast Air Quality Mgmt. Dist.,*
    No. 2:06-cv-01416, 2007 WL 2439499 (C.D. Cal. Apr. 30, 2007). ..................11

*BNSF Ry Co. v. Cal. Dep't of Tax and Fee Admin.*,
    904 F.3d 755 (9th Cir. 2018) ...................................................................................9

*Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*,
    450 U.S. 311 (1981) ................................................................................................9

*City of Auburn v. U.S. Gov't*,
    154 F.3d 1025 (9th Cir. 1998) ..........................................................7, 10, 11, 12

*City of Lincoln v. STB*,
    414 F.3d 858 (8th Cir. 2005) ..................................................................................8

*Fayus Enters. v. BNSF Ry. Co.*,
    602 F.3d 444 (D.C. Cir. 2010) .......................................................................10, 12

*Franks Inv. Co. v. Union Pac. R.R. Co.*,
    593 F.3d 404 (5th Cir. 2010) ...............................................................................10

*Green Mountain R.R. Corp. v. Vermont*,
    404 F.3d 638 (2d Cir. 2005) ................................................................................12

*Or. Coast Scenic R.R. v. Or. Dep't of State Lands*,
    841 F.3d 1069 (9th Cir. 2016) ...............................................................................7

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    593 F. Supp. 2d 29 (D.D.C. 2008) .........................................................................8

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983) ................................................................................................11

*Thompson v. Tex. Mexican Ry.*,
    328 U.S. 134 (1946) ...................................................................................10

*United Transp. Union v. Long Island R.R.*,
    455 U.S. 678 (1982) .....................................................................................8

**Statutes**

49 U.S.C. § 10102(9) .........................................................................................8

49 U.S.C. § 10501(b) ..................................................................................*passim*

49 U.S.C. § 11101(a) .........................................................................................6

49 U.S.C. § 20106(a)(2) ...................................................................................11

Federal Railroad Safety Act ............................................................................11

ICC Termination Act, Pub. L. No. 104-88, 109 Stat. 803 (1995) ...................*passim*

Treaty of Point Elliott, 12 Stat. 927 (1855) ....................................................3

**Other Authorities**

AAR, *4 Ways Freight Rail Reduces Its Carbon Footprint*,
    https://bit.ly/2Fj6OXy .................................................................................22

*CSX Transp., Inc.—Petition for Declaratory Order*,
    No. FD 34662, 2005 WL 584026 (STB Mar. 14, 2005),
    *recons. denied* (STB May 3, 2005) ...........................................................12

*CSX Transp., Inc.—Petition for Declaratory Order*,
    No. FD 35832, 2015 WL 4597223 (STB July 29, 2015) ...........................13

H.R. Rep. No. 104-311 (1995),
    *as reprinted in* 1995 U.S.C.C.A.N. 793 .................................................7, 9

S. Rep. No. 104-176 (1995) ...............................................................................8

Texas A&M Transp. Inst., *Traffic Gridlock Sets New Records for
    Traveler Misery* (Aug. 26, 2015), https://bit.ly/2B2OHkn ......................21

**Regulations**

49 C.F.R. pt. 172 app. D ............................................................. 19

# INTEREST OF AMICUS CURIAE

The Association of American Railroads ("AAR") is a nonprofit trade association whose members include all of the Class I freight railroads (North America's largest freight railroads), smaller freight railroads, and passenger railroads. AAR's members operate 83 percent of the line-haul mileage, employ 95 percent of the workers, and account for 97 percent of the freight revenues of all railroads in the United States. AAR and its members are committed to operating the safest, most efficient, cost-effective, and environmentally sound freight rail transportation system in the world. AAR represents its member railroads in proceedings before Congress, the courts, and administrative agencies in matters of common interest, such as the issues involved in this litigation.

This case involves preemption under the ICC Termination Act of 1995 ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803, which provides in relevant part that "the remedies provided under [ICCTA] with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b). Most of AAR's members operate across multiple states, as well as local and tribal jurisdictions, and are periodically subjected to improper efforts to regulate their operations through federal and state remedies that are not authorized under ICCTA. Accordingly, AAR has a strong interest in ensuring that ICCTA preemption is properly enforced.

No person—other than AAR, its staff, and its counsel—authored this brief in whole or in part, and no person—other than AAR, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief. All parties have consented to the filing of this brief.

## RELEVANT BACKGROUND

For more than a century, BNSF Railway has moved traffic on a rail line that crosses land the Swinomish Indian Tribal Community ("the Tribe") claims is part of its reservation. In 1991, to settle a dispute over the line, the Tribe granted BNSF a right-of-way easement. The Tribe now alleges that BNSF is violating the easement by transporting crude oil on the line with greater frequency and larger volumes than allowed under the easement (two trains of 25 cars or less per day). The Tribe seeks, among other things, "an injunction precluding the transportation of certain types of cargo over the reservation, and it has refused to negotiate regarding the number of trains and the appropriate rental amount because it disapproves of the cargo BNSF is carrying." ER 21.

The district court recognized that ICCTA preempts all "remedies provided under Federal or State law," other than those authorized by ICCTA itself. ER 18 (quoting statute). And it initially held that ICCTA preempted the Tribe's demand for an injunction, explaining that ICCTA bars any "injunction limiting the type of cargo or the number of trains or cars crossing the reservation[,] whether under a

breach of contract, trespass, or estoppel theory." ER 28. But it changed course on reconsideration, holding that an injunctive remedy was ***not*** preempted. ER 11. The court explained that the Tribe's contract and trespass claims arise under federal, rather than state law, because they arise from the Tribe's right to exclusive use of its reservation land conferred under the Treaty of Point Elliott, 12 Stat. 927 (1855). ER 8. Thus, in the court's view, "[t]he correct analysis when considering the Tribe's treaty-based federal common law claim is not whether the requested relief would interfere with rail transportation, but whether Congress intended to repeal the Treaty of Point Elliott when it enacted the ICCTA." ER 9. The court concluded that the ICCTA "preemption analysis that applies to state law claims is therefore inapplicable," and "[b]ecause Congress has not clearly abrogated the Tribe's treaty right of exclusive use, that right remains enforceable in federal court" and "preemption is not a defense" to the Tribe's request for an injunction. ER 11.

## SUMMARY OF ARGUMENT

**I.** ICCTA preempts ***all*** remedies regarding transportation by rail carrier that are not expressly authorized under the statute itself. In authorizing the Tribe to seek injunctive relief that would enjoin certain rail traffic on a critical BNSF line in Washington state, the district court defied ICCTA's language and purpose.

**A.**     Congress has long regulated railroad operations at the national level and given federal legislation a broad preclusive effect.  ICCTA gives the Surface Transportation Board ("STB" or "the Board") exclusive jurisdiction to regulate rail transportation.  If states, municipalities, or single landowners had the power to restrict or enjoin rail traffic, the national rail network would be brought to a halt.

For this reason, ICCTA's broad preemption provision, 49 U.S.C. § 10501(b), provides that ICCTA's remedies are "exclusive," and that all other "remedies"—whether arising under "Federal or State law"—are preempted.  Many courts, and the STB itself, have applied this clear and unambiguous language to strike down a variety of efforts to circumvent ICCTA and regulate rail transportation through other means.

**B.**     The district court's decision authorizing the Tribe to seek an injunction enjoining rail traffic plainly conflicts with ICCTA, which expressly "preempt[s] the remedies provided under Federal or State law," including judicial injunctions.   49 U.S.C. § 10501(b).   Allowing an injunction also undermines ICCTA's purpose of consolidating federal oversight over railroad operating practices in a single national regulator—the STB.  The district court should have harmonized ICCTA and the Treaty of Point Elliott by holding that the Tribe's treaty-conferred rights can be vindicated through means other than an injunction.

If left undisturbed, the district court's ruling will have severe and harmful consequences for railroads, shippers, and the public generally. The freight railroads have made substantial investments in their networks, and if a single landowner can force rail traffic to a halt, the efficient operation of the entire interconnected interstate system is jeopardized. It is not as though tracks can simply be lifted and moved to a different location. And even if it is physically possible to reroute the traffic in a given case, doing so will increase network congestion by forcing the use of less efficient, and more expensive, routes. Shippers too would be harmed because they rely on freight railroads to move their goods; indeed, many shippers have made substantial investments—building factories or facilities in reliance on existing rail service—all of which could be threatened by a single landowner that does not want rail traffic passing in or near its own backyard. Much of the massive increased costs of redirecting rail traffic would ultimately be passed along to consumers.

**II.** The Tribe is mistaken in suggesting that BNSF's freight traffic is unsafe or environmentally harmful. Freight rail is an extremely safe method of transporting goods and commodities, including hazardous materials such as crude oil, and is an environmentally friendly mode of surface transportation.

The railroad industry has a demonstrated track record of safe operations under the guidance and supervision of federal safety regulators. The railroads

have made substantial investments in infrastructure and technology to further safety, and they continually develop even safer operational practices to move the freight, including crude oil and other hazardous materials, that they are required by their common carrier obligation to move. Those efforts have paid off, as the last five years have been the safest on record.

Freight rail is an environmentally friendly mode of surface transportation. Freight trains move an average of one ton of freight 479 miles per gallon of fuel. Trains reduce pollution by easing gridlock on already-congested highways. In recent years, the amount of freight carried by an average train has increased steadily, delivering further environmental benefits by avoiding the need to operate more trains.

## ARGUMENT

This case raises questions of great importance to the nation's freight railroads. By virtue of their common carrier obligation, *see* 49 U.S.C. § 11101(a), railroads are generally required to accept hazardous materials, including crude oil, for shipment. It is not surprising that, from time to time, private landowners, local governments, and Indian Tribes will attempt to prevent such shipments from crossing their land. This dispute presents that very situation.

I.  **Allowing The Tribe To Pursue An Injunction Violates ICCTA, Undermines The Congressional Design, And Would Have Sweeping And Harmful Consequences For Rail Transportation.**

ICCTA preemption helps ensure the regulatory uniformity necessary for a healthy and robust national rail network.  Allowing the Tribe to pursue a judicial injunction prohibiting certain rail traffic based on "contract and trespass claims [that] arise under federal law," ER 11, defies the plain language of the preemption provision, and contravenes the congressional purpose of making ICCTA's remedies exclusive.  It would also have broad and potentially devastating consequences for rail transportation, harming consumers, shippers, and the railroads themselves.

A.  **ICCTA's Remedies Are "Exclusive" And Preempt All Other Remedies Under Federal Or State Law.**

1.  Freight railroads are a key part of the nation's critical infrastructure and an essential artery for interstate commerce.  Because an efficient interstate railroad network is vital to the national economy, "Congress and the courts long have recognized a need to regulate railroad operations at the federal level" and the "preclusive effect of federal legislation in this area." *City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1029 (9th Cir. 1998).  In 1995, Congress enacted ICCTA, "in part with the purpose of expanding federal jurisdiction and preemption of railroad regulation." *Or. Coast Scenic R.R. v. Or. Dep't of State Lands*, 841 F.3d 1069, 1072 (9th Cir. 2016) (citing H.R. Rep. No. 104-311, at 95 (1995)).  ICCTA

abolished the Interstate Commerce Commission and gave the newly-created Surface Transportation Board exclusive jurisdiction to regulate rail transportation. *See* Pub. L. No. 104-88, §§ 101, 201, 109 Stat. 803, 804, 932 (1995). "As the Senate noted when it enacted ICCTA . . . '[t]he hundreds of rail carriers that comprise the railroad industry rely on a nationally uniform system of economic regulation.'" *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 593 F. Supp. 2d 29, 38 (D.D.C. 2008) (quoting S. Rep. No. 104-176, at 6 (1995)).

The Board is vested with the mission of ensuring the "uniform regulatory scheme" that Congress has deemed "necessary to the operation of the national rail system." *United Transp. Union v. Long Island R.R.*, 455 U.S. 678, 688 (1982). ICCTA thus gives the Board "exclusive" jurisdiction over "transportation by rail carriers," 49 U.S.C. § 10501(b), and defines "transportation" broadly to include all equipment, services and facilities relating to the movement of property by rail. *Id.* § 10102(9).

"Courts have recognized that Congress intended to give the [STB] extensive authority in this area." *City of Lincoln v. STB*, 414 F.3d 858, 861 (8th Cir. 2005). If states and municipalities—or individual property owners—were permitted to impose their own limits on rail traffic that passes through or near their jurisdictions or neighborhoods, a single landowner could bring a rail network to a halt. At a minimum, there would be a patchwork of disparate and potentially

conflicting obligations that would burden interstate commerce and threaten the nation's transportation system. Congress underscored this very concern when it enacted ICCTA. *See* H.R. Rep. No. 104-311, at 95-96 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 793, 807-08 ("[T]he Federal scheme of economic regulation and deregulation is intended to address and encompass all regulation and to be completely exclusive. Any other construction would undermine the uniformity of Federal standards and risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation.").

2. A key element of the congressional design is ICCTA's "broad" preemption provision, *BNSF Ry Co. v. Cal. Dep't of Tax and Fee Admin.*, 904 F.3d 755, 760 (9th Cir. 2018), which preempts all "remedies," whether arising under federal or state law, that are not expressly authorized in ICCTA itself. It provides:

> The jurisdiction of the Board over . . . transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers . . . is exclusive. <u>Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law</u>.

49 U.S.C. § 10501(b) (emphasis added).

As the statute's text reflects, ICCTA is "among the most pervasive and comprehensive of federal regulatory schemes." *Chi. & N.W. Transp. Co. v. Kalo*

Brick & Tile Co., 450 U.S. 311, 318 (1981). Although "the core of ICCTA preemption is 'economic regulation,' which [refers] to regulation of the relationship . . . of shippers and carriers," *Fayus Enters. v. BNSF Ry. Co.*, 602 F.3d 444, 451 (D.C. Cir. 2010), this Court has recognized that ICCTA preemption is broader, and applies wherever a common carrier railroad "is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line." *City of Auburn*, 154 F.3d at 1031; *see also id.* at 1029-31 (reviewing the history of railway preemption, text of ICCTA, and court decisions to reject the argument that preemption is limited to a narrow view of "economic" regulation). And in construing ICCTA's predecessor, the Supreme Court has recognized that the common carrier obligation survives the expiration of a contractual agreement for use of the property. *See Thompson v. Tex. Mexican Ry.,* 328 U.S. 134, 144 (1946).

As the Fifth Circuit has put it, regulation which either "could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized," or involves "matters directly regulated by the Board" is "by its very nature . . . unreasonable interference with interstate commerce and *must* be preempted." *Franks Inv. Co. v. Union Pac. R.R. Co.*, 593

F.3d 404, 410–11 (5th Cir. 2010) (emphasis added; quotation omitted).* This

Court in particular has emphasized that ICCTA's preemptive mandate is so strong

that preemption is not optional or discretionary.  Rather, "[p]reemption of state

law is *compelled* if Congress' command is explicitly stated in the federal statute's

language or implicitly contained in its structure or purpose." *City of Auburn*, 154

F.3d at 1031 (emphasis added) (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85,

95 (1983)).

3.     Consistent with this broad understanding of ICCTA's preemptive

sweep, courts have invoked ICCTA to invalidate a wide variety of laws and

regulations.  This Court, in *Association of American Railroads v. South Coast Air*

*Quality Management District*, 622 F.3d 1094, 1097 (9th Cir. 2010), affirmed the

holding that rules restricting locomotive idling are "exactly the type of local

regulation Congress intended to preempt by enacting the ICCTA in order to

prevent a 'patchwork' of such local regulation from interfering with interstate

commerce." *Ass'n of Am. R.R.s v. S. Coast Air Quality Mgmt. Dist.,* No. 2:06-cv-

---

* Of course, other statutes may independently preempt state and local attempts to regulate rail transportation.  For example, the Federal Railroad Safety Act provides that a state may not adopt or enforce laws related to railroad safety if the United States Department of Transportation has prescribed a regulation or issued an order covering the subject matter of the state requirement.  *See* 49 U.S.C. § 20106(a)(2).

01416, 2007 WL 2439499, at *8 (C.D. Cal. Apr. 30, 2007). Likewise, in *Fayus Enterprises*, 602 F.3d at 452, the D.C. Circuit held that application of state antitrust laws to rail transportation would "subject [shipments] to fluctuating rules as they crossed state lines" and "easily lead to balkanization" that "directly interfere[s]" with the objective of national uniformity and "ICCTA's deregulatory objectives." *See also, e.g.*, *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005) (law requiring pre-construction permit preempted); *City of Auburn*, 154 F.3d at 1029 (environmental review of rail line acquisition and operation preempted).

The Surface Transportation Board has made these same points in rejecting attempts to circumvent ICCTA and halt shipments of hazardous materials. In *CSX Transportation, Inc.—Petition for Declaratory Order*, No. FD 34662, 2005 WL 584026 (STB Mar. 14, 2005), *recons. denied* (STB May 3, 2005), the Board held that local regulation regarding routes for rail transportation of hazardous materials through the District of Columbia was preempted because such regulation would interfere with interstate commerce and lead to piecemeal regulation. The Board emphasized that "[b]y enacting section 10501(b), Congress foreclosed state or local power to determine how a railroad's traffic should be routed." *Id*. at *7. As the Board explained more recently in canvassing its prior preemption decisions, "[t]he interstate rail network could not function properly if states and localities could impose their own potentially differing standards for railroad activities that

are an integral part of, and directly affect, rail transportation." *CSX Transp., Inc.—Petition for Declaratory Order*, No. FD 35832, 2015 WL 4597223, at *4 (STB July 29, 2015).

> **B.** **Allowing A Single Landowner To Obtain A Judicial Injunction Halting Rail Traffic Violates ICCTA And Would Have Severe Consequences.**

1. The district court's decision cannot be reconciled with the plain language of ICCTA. Congress expressly provided that ICCTA's remedies are "exclusive" and "preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b). The injunction the Tribe demands is a remedy provided by federal law. Thus, under a straightforward application of ICCTA, the district court should have deemed an injunction unavailable.

The district court's decision also undermines ICCTA's purpose. Congress sought to vest the Board with exclusive jurisdiction to prevent precisely this scenario—a single landowner circumventing the remedies set forth in ICCTA and seeking to halt interstate shipments of hazardous materials through a judicial injunction under the common law.

Although the district court at one point recognized the need to read ICCTA and the Treaty of Point Elliott in harmony, ER 23 (citing *Ass'n Am. R.R.s*, 622 F.3d at 1097), it made no effort to actually do so. Had it attempted to reconcile the two, it would have realized that harmony does not require allowing an injunction—an

outcome that eviscerates ICCTA's preemption provision. Rather, harmony is achieved by recognizing that the rights the Tribe enjoys under the treaty can be vindicated through means other than an injunction, such as a claim for increased payments from BNSF reflecting the heightened amount of traffic on the line. Harmony requires construing ICCTA and the treaty together, so as to respect both, not nullifying one of ICCTA's key provisions.

Even in cases where there is a direct conflict between ICCTA and other sources of federal law, the plain language of ICCTA—and its underlying purposes and policies—compel the conclusion that ICCTA prevails. ICCTA's text expressly provides that ICCTA's remedies are "exclusive" and displace all remedies allowed under federal law. The statutory language is sweeping and reflects ICCTA's objective of ensuring uniformity in rail regulation through a single federal statute and a single federal regulator. The district court's conclusion that Congress needed to do *more*—namely include an express reference to the Treaty of Point Elliott—is mistaken. It would be unrealistic, and effectively impossible, for Congress to itemize every possible source of federal law that could provide a remedy in the vast universe of disputes that could conceivably arise.

2. If left undisturbed, the district court's ruling will have severe and harmful consequences for railroads, shippers, and the public generally.

The district court's decision threatens substantial harm to the freight railroads, which have made substantial investments in their networks. It is not as though the tracks themselves can simply be picked up and laid down in a different location to comply with an injunction to route around a landowner. While in some cases shipments can be rerouted and still reach their destination, that is not always possible and it almost invariably can only be done at considerable additional expense. The additional expense would arise from, among other things, the cost of acquiring new rights-of-way (where that is even possible); the cost of constructing new lines and facilities (sometimes across more difficult terrain); and the increased costs (in both money and transit time) of operating along routes that are longer or involve more elevation changes.

If an Indian Tribe can enjoin interstate rail shipments, it is no exaggeration to say that the health of the national economy would be jeopardized. Particularly in the western United States, there are broad swaths of tribal land that railroads have no choice but to cross—and long have, notwithstanding the possessory rights many Tribes can assert under treaties with the United States. For example, one AAR member railroad operates on rail lines that traverse 39 different reservations. Thus, even if the logic of the district court's decision were limited to tribal landowners, the harm to the freight railroads would be substantial, as many Tribes can claim federal property rights arising from treaties signed long ago.

Shippers would also be injured. They rely on freight railroads to transport massive volumes of goods and materials that are used in manufacturing or sold directly to the public. Many shippers have built factories or located facilities in reliance on existing rail service; these investments would be threatened if courts claimed the power to enjoin rail traffic based on trespass or similar claims arising under federal law. Some, like the shippers involved in this case, would lose service entirely because there is no alternative route available. And when re-routing is possible, it would typically be less efficient, and thus at a higher cost or a lower quality of service. This harm would extend to the shippers' customers, many of whom have themselves built manufacturing plants or made other substantial capital investments in reliance on the continued existence of rail service between their own facilities and those of their business partners. And of course the American public would ultimately bear the injury in the form of higher prices for consumer goods and products.

The danger is particularly acute with regard to shipments of hazardous materials or commodities, such as the crude oil at issue in this case, or hazardous but vitally necessary chemicals such as chlorine. Individual landowners, not to mention individual cities and towns, are often tempted to adopt a "not in my backyard" posture, insisting that hazardous materials be rerouted through different areas. Entertaining requests for injunctions that are not authorized under ICCTA

would incentivize objectors to petition the courts in hopes of halting and redirecting rail traffic around their neighborhood.

Finally, all of these impacts are magnified by the interconnected nature of the national freight rail system, with many shipments travelling across the lines of multiple carriers to reach their final destinations, relying on a complex system of coordinated interchanges—points at which one freight railroad transfers a shipment to another. These hand-offs necessarily can only occur where two railroads already meet. Forcing a railroad to reroute its traffic from the most efficient and sensible route will have cascade effects, affecting where and when the railroads interchange cars with one another, and, in turn, the routing and resource allocation decisions of the next railroad, and its ability to efficiently and reliably serve its own customers.

## II. Under Federal Oversight, Freight Rail Is An Extremely Safe And Environmentally Friendly Mode Of Surface Transportation.

In the course of this litigation, the Tribe has expressed concern that some of the trains at issue present a safety risk and cause environmental harm. Among other things, the Tribe asserts that "transporting crude oil is extremely dangerous" and that an accident could occur. No. 18-80062, Doc. 2 at 9 (9th Cir. June 4, 2018). The Tribe also contends that the freight traffic "decreas[es] air quality," making its casino, lodge and RV park "less appealing to guests." *Id.*

These concerns cannot override ICCTA's plain language, and they are unfounded in any event. Freight rail is an extremely safe method of transporting goods and commodities, including hazardous materials such as crude oil. Moreover, freight rail is an environmentally friendly mode of surface transportation.

**A.    Freight Rail Is The Safest Method Of Surface Transportation.**

Under the guidance of the Federal Railroad Administration and other agencies, the railroad industry has a demonstrated track record of safe operations. Contrary to the impression the Tribe seeks to create, safety is of paramount importance to the railroads—the safety of rail operations, rail employees, and the communities through which the railroads operate. The industry demonstrates this commitment every day, through massive investments in infrastructure and technology totaling over $100 billion in the last four years alone. And the railroads continually work to develop safer operational practices and methods of moving the freight, including hazardous materials, that they are obligated by law to move.

Those efforts have paid off. The last five years have been the safest on record, with the number of hazmat release accidents down nearly 64 percent since 2000—and 95 percent compared to 1980. The transport of crude oil has raised particular concerns in recent years, but the fact is that less than 1 percent of all

train derailments involve crude oil, and more than 99.99 percent of all hazmat shipments reach their destination without an accident-caused release.

The railroads have developed new technologies that have significantly improved safety. For example, the railroads use trackside wheel temperature detectors to detect when brakes are not applying or sticking; advanced ultrasonic track detection technology vehicles to detect track defects too small to be seen by eye; and trackside wheel impact load detectors to detect wheels that are imposing too much force on the rails, which might lead to defective rails.

The railroads also use a sophisticated statistical routing tool designed to determine rail routes that pose the least overall safety and security risk for the transportation of certain hazardous materials. This tool, developed in partnership with federal regulators from the Department of Transportation and elsewhere, uses 27 risk factors—including hazmat volume, trip length, population density along the route, and emergency response capability—to assess the safety and security of rail routes. *See generally* 49 C.F.R. pt. 172 app. D.

The railroads provide local authorities, upon request, with a list of the hazardous materials, including crude oil, transported through their communities. The railroads have developed an app for providing emergency responders with information on the hazardous materials in a train via their phones. The railroads also equip train dispatchers and crews with information about hazardous materials

on individual trains and detailed emergency response information specific to those materials.

In addition to prevention and mitigation of accidents, the railroads work with state and local leaders and emergency responders across their network to ensure that communities understand how railroads operate and are prepared in the event of an accident. The railroads actively participate in state emergency planning committees and state agency conferences on emergency response. They also help communities develop and evaluate their own emergency response plans. These activities include representatives from local fire and health departments, education institutions, industry organizations, transportation departments and the public. The railroads also invest in equipment used to train emergency response personnel and respond to accidents involving hazardous materials. This equipment is strategically located throughout the network to ensure that it can arrive quickly at the scene of an accident.

Each year, thousands of emergency responders and railroad and shipper employees receive specialized training through individual railroad efforts and industry programs. The Security and Emergency Response Training Center at AAR's Transportation Technology Center has trained more than 55,000 emergency responders and contractors from all over the world to safely handle accidents involving tank cars carrying hazardous materials.

For all of these reasons, rail is the safest way to transport crude oil and other commodities and materials that are central to our nation's economy. These efforts will be undercut if landowners and local governments are allowed to force rerouting or shifting of hazardous materials to trucks.

**B.** **Freight Rail Is An Environmentally Friendly Method Of Surface Transportation.**

Railroads are also an environmentally sound way to move freight over land. They reduce pollution and ease gridlock on our nation's already-congested highways. Freight rail also helps reduce the substantial economic costs of highway congestion. According to the Texas A&M Transportation Institute, road congestion cost Americans $160 billion in wasted time and fuel in 2014. Texas A&M Transp. Inst., *Traffic Gridlock Sets New Records for Traveler Misery* (Aug. 26, 2015), https://bit.ly/2B2OHkn. Lost productivity, cargo delays, and other costs add tens of billions of dollars to this tab. A single freight train can replace several hundred trucks, freeing up space on the highway for other motorists. Shifting freight from trucks to rail also reduces highway wear and tear and the pressure to build costly new highways.

Technology is driving further improvements. For example, the railroads have acquired thousands of new and more efficient locomotives, enabling them to retire many older and less fuel efficient models. And thanks to improved freight car design, the use of longer trains, and other factors, the amount of freight carried

in an average train has increased steadily, further delivering environmental benefits by avoiding the need to operate more trains. *See* AAR, *4 Ways Freight Rail Reduces Its Carbon Footprint*, https://bit.ly/2Fj6OXy.

## CONCLUSION

This Court should reverse the judgment below.

Respectfully submitted,

/s/ Thomas H. Dupree Jr.

| | |
|---|---|
| Kathryn D. Kirmayer | Thomas H. Dupree Jr. |
| Timothy J. Strafford | David A. Schnitzer |
| ASSOCIATION OF AMERICAN | GIBSON, DUNN & CRUTCHER LLP |
|   RAILROADS | 1050 Connecticut Avenue NW |
| 425 Third Street SW, Suite 1000 | Washington, DC 20036 |
| Washington, DC 20024 | (202) 955-8500 |
| (202) 639-2100 | |

Dated: November 21, 2018

# CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 4810 words, as determined by the word-count function of Microsoft Word 2016, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and (f); and

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated:  November 21, 2018.

<div style="margin-left:40%">

/s/ Thomas H. Dupree Jr._____
Thomas H. Dupree Jr.
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2018, the foregoing brief was filed with the Clerk of the Court via the Appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Appellate CM/ECF system.

/s/ Thomas H. Dupree Jr.
Thomas H. Dupree Jr.