No. 18-35704

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**SWINOMISH INDIAN TRIBAL COMMUNITY**,
a federally recognized Indian Tribe

Plaintiff/Appellee,

v.

**BNSF RAILWAY COMPANY**,
a Delaware corporation

Defendant/Appellant.

*On Appeal by Permission Under 28 U.S.C. § 1292(b) of Orders of the United States District Court for the Western District of Washington, Case No. 2:15-cv-543-0RSL The Honorable Robert S. Lasnik, United States District Judge*

**ANSWERING BRIEF FOR PLAINTIFF/APPELLEE
SWINOMISH INDIAN TRIBAL COMMUNITY**

Christopher I. Brain, WSBA #5054
Email:  cbrain@tousley.com
Chase Alvord, WSBA #26080
Email: calvord@tousley.com
Tousley Brain Stephens PLLC
1700 Seventh Avenue, Suite 2200
Seattle, WA 98101
Tel:  (206) 682-5600
Fax: (206) 682-2992

Stephen T. LeCuyer, WSBA #36408
Email: slcuyer@swinomish.nsn.us
Office of the Tribal Attorney
11404 Moorage Way
La Conner, WA 98275
Tel: (360) 466-1058
Fax: (360) 466-5309

Attorneys for Swinomish Indian Tribal Community

1

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ....................................................... 4

ISSUES PRESENTED ........................................................................... 4

STATEMENT OF THE CASE ............................................................... 4

    A.   The Swinomish Reservation has been set aside for the
exclusive use of the Tribe ..................................................... 4

    B.   BNSF constructed a railroad across Reservation land
without Tribal consent .......................................................... 5

    C.   BNSF sought to legitmize its use of the railroad by
applying for a right-of-way over the Tribe's objections. This
Court confirmed tribal consent is necessary ........................ 6

    D.  The Tribe sued BNSF for trespass. The parties ultimately
agreed to a limited easement ................................................ 8

    E.  The Easement limits the number of trains and railcars that
may cross the Reservation each day ..................................... 9

    F.  The railway is adjacent to central Tribal economic
infrastructure ...................................................................... 12

    G.  BNSF breached the Easement by running more than 100
cars per day over the Reservation ...................................... 13

    H.  Procedural Background ........................................................ 14

    G.  BNSF breached the Easement by running more than 100
cars per day over the Reservation ...................................... 13

SUMMARY OF ARGUMENT .............................................................. 17

ARGUMENT ........................................................................................ 20

I.   The contested terms of the Easement were the basis of the
Tribe's consent; BNSF's failure to comply consistitues a
trespass on Tribal land ............................................................... 20

II. BNSF provides an incomplete picture of the relevant statutory and legal framework .......................................................................... 25

    A.  BNSF overstates the scope of ICCTA and its predessors .......... 25

    B.  BNSF ignores applicable Indian law to mislabel the Tribe as a "local" interest ................................................................................ 28

III. ICCTA can be harmonized with the IRWA law, the Treaty and federal common law .......................................................................... 30

    A.  Implicit repeals are highly disfavored and courts must endeavor to harmonize conflicting federal statutes .......................... 30

    B.  The Treaty can be harmonized with ICCTA .............................. 33

        i.  The district court correctly found that ICCTA did not diminish the Tribe's rights under the Treaty ..................................... 33

        ii.  BNSF's proposed harmonization is the sham that would eviscerate the hallmark of covereignty over the tribal lands .......... 35

        iii.  The Treat nullifies ICCTA's wholesale application to the Tribe........................................................................................ 42

    C.  The IRWA can be harmonized with ICCTA .............................. 45

        i.  ICCTA did not repeal the IRWA .......................................... 45

        ii.  The IRWA expressly authorizes the DOI to impose conditions on rights-of-way over tribal land ................................... 46

        iii.  ICCTA and the IRWA can be harmonized.......................... 49

        iv.  Courts have recognized the STB's subservience to IRWA grants........................................................................................ 52

        v.  Harmonizing the IRWA and ICCTA does not interfere with federal rail policies ................................................................. 53

IV.  The Easement's restrictions are enforceable by injunction ........... 54

    A.  Federal common law provides for injunctive relief for trespasses on Indian Lands ................................................................ 54

CONCLUSION ...................................................................................... 59

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alaska R.R. Corp.*,
2010 WL 1266781 (S.T.B. Mar. 16, 2010) ........................................53

*Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist.*,
622 F.3d 1094 (9th Cir. 2010) ...............................................31

*Blanchette v. Conn. Gen. Ins. Corp.*,
419 U.S. 102 (1974).............................................................50

*BNSF Ry. Co. v. Albany & E. R.R. Co.*,
741 F.Supp.2d 1184 (D. Or. 2010) ...............................................32

*BNSF Ry. Co. v. Cal. Dep't of Tax and Fee Admin.*,
904 F.3d 755 (9th Cir. 2018) ...............................................31, 32, 46

*Boston & Maine Corp. & Town of Ayer*,
2001 WL 458685 (S.T.B. Apr. 30, 2001).........................................24

*Bryan v. Itasca County*,
426 U.S. 373 (1976).............................................................30

*Burlington N., Inc. v. Andrus et al.*,
No. C79-1199V (W.D. Wash. filed Oct. 15, 1979)..............................7

*California High-Speed Rail Authority—Construction Exemption—In
Fresno, Kings, Tulare, and Kern Counties, Cal.*,
2014 WL 3973120 (S.T.B. Aug. 11, 2014) ......................................21

*Choate v. Trapp*,
224 U.S. 665 (1912)............................................................30

*City of Des Moines v. Chicago & N.W. Ry. Co.*,
264 F.2d 454 (8th Cir. 1959) ...............................................22, 26, 27

*City of Milwaukee v. Illinois*,
451 U.S. 304 (1981)............................................................55

*City of Sherrill v. Oneida Indian Nation*,
    544 U.S. 197 (2005) (*Oneida III*) ..................................................37, 38

*Confederated Tribes of Chehalis Indian Reservation v. Washington*,
    96 F.3d 334 (9th Cir. 1996) ...................................................29

*Crawford Fitting Co. v. J.T. Gibbons, Inc.*,
    482 U.S. 437 (1987)...................................................46

*CSX Transp., Inc.—Petition for Declaratory Order*,
    FD 34662, 2005 WL 584026 (STB Mar. 14, 2005) ...........................................28

*Donovan v. Coeur d'Alene Tribal Farm*,
    751 F.2d 1113 (9th Cir. 1985) ................................................43, 44, 45

*Holland v. Delray Connecting R.R. Co.*,
    311 F. Supp. 2d 744 (N.D. Ind. 2004) ...................................................32

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct 1612, 1624 (2018)...................................................32

*Iowa Mut. Ins. Co. v. LaPlante*,
    480 U.S. 9 (1987)...................................................34

*Louisville & Nashville R.R. v. Mottley*,
    219 U.S. 467 (1911)...................................................24

*Lumber Indus. Pension Fund v. Warm Springs Forest Prods. Indus.*,
    939 F.2d 683 (9th Cir. 1991) ...................................................44

*In re Mercury Interactive Corp. Sec. Litig.*,
    618 F.3d 988 (9th Cir. 2010) ...................................................43

*Merrion v. Jicarilla Apache Tribe*,
    455 U.S. 130 (1982)...................................................29, 33

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
    526 U.S. 172 (1999)...................................................34

*Montana v. Blackfeet Tribe of Indians*,
    471 U.S. 759 (1985)...................................................29

*Morton v. Mancari*,
    417 U.S. 535 (1974)......................................................................29

*N.M. Navajo Ranchers Ass'n v. ICC*,
    702 F.2d 227 (D.C. Cir. 1983) .....................................................41

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007)......................................................................31

*Nat'l Audubon Soc. v. Dep't of Water*,
    869 F.2d 1196 (9th Cir. 1988) .....................................................54

*New Mexico v. Mescalero Apache Tribe*,
    462 U.S. 324 (1983)................................................................29, 33

*Oneida Cty. v. Oneida Indian Nation*,
    470 U.S. 226 (1985) (*Oneida II*) ............................................30, 41

*Oneida Indian Nation v. Oneida Cty.*,
    414 U.S. 661 (1974) (*Oneida I*)..................................................31

*Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*,
    724 F.3d 230 (D.D.C. 2013) ........................................................34

*PCS Phosphate Co. v. Norfolk S. Corp.*,
    559 F.3d 212 (4th Cir. 2009) .......................................................23

*Quechan Tribe of Indians v. Rowe*,
    531 F.2d 408 (9th Cir. 1976) ..................................................54, 55

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976)................................................................31, 46

*Randolph v. IMBS, Inc.*,
    368 F.3d 726 (7th Cir. 2004) .......................................................31

*Sanders v. City of Seattle*,
    156 P.3d 874 (Wash. 2007) .....................................................39, 56

*Skokomish Indian Tribe v. United States*,
    410 F.3d 506 (9th Cir. 2005) ............................................35, 36, 39

*South Dakota v. Bourland*,
    508 U.S. 679 (1993)................................................................34

*Southern Pacific Transportation Co. v. Watt*,
    700 F.2d 550 (9th Cir. 1983), *cert. den.* 464 U.S. 960 (1980) ......8, 22

*Star Lake R.R. v. Lujan*,
    737 F. Supp. 103 (D.D.C. 1990)..........................................47, 52

*Star Lake R.R. Co.—Rail Constr. & Operation in Mckinley Ct., New Mexico*,
    FD 28273, 1987 WL 98276, at *5 ............................................52

*Sunnyside Valley Irr. Dist. v. Dickie*,
    73 P.3d 369 (Wash. 2003) ....................................................56

*Swinomish Tribal Cmty. v. Burlington N., Inc.*,
    Case No. C78-429V (W.D. Wash. filed July 18, 1978) ...................8

*Thompson v. Texas Mexican Ry. Co.*,
    328 U.S. 134 (1946) (*Tex-Mex*)........................................26, 27

*Tibble v. Edison Int'l*,
    843 F.3d 1187 (9th Cir. 2016) (en banc) ..................................43

*Town of Conway v. Atl. Coast Line R. Co.*,
    20 F.2d 250 (E.D.S.C. 1926) ...............................................22

*Township of Woodbridge v. Consol. Rail Corp.*,
    2000 WL 1771044 *3 ....................................................23, 24

*Tubbs v. Surface Transp. Bd.*,
    812 F.3d 1141 (8th Cir. 2015) ..............................................56

*Tyrrell v. Norfolk S. Ry. Co.*,
    248 F.3d 517 (6th Cir. 2001) ............................................28, 31

*United States Dep't of Labor v. Occupational Safety & Health Review Comm'n*,
    935 F.2d 182 (9th Cir. 1991) ............................................44, 45

*United States Envtl. Prot. Agency—Petition for Declaratory Order*,
    FD 35803, 2014 WL 7392860 (S.T.B. Dec. 29, 2014) ...............32, 53

*United States v. Baltimore & Ohio R.R.*,
 333 U.S. 169 (1948) (*Baltimore*) ..........................................39, 40, 41

*United States v. Dion*,
 476 U.S. 734 (1986) ...................................................................25, 34

*United States v. Farris*,
 624 F.2d 890, 893-94 (9th Cir. 1980) .......................................43

*United States v. Kimbell Foods, Inc.*,
 440 U.S. 715 (1979) ....................................................................54

*United States v. Mazurie*,
 419 U.S. 544 (1975) .........................................................28, 29, 40

*United States v. Milner*,
 583 F.3d 1174 (9th Cir. 2009) ...............................................31, 54

*United States v. Park*,
 536 F.3d 1058 (9th Cir. 2008) .....................................................55

*United States v. S. Pac. Transp. Co.*,
 543 F.2d 676 (9th Cir. 1976) (*Southern Pacific I*) ....................22

*United States v. Smiskin*,
 487 F.3d 12604 (9th Cir. 2007) ..................................................44

*United States. v. Torlaw Realty, Inc.*,
 83 F. Supp. 2d 967 (C.D. Cal. 2007) ..........................................55

*United States. v. United Cont. Tuna Corp.*,
 425 U.S. 164 (1976)......................................................................51

*United States v. Washington*,
 459 F. Supp. 1020 (W.D. Wash. 1978) ........................................13

*United States v. Washington*,
 459 F. Supp. 1028 (W.D. Wash. 1974) ........................................36

*United States v. Washington*,
 853 F.3d 946 (9th Cir. 2017), *rehrg. & rehrg. en banc den.*, 864
 F.3d 1017 (2017), *aff'd by equally divided court* 138 S. Ct. 1832
 (2018)............................................................................................37

*United States v. Winans*,
198 U.S. 371 (1905) ......................................................36

*Visendi v. Bank of Am., N.A.*,
733 F.3d 863 (9th Cir. 2013) ..........................................43

*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*,
443 U.S. 658 (1979) (*Fishing Vessel*) ....................5, 36, 37

*Water Wheel Camp Recreational Area, Inc. v. LaRance*,
642 F.3d 802 (9th Cir. 2011) .....................................33, 34

*White Mountain Apache Tribe v. Bracker*,
448 U.S. 136 (1980)......................................................30

**Statutes**

49 U.S.C. § 102(f)(2)(B) ...................................................41

Act of March 2, 1899, 25 U.S.C. § 312 *et seq.*...................7, 8

Hazardous Materials Transportation Act, 49 U.S.C. § 1811(a)(1)–(2) ...............4, 42

ICC Termination Act of 1995 (ICCTA)
Pub. L. No. 104-88, 109 Stat. 803 (1995) ..................*passim*

49 U.S.C. § 10501(b) ..................................................28

49 U.S.C. § 11323(a)(6)...............................................26

Indian Reorganization Act of 1934, 25 U.S.C. § 476.........................4, 46

Indian Right of Way Act of 1948, 25 U.S.C. § 323 *et seq.* ............*passim*

25 U.S.C. § 323.........................................................39, 47

25 U.S.C. § 324.........................................................46, 47

25 U.S.C. § 328...........................................................47

Interstate Commerce Act ...............................................32, 40

Treaty of Point Elliott, 12 Stat. 927 (1855) ....................*passim*

Transportation Act of 1920 .......................................................................21, 27

**Other Authorities**

25 C.F.R. § 169.401 ...............................................................................48, 55

25 C.F.R. § 161.3(a) ......................................................................................7

25 C.F.R. § 169.1(a) ....................................................................................47

25 C.F.R. § 169.1 *et seq.* ............................................................................47

25 C.F.R. § 169.2 .........................................................................................47

25 C.F.R. § 169.413 .....................................................................................55

25 C.F.R. § 169.5(a)(1) ...............................................................................47

25 C.F.R. § 169.9(a) ....................................................................................50

25 C.F.R. § 169.413 ...............................................................................48, 51

33 Fed. Reg. 19,803 (Dec. 27, 1968) .........................................................48

80 Fed. Reg. 72,492 (Nov. 19, 2015)......................................................48, 50

COHEN'S HANDBOOK OF FEDERAL INDIAN LAW (Nell Jessup Newton et
    al. eds., 2012) ............................................................23, 29, 46, 47

**INTRODUCTION**

The Swinomish Indian Tribal Community (the "Tribe") is not merely a "local" entity. It is a sovereign Indian nation. The Tribe is not a private "landowner." Its land is held in trust by the United States on a Reservation set aside in 1855 by the Treaty of Point Elliott (the "Treaty"). The Treaty provides (as does federal common law) that the Tribe has the right to exclude non-Indians from the Reservation without limitation, including those whose prior presence was unlawful and without the consent of the Tribe.

In 1889, a BNSF-predecessor illegally, and over the objections of the Tribe and Department of the Interior's Bureau of Indian Affairs ("BIA"), constructed a rail line across the Reservation. It had no authority to condemn or otherwise usurp Reservation property. And until 1991, when the Department of the Interior ("DOI") issued a Right-of-Way Easement (the "Easement"), BNSF and its predecessors had no authorization to use Reservation land. The Easement was negotiated in settlement of decade-long litigation. It incorporates limitations on the *maximum*—not minimum—number of trains and cars that may cross the Reservation daily. It does not "envision" a right to increase; it provides that BNSF must present the Tribe with a prior, written request to increase the number of trains and cars, but also permits the Tribe to deny such request, so long as its consent is

not arbitrarily withheld—a compromise proposed by BNSF in place of the Tribe's insistence on an absolute limitation.

The Indian Right of Way Act of 1948, 25 U.S.C. § 323 *et seq.* ("IRWA") expressly requires that any right-of-way, and any terms therein, over tribal lands must have tribal consent. The Tribe would not have consented to the Easement without these restrictive terms, mutually agreed to at the inception of the grant. Only after issuance of the Easement—and only so long as BNSF remained in compliance with its terms—did BNSF cease to be a trespasser on Reservation property.

BNSF's "dissertation" on the history of rail regulation and policy, now implemented under ICCTA by the Surface Transportation Board ("STB"), goes far beyond what the case law and regulatory decisions actually hold. BNSF implies that the STB has authority to unilaterally excuse trespass simply because the perpetrator is a railroad. This is not and cannot be the law, particularly where the railroad's use was impermissible from the outset.

Nothing in ICCTA indicates congressional intent to abrogate or repeal the Tribe's Treaty or federal common law right to exclude—and eject—non-Indians from Tribal lands. In fact, nothing in ICCTA or its legislative history even addresses tribal rights or land. The conditions imposed by DOI in the Easement pursuant to its authority in the IRWA are valid. Nothing in ICCTA repeals,

preempts or otherwise diminishes the IRWA. Yet this is precisely the sham harmonization that BNSF proposes: complete evisceration of tribal rights under the Treaty and IRWA to accommodate private, common-carrier operations. But the Tribe's rights under the Treaty, the IRWA, and the federally-issued Easement *can* be truly harmonized with ICCTA and the STB's jurisdiction over rail operations without annihilating either regime. Specifically, the STB retains authority to regulate common-carrier rail operations over Indian lands, but only within the confines of terms imposed by the applicable DOI-issued rights-of-way. This interpretation gives effect to both ICCTA and IRWA. Under this framework, injunctive relief available under federal common law remains available to the Tribe.

Moreover, BNSF provides no support for its assertion that the United States, acting in its role as trustee, could not authorize restrictions on railroad use of tribal lands (that BNSF voluntarily agreed to) simply because BNSF now believes those restrictions unreasonably interfere with its ability to serve shippers. BNSF proposes that no matter how its contract was negotiated, even if obtained by misrepresentation or fraud, so long as it gets its "foot in the door," it can elect to opt out of its promises it claims unreasonably regulate its rail use. But the courts and the STB routinely hold that when a railroad voluntarily enters into a contract limiting rail use, it is presumed to have been a reasonable restriction. The Tribe is

not seeking to "stop rail service entirely," as BNSF and its amici repeatedly charge; rather it seeks BNSF's compliance with the terms of the Easement that BNSF sought and itself proposed.[1] This will not bring about railway-Armageddon or disrupt national rail service as BNSF and its amici speculate, but will ensure tribal rights are preserved.

## JURISDICTIONAL STATEMENT

The Tribe agrees with BNSF's jurisdictional statement.

## ISSUES PRESENTED

Whether the Tribe's rights to obtain injunctive relief from BNSF's ongoing breach of the DOI-issued Easement, which constitutes a willful trespass on the Reservation, were implicitly repealed or abrogated by ICCTA.

## STATEMENT OF THE CASE

### A. The Swinomish Reservation has been set aside for the exclusive use of the Tribe.

The Tribe is a federally-recognized Indian tribe organized under the Indian Reorganization Act of 1934, 25 U.S.C. § 476. ER0671. The Tribe is a successor to

---

[1] BNSF also incorrectly asserts that the Tribe now seeks an injunction on the type of cargo BNSF may transport over the Reservation. *See, e.g.*, Br. at 1, 54. The Tribe recognizes that the Hazardous Materials Transportation Act, 49 U.S.C. § 1811(a)(1)–(2), expressly prohibits tribal regulation of railroad transportation of Bakken Crude, but the nature of the cargo is relevant to whether the Tribe's refusal to increase the number of cars and trains that may run over the Reservation is arbitrary. This issue is not currently before this Court.

signatories of the Treaty of Point Elliott of 1855, 12 Stat. 927 (1855), which

established the Swinomish Reservation (the "Reservation") on Fidalgo Island in

Washington state. *Id*. Reservation lands are held in trust for the Tribe by the United

States. *Id*. The Treaty was one of a series executed with the United States and

negotiated by Territorial Governor Isaac Stevens, by which Indian tribes

relinquished all of Western Washington for monetary payments and parcels of land

"reserved for their exclusive use." *Washington v. Washington State Commercial*

*Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 662 n.2 (1979) (*Fishing Vessel*).

### B. BNSF[2] constructed a railroad across Reservation land without Tribal consent.

In 1889, shortly after the Reservation was set aside for the Tribe's exclusive

use, the Seattle and Northern Railroad Company ("SNRC") entered and

constructed a railroad on Reservation land without consent. The Tribe objected.

ER0681. United States Indian Agent W.H. Talbot met with the U.S. District

Attorney for Washington Territory to instigate injunction proceedings against

SNRC. ER0683–ER0687. In response, SNRC petitioned the Secretary of the

Interior who, recognizing that the railroad was being constructed on Tribal land,

advised SNRC that if a right-of-way was not granted by treaty or agreement,

congressional legislation was necessary to procure one. ER0689–ER0690. There is

---

[2] BNSF has never contested privity with BN as its predecessor-in-interest to the Settlement Agreement or Easement Agreement. ER1073; ER0993. Reference to BNSF herein is a reference to all predecessors-in-interest.

no evidence that SNRC obtained such legislation, nor did it seek a treaty or agreement with the Tribe; nevertheless, it proceeded with construction of the railroad. The U.S. Attorney, however, took no action to enjoin the construction or use of the railroad. ER0692. After construction, SNRC used the tracks without permission from the Tribe or DOI. ER0694–ER0698.

## C. BNSF sought to legitimize its use of the railroad by applying for a right-of-way over the Tribe's objections. This Court confirmed tribal consent is necessary.

Unsanctioned use of the railroad continued for over a century over the Tribe's objections. ER0264–ER0269. In 1970, the Tribe attempted to settle with Burlington Northern Railroad Company ("BN")—a successor to SNRC and BNSF's immediate predecessor—regarding its use. When these negotiations failed, in 1977 the Tribe petitioned the United States as its trustee to sue BN for ejectment and damages. ER0694–ER0701.

In response, and to legitimize its unauthorized use of the Reservation land, BN applied for a right-of-way with DOI in September 1977. ER0703–ER0712. The application was forwarded to the BIA's Portland Area Director, with a preliminarily note finding BN's "case to be lacking under current CFR regulations in that . . . [t]he landowners have not concurred. In fact the tribe . . . has gone on record . . . requesting removal of said railroad." ER0714. The Tribe objected to the

application, reiterating that a right-of-way could not be issued without its consent. ER0716–ER0725.

BIA's Western Washington Agency denied the application due to lack of tribal consent. ER0727. BN appealed to the BIA Area Director. ER0743–ER0762. BN claimed that the Tribe did not own the tidelands in question, but nevertheless sought "to put to rest any question as to right of way ownership." ER0746. BN's sole argument was that the Act of March 2, 1899, 25 U.S.C. § 312 *et seq.* ("1899 Act") governed its application and did not require tribal consent. ER0743–ER0762. BN did not argue that it was entitled to a right-of-way pursuant to its common-carrier obligations or that a failure to grant a right-of-way would interfere with interstate commerce. *Id.* Citing a previous ruling by DOI, the Tribe countered that the IRWA and its implementing regulations governed and expressly required tribal consent before a right-of-way could be granted. ER0764–ER0805; 25 C.F.R. § 161.3(a). The Area Director affirmed, finding that tribal consent was required regardless of whether the 1899 Act or the IRWA applied. ER0807–ER0809.

BN appealed again, this time to the Assistant Secretary for Indian Affairs of DOI. ER0811. The Assistant Secretary concurred with the prior decisions: consent by the Tribe was statutorily mandated. ER0813–ER0817.

BN appealed for a third time by filing suit in the Western District of Washington. *Burlington N., Inc. v. Andrus et al.*, No. C79-1199V (W.D. Wash.

filed Oct. 15, 1979); ER0819–ER0831. The Tribe intervened and moved for summary judgment on the issue of Tribal consent. ER0833; ER0835–ER0836. The district court deferred ruling until this Court decided *Southern Pacific Transportation Co. v. Watt*, 700 F.2d 550 (9th Cir. 1983), *cert. den.* 464 U.S. 960 (1980). ER0835–ER0836. *Southern Pacific* involved an identical issue: the BIA denied a right-of-way application of the railroad, operating a railway over tribal trust lands without consent since the 1800s, due to lack of tribal consent. *Id.* at 552. In *Southern Pacific*, however, the district court ruled that tribal consent was not required under the 1899 Act, but this Court reversed, holding the tribe's consent was required irrespective of which statute governed. *Id.* In accordance with this Court's *Southern Pacific* opinion, the district court entered judgment against BN. ER0838–ER0840. BN appealed to this Court, but it was dismissed by stipulation after the Supreme Court denied Southern Pacific's petition for certiorari. ER0842–ER0844.

The legal result was conclusive: tribal consent was necessary for BN to obtain a right-of-way for the railroad, which ran over the Reservation.

### D. The Tribe sued BNSF for trespass. The parties ultimately agreed to a limited easement.

While BN pursued its futile endeavor to obtain a right-of-way without the Tribe's consent, the Tribe commenced a trespass action against BN to put an end to the railroad's unlawful misappropriation and use of Tribal lands. *Swinomish Tribal*

*Cmty. v. Burlington N., Inc.*, Case No. C78-429V (W.D. Wash. filed July 18, 1978)

("Trespass Litigation"); ER0732–ER0735. BN filed an answer and counterclaims,

including the assertion that the Tribe did not own the lands at issue. ER0737–

ER0741. The United States intervened and became a party plaintiff in the Trespass

Litigation in 1983. ER0147–ER0156.

The Trespass Litigation continued for over a decade before all parties

reached a settlement. The resolution was formalized in a "Settlement Agreement,"

and later, the "Easement Agreement." ER0846–ER0858; ER0860–ER0896.

Notably, the Settlement Agreement included a release of all of BN's claims against

the Tribe, which necessarily included BN's contention that the Tribe did not own

the land in question. ER0851–ER0852 at ¶ 7; ER0896; *see also* ER0861

(recognizing existing railway passed over lands comprising part of the

Reservation).

## E. The Easement limits the number of trains and railcars that may cross the Reservation each day.

Although the Tribe granted BNSF an easement over Tribal land in the

settlement, it was not an open-ended consent to unrestricted use. To the contrary,

the Easement was premised on a number of carefully defined conditions.

Specifically—and critically for this dispute—the Easement limits the number of

trains and the number of cars attached to those trains that are permitted to cross the

Reservation each day:

> Burlington Northern agrees that, unless otherwise agreed in writing, only one eastern bound train, and one western bound train, (of twenty-five (25) cars or less) shall cross the Reservation each day. The number of trains and cars shall not be increased unless required by shipper needs. The Tribe agrees not to arbitrarily withhold permission to increase the number of trains or cars when necessary to meet shipper needs.

ER0869 at ¶ c. The Easement also requires BNSF to make at least one annual report to the Tribe describing all cargo transported over the Reservation and specifically identify "shipped cargo that is different in nature, identity or quantity from the cargo described in previous disclosure." ER0868–ER0869 at ¶ b. The Easement was also limited in time, with an initial term of forty-years with two 20-year renewal options. ER0860 at ¶ C. The Easement will terminate no later than 2071.

These conditions were the result of painstaking and contested negotiation. Limiting the number of trains and railcars and knowing their contents were major objectives of the Tribe. Indeed, at the time, the Tribe was contemplating significant economic development in the area adjacent to the railway. ER0848–ER0850; ER0863–ER0865; ER0898. Initially, the Tribe demanded that the number of trains and railcars be absolutely limited. ER0412–ER0427 at ER0423. BNSF objected to a strict limitation on the number of trains and cars per day, claiming that railroad operations might necessitate more cars or trains on occasion, but BNSF expressed doubt that more trains would ever be needed on a regular basis. ER0920–ER0922.

BNSF then suggested the language incorporated in the final Easement that allowed BNSF to seek prior permission from the Tribe for additional trains and cars—permission the Tribe could withhold so long as its decision was not arbitrary. ER0924–ER0925.

While BNSF claims that this term was negotiated in reference to BNSF's common-carrier obligations (Br. at 16), that is misleading. BNSF never informed the Tribe that it believed its common-carrier obligations would be implicated, and the Tribe certainly did not "acknowledge shippers' rights to common-carrier service." Br. at 58 (citing ER0869). Indeed, had BNSF not indicated that the need for more than 25-cars a day would be sporadic, the Tribe would not have given consent. Likewise, the provision in the Settlement Agreement that federal law remains fully in effect was not intended to preserve BNSF's common-carrier obligations, but to protect the Tribe's right to full compensation for the limited use it authorized. Reviewing the entire term makes clear that it was included to ensure that the Tribe was compensated at appropriate rates, not to eliminate the key limitations on use through application of the common-carrier doctrine. ER0856–ER0857.

Upon conclusion of the negotiations, the Tribe approved both the Settlement Agreement and Easement Agreement by resolution. ER0935–ER0964. The United States approved the Settlement Agreement through the Department of Justice and

DOI. ER0889–ER0891. Moreover, pursuant to the terms of the Settlement

Agreement (and the IRWA and its implementing regulations), BNSF was required

to—and did—apply to DOI for formal approval of the Easement. ER0966–

ER0983. Although the Interstate Commerce Commission ("ICC") had attempted to

intervene in the Trespass Litigation (ER0927–ER0933), nothing in the Settlement

Agreement or Easement Agreement required review or approval of the Easement

by the ICC.

**F.    The railway is adjacent to central Tribal economic infrastructure.**

The railway crosses a part of the Reservation that constitutes the heart of the

Tribe's economic development enterprises. ER0257; ER0671; ER0848–ER0850;

ER0863–ER0865. Although these enterprises did not evolve exactly as envisioned

during the initial settlement negotiations, the railway is, as anticipated, adjacent to

central components of the Tribe's economic infrastructure, including the

Swinomish Casino and Lodge, a Chevron station and convenience store, an RV

Park, a Tribal waste treatment plant, and an air quality monitoring facility. *Id.*

Hundreds of guests and employees utilize these facilities at any given time. *Id.*

This infrastructure is the main source of funding for the Tribe's governmental

functions and programs. *Id.* The railway also crosses a swing bridge over the

Swinomish Channel and a trestle across Padilla Bay, both of which are within the

Reservation and many decades old. *Id.* These water bodies connect with the Salish

Sea, in which the Tribe has usual and accustomed fishing grounds and stations. *United States v. Washington*, 459 F. Supp. 1020, 1049 (W.D. Wash. 1978). Since time immemorial, the Tribe and its predecessors have benefited from these bodies of water to support its fishing lifeway, among other purposes, and salmon and other marine resources have played central and enduring roles in the Tribe's subsistence, culture, identity, and economy. *Id.*

### G. BNSF breached the Easement by running more than 100 cars per day over the Reservation.

In October 2011, the Tribe learned from Skagit County that Tesoro sought a permit to ship oil by train and that the number of cars and trains running over the Reservation could increase. ER0257–ER0259. The Tribe immediately contacted BNSF expressing concerns about this increase and the impact on its economic center. *Id.*; ER0251–ER0255. The Tribe never received a response. In 2012, the Tribe learned from a local newspaper that BNSF had commenced running six "unit trains" of 100 or more cars—in *addition* to the daily 25-car trains contemplated in the Easement—in each direction, each week over the Reservation to reach the Tesoro refinery. ER0454–ER0455; ER0672. BNSF later advised the Tribe that it intended to run 10 to 12 unit trains a week in the future. ER0457; ER0479. This represents an additional four train trips and more than eight times as many railcars per day as are permitted under the Easement. Indeed, BNSF's agreement with

Tesoro has no limitations as to the number of trains or cars. ER0500–ER0507 at ER0505.

Even when BNSF belatedly informed the Tribe of the number of cars it would be running over the Reservation, it continued to withhold the nature of fuel to be carried. ER0457–ER0461 at ER0460; ER0467–ER0481 at ER0476. Although the Tribe and BNSF communicated regarding the Tribe's concerns about increased traffic, and BNSF acknowledged the terms of the Easement, BNSF nonetheless refused to honor those terms and espoused its rights under ICCTA. ER0463–ER0484; ER0496–ER0498. The Tribe has continuously demanded that BNSF comply with the Easement and BNSF has continuously refused to do so.

## H. Procedural Background.

As a result of BNSF's refusal to comply with the Easement, the Tribe was forced to file suit. ER1072–ER1085. BNSF responded that it could not—and therefore was not obligated to—comply with its promises due to its common-carrier obligations under ICCTA, which it argued preempted the Easement, the IRWA, and federal Tribal rights. ER1003–ER1014. The parties agreed to bifurcate the trial to first determine liability and the remedies available for BNSF's ongoing

trespass with the issue of past damages[3] to be determined at a later time. ER0034. The parties then filed cross-motions for summary judgment.

On January 13, 2017, the district court entered its Order Regarding Cross-Motions for Summary Judgment. ER0012–ER0028. It ruled that BNSF "breached the terms of the Easement Agreement by failing to make annual disclosures regarding the cargo it was carrying across the reservation and by increasing the number of trains and cars traversing the reservation without first seeking to obtain the Tribe's written consent." ER0028. The district court considered BNSF's preemption arguments, the intersection of ICCTA and the IRWA, and the available remedies thereunder. The court found that Congress did not mention the IRWA and made no "attempt to address the intersection of tribal rights and transportation policy" when it enacted ICCTA, and that the "courts, the STB, and the Secretary of the Interior have all continued to recognize the BIA's primary responsibility in the area of intersection." ER0026–ER0027. The court ultimately concluded that "ICCTA does not preempt or repeal the IRWA when a railroad right of way crosses tribal lands. The rights and remedies afforded by the IRWA and its

---

[3] BNSF states that the Tribe seeks increased rent as monetary damages for breach of the Easement and trespass. Br. at 18. This is a complete misstatement of the Tribe's claims in this lawsuit, which seek monetary damages for BNSF's *prior* unauthorized use. ER1083; ER1045. Separate from the lawsuit, the Tribe sought increased rent under the Easement Agreement for the limited, permissible use of the Easement based upon an increase in its appraised value. ER0255.

implementing regulations remain available to the Tribe, and the BIA retains the power to enforce and/or cancel the right of way." ER0027–ER0028. Believing the remedy sought was based on state law, however, the court held that the Tribe's state law injunctive relief claim was preempted. ER0021.

The Tribe filed a Motion for Reconsideration arguing that it was not pursuing state law claims for injunctive relief, but federal common law claims pursuant to its Easement and Treaty-based property interests. ER0229. The district court granted the Tribe's Motion, conceding it had "incorrectly analyzed the breach of contract and trespass claims as if they arose under state law" and finding federal law governed. ER0008. Recognizing that when "a treaty is pitted against a federal statute, there is no issue of preemption," the court concluded that the proper analysis was not "whether the relief requested would interfere with rail transportation, but whether Congress intended to repeal the Treaty of Point Elliott when it enacted the ICCTA. The Court finds that it did not." ER0009. The court held that "Congress has not clearly abrogated the Tribe's treaty right of exclusive use, [and] that right remains enforceable in federal court." ER0011.

In response, BNSF filed a Motion for Clarification and, if Necessary, Reconsideration asking the district court to clarify whether it ruled on the Tribe's possessory interest to the property at issue, which it claimed the Tribe had not established. ER1116–ER1122. The Tribe responded that (1) its claims did not arise

directly under the Treaty, but the Easement; (2) the Trespass Litigation resolved the ownership issue; and (3) BNSF had never previously disputed ownership in the present litigation. ER0038. The district court clarified that it "relied on the record evidence showing that the Tribe has a treaty right to the land under BNSF's tracks" and denied the motion for reconsideration. ER0006.

BNSF filed a motion to certify these three orders for interlocutory appeal, which the district court granted on May 15, 2018. ER0001. BNSF filed its Petition for Interlocutory Review on May 25, 2018. The Tribe did not contest interlocutory review, but disagreed with the background provided by BNSF and the scope of requested relief. This Court granted BNSF's Petition on August 21, 2018. ER0035.

## SUMMARY OF ARGUMENT

1.     BNSF's historical operation of the railroad constituted a blatant trespass on the Reservation that was not, and cannot, be exonerated by mere citation to ICCTA, which BNSF concedes does not authorize a railroad to intrude on tribal lands in the first instance. Instead, only once the Easement was issued by DOI with the Tribe's consent, did BNSF cease to be a trespasser and lawfully conduct operations on the line. The Easement contained express volume restrictions: limiting BNSF to 25-cars per-direction, per-day, which could be exceeded only with prior, written authorization of the Tribe. This was an implicit admission by BNSF that it would not only be bound by these terms, but that

adherence would not interfere with its common-carrier obligations. Tribal consent—which, here, was predicated on BNSF's promised adherence to explicit restrictions—is mandatory for any railroad operating on tribal lands. The Tribe is entitled under the Easement, its Treaty-rights, the IRWA, and federal common law to seek prospective, injunctive relief to hold BNSF to them. These authorities can be readily harmonized with ICCTA: STB regulation of rail operations over tribal lands must be confined to the consensual terms incorporated into the applicable IRWA right-of-way.

2.      BNSF misleads the Court in describing the scope of ICCTA and common-carrier service. It overstates the rights of a common-carrier to operate when it lacks property rights to use land underlying rail tracks. It further overstates the scope of ICCTA's preemption provision, which courts routinely find does not preempt, or more properly, repeal other conflicting federal law. Most critically, however, BNSF wholly ignores the massive body of federal Indian law that governs this analysis. Tribes are not, as BNSF asserts, "local" entities, but separate sovereigns with authority to regulate the use of their lands and exclude non-Indians therefrom. The United States' unique role as trustee over tribal lands requires that federal treaties, agreements and federal law be liberally construed in favor of protecting Indian rights, with ambiguities resolved in favor of tribes.

3.      In light of the applicable standards of construction, ICCTA did not abrogate or repeal the Tribe's Treaty and federal common law rights to exclude non-Indians from Reservation land, or the IRWA. Instead, these authorities can be harmonized with ICCTA.

The Treaty, which is on equal footing with federal statutes, was not abrogated by ICCTA. Indeed, Indian treaty rights are not abrogated absent clear congressional intent, which is lacking in ICCTA. The Treaty grants the Tribe the right of exclusive use of the Reservation. This right necessarily includes the right to impose conditions for entry *and* to eject non-Indians who fail to comply with those conditions. Indeed, this hallmark of Indian sovereignty necessarily exempts Indian tribes from applications of the ICCTA that impinge upon their right to exclude.

The IRWA codifies this Treaty right, which is also recognized under federal common law, by requiring tribal consent before a right-of-way may be issued for any purpose, including rail operations, over tribal land. The Secretary of the Interior is expressly authorized to impose and enforce conditions on a right-of-way. Although common-carrier obligations and the federal rail regulatory scheme existed at the time that the IRWA was enacted, Congress did not exempt railroads from its terms or restrict the authority of DOI to impose restrictions on railroads seeking rights-of-way over tribal lands. The IRWA therefore operates in tandem

with ICCTA, prescribing the outer-bounds of rail operations on tribal land and the STB's authority thereof. Indeed, recognizing STB's operating approval is *permissive* rather than a right, the STB defers to DOI and federal courts to resolve property-rights issues involving railroads operating on Indian land.

4. The Tribe is therefore entitled, based upon its Treaty and federal common law rights, to pursue the remedy of injunction to enforce the conditions in its DOI-issued Easement. This is provided for in the Easement itself, which requires BNSF to obtain prior, written permission before exceeding the maximum number of daily railcars or trains. It is provided for under the Treaty, which is self-enforcing. And it is provided for under federal common law, which unequivocally allows for injunctive relief in tribal trespass cases. Nothing in ICCTA indicates that Congress intended that these federal remedies be limited or eradicated, and a contrary finding would effectively repeal the IRWA and impermissibly abrogate the Treaty right.

## ARGUMENT

**I.** **The contested terms of the Easement were the basis of the Tribe's consent; BNSF's failure to comply constitutes a trespass on Tribal land.**

BNSF's brief omits the exploitive history of its rail line: that it was built on the Reservation and used without the Tribe's or the United States' permission, and that their eventual consent was entirely contingent upon BNSF's adherence to strict limitations in use. BNSF now attempts to disregard its historical trespass and

legitimize its current, ongoing trespass by arguing that this consideration became irrelevant the moment it began operating on the line. *See* Br. at 49 ("regulated common-carrier service has been underway for a century on an *existing* railroad" across the Reservation). But this cannot be the case. BNSF acknowledges that "[b]efore a rail carrier can construct or operate a railroad line that will be part of the interstate rail network, it must obtain authorization from the STB." Br. at 11; *see also* Br. at 10 ("STB's exclusive prerogative[] is determining whether common-carrier rail service will commence or terminate on a particular rail line."). BNSF does not, however, provide any authority that the STB can grant the *right* to operate common-carrier service over any property; to the contrary, the STB has repeatedly confirmed that its authorization is *permissive* only and railroads must still obtain necessary property rights to use the underlying land. *See California High-Speed Rail Authority—Construction Exemption—In Fresno, Kings, Tulare, and Kern Counties, Cal.*, 2014 WL 3973120, at *8, *12 (S.T.B. Aug. 11, 2014) (recognizing authority is permissive and issues outside of the STB's control, such as property rights, may prevent operations). Likewise, BNSF acknowledges that DOI has no ability to authorize common-carrier service across tribal land. Br. at 70–71.

BNSF's prior use of the rail segment was a trespass. BNSF is completely incorrect, therefore, when it argues that "[t]he Transportation Act of 1920 made the

preexisting common-carrier service on the line subject to the ICC's (and now the STB's) exclusive jurisdiction." Br. at 44–45; *see also* Br. at 14. BNSF's illegal operation over tribal land did not place the line within the exclusive purview of the ICC or STB. *See* Br. at 51 ("ICCTA does not authorize a railroad to intrude on a tribe's reservation lands in the first instance."); *compare City of Des Moines v. Chicago & N.W. Ry. Co.*, 264 F.2d 454, 457 (8th Cir. 1959) (finding valid dedication made to railroad and existing at enactment of Transportation Act of 1920 brought railroad within power of ICC), *with United States v. S. Pac. Transp. Co.*, 543 F.2d 676, 699 (9th Cir. 1976) (*Southern Pacific I*) (railroad operating on tribal land without valid right-of-way was trespasser); *Town of Conway v. Atl. Coast Line R. Co.*, 20 F.2d 250, 260 (E.D.S.C. 1926) (holding abandonment certificate not required where railroad was initially a trespasser). As the *Southern Pacific* cases make clear, railways impermissibly built on tribal lands constitute trespass and lack authority for use absent express consent from DOI and the respective tribe. *S. Pac. Transp. Co. v. Watt*, 700 F.2d 550, 556 (9th Cir. 1983) (*Southern Pacific II*) (requiring tribal consent); *Southern Pacific I*, 543 F.2d at 699.

BNSF concedes that the Treaty "grants the Tribe an exclusive right to use the Reservation—it need not allow a railroad on its land to begin with." Br. at 51. BNSF contends, however, that its "existing activity" on the Reservation renders this right inapplicable here. *Id.* To the extent that BNSF refers to its pre-Easement

use, the Treaty was executed long before the railway was constructed and the Tribe never allowed BNSF on its land to begin with; instead, it actively opposed the railroad's construction. Only after the Easement was issued—and pursuant to its terms and restrictions—did BNSF have *any* authority to conduct rail operations on Reservation lands. Only then did BNSF cease being a trespasser. *See* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW §15.09[4] (Nell Jessup Newton et al. eds., 2012) ("COHEN") ("Unless there has been compliance with a right-of-way statute, the user of a right-of-way over Indian lands obtains no interest in those lands and may be held to be a trespasser."). It cannot be the case, as BNSF asks, that the courts are required to force a sovereign Indian tribe to suffer an unrestricted and perpetual trespass on its lands simply because the trespasser is a railroad.

Moreover, BNSF voluntarily executed the Easement Agreement with the United States and the Tribe to settle the Trespass Litigation and requested that DOI issue the Easement. ER0966–ER0983. As BNSF's historical background indicates (Br. at 6–8), the same common-carrier obligations existed when BNSF agreed to the Easement's terms in 1991 as they do today under ICCTA; accordingly, the Easement Agreement must be construed as an admission by BNSF that the maximum car limitation would not impinge on its common-carrier obligations. *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 221 (4th Cir. 2009) (quoting *Township of Woodbridge v. Consol. Rail Corp.*, 2000 WL 1771044,

at *3 (S.T.B. Dec. 1, 2000)). The STB confirms that "the preemption provisions should not be used to shield the carrier from its own commitments, and 'voluntary agreements must be seen as reflecting the carrier's own determination and admission that the agreements would not unreasonably interfere with interstate commerce.'" *Boston & Maine Corp. & Town of Ayer*, 2001 WL 458685, at *5 (S.T.B. Apr. 30, 2001) (quoting *Township of Woodbridge*, 2000 WL 1771044, at *3); *but cf. Louisville & Nashville R.R. v. Mottley*, 219 U.S. 467, 478–80 (1911) (excusing railroad's performance under settlement agreement when subsequent change in law made terms illegal).

Ultimately, this is a problem of BNSF's own making. BNSF misrepresented the scope of its anticipated common-carrier obligations to the Tribe during settlement negotiations, and BNSF apparently failed to inform the refineries of the limitations on the number of cars it could transport across the Reservation each day. Had BNSF sought permission from the Tribe before running unit trains over the Reservation—as required by the Easement—it could have learned that the Tribe would *not* consent to an increase in cars. This information could have been conveyed to the refineries *before* they made investments to expand their facilities. Or if BNSF believed it had a right to unlimited use of Tribal land, it could have sought clarification *prior* to overburdening the Easement. Instead, BNSF did none

of these things, and chose to simply ignore the Tribe's notice of the Easement conditions.

The Tribe has both Treaty and federal common law rights to exclude, set and enforce conditions for entry, and evict non-Indians from the Reservation. As detailed below, nothing in ICCTA or the railroad regulatory scheme interferes with these rights. *See, e.g.*, *United States v. Dion*, 476 U.S. 734, 745 (1986) (legislative history of Eagle Protection Act amendments plainly showed an "unmistakable and explicit" policy choice to abrogate treaty hunting rights). The Tribe's rights under the Treaty, the IRWA, and the federally-issued Easement can be readily harmonized with ICCTA and the STB's jurisdiction over rail operations. Specifically, the STB retains its authority to regulate common-carrier rail operations over Indian lands, but only within the confines of terms and restrictions imposed by the DOI when approving the applicable right-of-way that is to be used for common-carrier purposes. This interpretation gives effect to both ICCTA and IRWA.

## II. BNSF provides an incomplete picture of the relevant statutory and legal framework.

### A. BNSF overstates the scope of ICCTA and its predecessors.

BNSF provides an extensive treatise on the history and purpose of common-carrier obligations and centralized regulation of the railroads by a federal authority.

BNSF's recitation of the law, however, is incomplete and inaccurate in two critical areas.

First, BNSF misleads the Court regarding continuation of common-carrier service when a railroad loses the right to enter the underlying land. BNSF principally relies on two cases, neither of which pertain to anything remotely similar to federally issued rights-of-way over tribal trust lands. In *Tex-Mex*, the Supreme Court held that a certificate of abandonment was required before a common-carrier railroad could cease operations after the termination of a trackage agreement —not a "[land] contract" as BNSF misstates—between two common-carrier railroads in which one railroad agreed to allow the other to use its tracks. *Thompson v. Texas Mexican Ry. Co.*, 328 U.S. 134, 145 (1946) (*Tex-Mex*). *Tex-Mex* is wholly distinguishable because it has nothing to do with use of land, consent, or trespass; indeed, the Court concluded that the ultimate purpose of the dispute was to obtain damages, not ouster. *Id.* at 140. And critically, unlike *Tex-Mex*, the Tribe does not seek to evict BNSF from the Easement, only to enforce its terms. Issues of abandonment and trackage agreements—which are within the exclusive jurisdiction of the STB—are not implicated here. *See* 49 U.S.C. § 11323(a)(6).

BNSF's other case, *City of Des Moines*, is similarly unhelpful. It involved a city's attempt to oust a railroad for violation of an 1873 ordinance, which granted

easement rights. *City of Des Moines*, 264 F.2d at 455–56. The Eighth Circuit held that the ICC's permission to abandon the line was necessary because as a valid grant existing at the time of the Transportation Act of 1920, the line became subject to the ICC's jurisdiction. *Id.* at 457. Here, BNSF did not have a valid grant apart from the Easement, which provided only limited rights to use the Reservation and which was not effective until 1991. Further, abandonment is not at issue here. Neither of these cases support BNSF's contention that the Tribe is required to institute abandonment proceedings to enforce the Easement, which BNSF continues to breach.

Second, BNSF overlooks the substantial body of law clarifying that ICCTA's preemption language is not absolute. The preemption provision (which BNSF selectively quotes) states:

> (b) The jurisdiction of the Board over—
>
> > (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
> >
> > (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b). But "although a literal reading of section 10501(b) might suggest that it supersedes other federal law, the Board and the courts have rejected such an interpretation as overbroad and unworkable. Instead, the Board and the courts have harmonized section 10501(b) with federal statutes." *CSX Transp., Inc.—Petition for Declaratory Order*, FD 34662, 2005 WL 584026, at *8 (STB Mar. 14, 2005); *see, e.g.*, *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 523 (6th Cir. 2001) (harmonizing ICCTA and FRSA).

## B. BNSF ignores applicable Indian law to mislabel the Tribe as a "local" interest.

BNSF's brief misleadingly relegates the Tribe to a "local" interest or entity, with the same status of states, municipalities and private parties. It does this to invoke the preemption language applicable to such entities found in the cases BNSF extensively relies on, but which is wholly irrelevant here where there are no state or local regulations to preempt. The Tribe is not a local interest or entity. BNSF can make this false analogy only by ignoring Indian law and the deferential canons of constructions regarding laws applicable to Indian tribes. This framework is crucial to understanding the specific and unique context of this case.

"Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory; they are 'a separate people' possessing 'the power of regulating their internal and social relations . . . .'" *United States v. Mazurie*, 419 U.S. 544, 557 (1975) (internal citations omitted). "Indian tribes

within 'Indian country' are a good deal more than 'private, voluntary organizations.'" *Id.*; *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 146 (1982). Federal law pertaining to Indians—and in particular, reservation lands—establishes that the United States owes a special duty to Indian nations. *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 335 (1983) (recognizing "Congress' overriding goal of encouraging 'tribal self-sufficiency and economic development'" and that as a "necessary implication of this broad federal commitment, we have held that tribes have the power to manage the use of its territory and resources by both members and nonmembers."); *see also Morton v. Mancari*, 417 U.S. 535, 552 (1974); COHEN §5.04[3][a].

Specific canons of interpretation govern Indian law cases and require liberal construction of applicable law and agreements, with resolution of ambiguities in favor of tribes. COHEN §2.02[1]. "Courts have uniformly held that treaties, statutes and executive orders must be liberally construed in favor of establishing Indian rights. Any ambiguities in construction must be resolved in favor of the Indians. These rules of construction 'are rooted in the unique trust relationship between the United States and the Indians.'" *Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 340 (9th Cir. 1996) (internal citations omitted); *see also Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) ("[T]he standard principles of statutory construction do not have their usual force

in cases involving Indian law. . . .") (quoting *Oneida Cty. v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985) (*Oneida II*)). "Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143–44 (1980); *see also Bryan v. Itasca County*, 426 U.S. 373, 392 (1976) ("Statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians."); *Choate v. Trapp*, 224 U.S. 665, 675–76 (1912) (applying canons to agreement and federal law providing for allotment and non-taxability of tribal land). ICCTA's preemption provision does not expressly apply to Indians. Any ambiguities in its intersection with the IRWA or the Tribe's rights under the Treaty and federal common law must be construed in favor of protecting the Tribe, its Treaty right and its Reservation land.

## III. ICCTA can be harmonized with the IRWA, the Treaty and federal common law.

### A. Implicit repeals are highly disfavored and courts must endeavor to harmonize conflicting federal statutes.

If a later-enacted statute does not expressly repeal existing federal laws, the court must consider whether there was an implicit repeal of an earlier statute. Implicit repeals are disfavored. "One federal statute does not preempt another. When two federal statutes address the same subject in different ways, the right

question is whether one implicitly repeals the other—and repeal by implication is a rare bird indeed." *Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004) (Easterbrook, J). "Repeal is to be regarded as implied only if necessary to make the (later enacted law) work, and even then only to the minimum extent necessary. This is the guiding principle to reconciliation of the two statutory schemes." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007). All issues regarding Indians are the subjects of *federal*, not state, law. *See Oneida Indian Nation v. Oneida Cty.*, 414 U.S. 661, 667 (1974) (*Oneida I*); *United States v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009). Accordingly, because only federal statutes, rights and remedies are implicated in this case, "preemption" is not the issue, but repeal and abrogation.

These principles apply to ICCTA. "If an apparent conflict exists between ICCTA and a *federal* law, then the courts must strive to harmonize the two laws, giving effect to both laws if possible." *Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097 (9th Cir. 2010) (holding EPA-approved statewide environmental plans are not preempted). Indeed, ICCTA has been successfully harmonized with multiple federal statutes and regulations. *See, e.g.*, *BNSF Ry. Co. v. Cal. Dep't of Tax and Fee Admin.*, 904 F.3d 755, 761 (9th Cir. 2018) (holding fees permitted in HMTA not preempted by ICCTA); *Tyrrell*, 248

F.3d at 522–23 (holding Congress did not intend ICCTA to repeal FRA's authority under FRSA to regulate rail safety); *United States Envtl. Prot. Agency—Petition for Declaratory Order*, FD 35803, 2014 WL 7392860, at *7 (S.T.B. Dec. 29, 2014) (stating, in advisory opinion, that state agency's implementation of locomotive-idling emissions regulations would be preempted and acknowledging "actions taken and regulations enacted under . . . federal statutes may directly conflict with the purposes and regulatory scheme under the Interstate Commerce Act. When such conflict occurs, the Board or a court must determine whether the two federal statutes and their applicable regulatory schemes can be harmonized."); *Holland v. Delray Connecting R.R. Co.*, 311 F. Supp. 2d 744, 747–52 (N.D. Ind. 2004) (ICCTA did not repeal Coal Industry Retiree Health Benefits Act); *BNSF Ry. Co. v. Albany & E. R.R. Co.*, 741 F. Supp. 2d 1184, 1198 (D. Or. 2010) (Sherman Act not preempted).

Before the district court, BNSF argued that harmonization was not possible because ICCTA's preemption clause was dispositive and any other reading would erase its common-carrier obligations. ER1103–ER1104. BNSF has now reversed course, recognizing that as the party claiming that two statutes cannot be harmonized it "bears the heavy burden of showing a clearly expressed congressional intention." *BNSF*, 904 F.3d at 761 (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018)). BNSF has not met this burden. And BNSF's newly-

proposed "harmonization" is nothing more than a new guise for its abiding objective of eradicating DOI's statutory authority to impose conditions on rights-of-ways in favor of unlimited common-carrier use.

### B. The Treaty can be harmonized with ICCTA.

#### i. The district court correctly found that ICCTA did not diminish the Tribe's rights under the Treaty.

The district court correctly held that the Treaty's right of exclusive use includes the right to enjoin unauthorized uses and trespasses on the Reservation. ER0010. "[A] hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands." *Merrion*, 455 U.S. at 141; *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 806 (9th Cir. 2011) ("[I]n light of the long-recognized power of Indian tribes to exclude non-Indians from Indian-owned land . . ."). The Treaty right of exclusive use also necessarily includes the subsidiary right to impose enduring conditions for entry on the Tribe's land. *Merrion*, 455 U.S. at 141 ("When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its ultimate power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry."); *Mescalero Apache Tribe*, 462 U.S. at 333 ("A tribe's power to exclude nonmembers entirely or to condition their presence on the reservation is equally well established.").

As a general matter, because treaties are on equal Constitutional footing with statutes, there is a presumption that newly enacted statutes do not abrogate existing

treaties. *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 724 F.3d 230, 240 (D.D.C. 2013). Congressional intent to abrogate Indian treaty rights in particular must be "clear and plain," and "absent explicit statutory language" the Supreme Court has been reluctant to find congressional abrogation of Indian treaty rights. *Dion*, 476 U.S. at 738–39. "What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Id.* at 739–40; *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999); *cf. South Dakota v. Bourland*, 508 U.S. 679, 687 (1993) (finding clear congressional intent to abrogate treaty). This analysis, as applicable to the Treaty right of exclusive use in particular, is completely consistent with the general rule that "Indian tribes retain 'attributes of sovereignty over both their members and their territory,' to the extent that sovereignty has not been withdrawn by federal statute or treaty." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987); *see also Water Wheel*, 642 F.3d at 808 ("We first acknowledge the long-standing rule that Indian tribes possess inherent sovereign powers, including the authority to exclude . . . unless Congress clearly and unambiguously says otherwise.").

ICCTA does not mention Indian treaties, land or treaty rights at all, nor does the congressional record indicate that Congress considered ICCTA's impact on Indian treaty rights. The Court must therefore affirm the district court's ruling that

the Tribe's Treaty right to exclude or condition presence on the Reservation has not been abrogated by ICCTA.

### ii. BNSF'S proposed harmonization is a sham that would eviscerate the hallmark of sovereignty over tribal lands.

In its attempt to evade this conclusion, BNSF makes two arguments. First, it claims the Treaty is irrelevant because the Tribe has not accused BNSF of violating the Treaty. Br. at 47. The Treaty's relevance is two-fold: (1) the Treaty reserved and confirmed the Tribe's possessory rights and right to exclude, which provides the foundation for the IRWA and the required Tribal consent for the Easement; and (2) the Treaty, along with the IRWA and the DOI-approved Easement, demonstrate that the Tribe's rights arise under federal, and not state law. ER0011. Further, the Tribe did not concede that the Treaty was irrelevant (Br. at 47 (citing ER0044)); it merely clarified, in responding to BNSF's attempts to re-litigate ownership of the land in question, that the Tribe's claim for trespass is based upon BNSF's violation of the Easement limitations, rather than a claim for violating the Treaty, so the Tribe's burden of proof is limited to showing that BNSF materially breached the Easement. But that does not mean that the Treaty is irrelevant to the Tribe's claims as the foundation of its right to enjoin BNSF's conduct. *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 512 (9th Cir. 2005) ("[T]reaties constitute the 'supreme law of the land' and they have occasionally been found to provide rights of action for equitable relief against non-contracting parties."). There is a

distinction between the Tribe's *claim* for breach of the Easement and its underlying Treaty and common law *right* to exclude and enjoin non-consensual conduct on the Reservation as a remedy.

Second, BNSF repeatedly contends that the Treaty is "entirely silent" or "says nothing" as to remedies, that "the Treaty guarantees no specific remedies for violations of the rights it establishes," providing at most "background remedies" under federal common law, and therefore, that injunctive relief is not available. Br. at 45–49. But as this Court recognized, the Supreme Court has held that the Stevens treaties are, by their own explicit terms, "self-enforcing" and do not require implementing legislation to form the basis for relief. *Skokomish Indian Tribe*, 410 F.3d at 512; *Fishing Vessel*, 443 U.S. at 693 n.33. BNSF's argument disregards more than a century of decisions of this Court and the Supreme Court repeatedly enforcing the terms of the Stevens treaties. *Skokomish*, 410 F.3d at 512; *see also United States v. Winans*, 198 U.S. 371, 384 (1905) (upholding Yakima Nation's treaty fishing rights and requiring removal of non-Indian "fishing wheels" that obstructed those rights); *Fishing Vessel*, 443 U.S. at 681.

Federal courts have authority to enjoin conduct that obstructs federal treaty rights. *United States v. Washington*, 459 F. Supp. 1028, 1031 (W.D. Wash. 1974). The Supreme Court confirmed the federal courts' authority to enter necessary orders to remedy violations of Treaty rights—even state court proceedings. *Fishing*

*Vessel*, 443 U.S. at 695–96. More recently, this Court followed *Fishing Vessel* to affirm a permanent injunction requiring correction of fish-barrier culverts. *United States v. Washington*, 853 F.3d 946, 978–80 (9th Cir. 2017), *rehrg. & rehrg. en banc den.*, 864 F.3d 1017 (2017), *aff'd by equally divided court* 138 S. Ct. 1832 (2018). This authority confirms that the Treaty is self-enforcing, the federal courts have jurisdiction, and the Tribe has more than the "background remedies" ascribed by BNSF to remedy BNSF's ongoing trespass.

Ignoring these cases, BNSF instead speciously relies on *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005) (*Oneida III*). In *Oneida III*, the Oneidas sought to reassert sovereignty and avoid taxes on lands acquired in fee simple, which had formerly been within the reservation, but had been voluntarily relinquished to non-Indians in the early 1800s. *Id.* at 203–12. The Court held that equitable factors—notably the long period of time that tribe had waited to assert a claim, long after the land had been owned, developed and governed by non-Indians for nearly 200 years—prevented the tribe's request for unification of aboriginal and fee title. *Id.* at 214–16. But there are no parallels between the Oneidas and BNSF. First, the Supreme Court did not hold that unification was unavailable as a remedy generally, only that it was equitably barred under the circumstances, a result consistent with the decisions of this Court and the Supreme Court enforcing the Stevens treaties. Second, BNSF grossly distorts the factual history here, and

*Oneida III* explicitly evaluated the relief sought "in light of the long history" involved. *Id.* at 214. Here, BNSF trespassed on the Reservation to build the railroad, and it used that railroad for nearly a century *before* finally acquiring Tribal consent and federal approval of a limited right to use the land. The fact that the railway already existed was due to BNSF's own malfeasance; it cannot rely on its historical misconduct to justify eradicating the Treaty right to exclude. Contrary to BNSF's reading, the equitable principles espoused in *Oneida III* are best applied to negate BNSF's belated pleas that STB's authority and its common-carrier obligations are determinative.

BNSF attempts to "harmonize" the Treaty and ICCTA by proposing that the Treaty only permits the Tribe to disallow a railroad's entry on its land in the first instance. Br. at 51. BNSF then argues that consent to entry on Tribal land is all or nothing: "an ordinary treaty right of exclusive use is not a license for a tribe to opt out of federal law by attaching conditions to the use of its reservation. No land owner, tribal or otherwise, can use property rights to violate federal law." Br. at 52. But attaching conditions to the use of Tribal trust land does not "opt out of" or "violate" federal law; rather, it is explicitly authorized by federal law. Not only is the Treaty *itself* federal law (as opposed to a common law property right), but by its very terms, the IRWA authorizes the Secretary of the Interior to grant rights-of-way "*subject to such conditions as he may prescribe*." 25 U.S.C. § 323 (emphasis

added). That is precisely the circumstance here: the Tribe consented to an easement with conditions proposed by BNSF, and DOI approved the Easement with those conditions.

By running far more trains and railcars over the Easement than the attached conditions allow, without the Tribe's prior, written agreement, BNSF has exceeded the scope of the Tribe's consent and DOI's approval. This is fundamentally no different than entering tribal land without consent to begin with. Indeed, overburdening an easement is itself a trespass. *Sanders v. City of Seattle*, 156 P.3d 874, 882–83 (Wash. 2007).

BNSF points to no authority that an *Indian tribe* forgoes conditions imposed on the use of its trust land when it grants and DOI approves an easement with conditions to a railroad. Instead, BNSF relies on the wholly distinguishable *Baltimore* case to assert that the Easement conditions cannot be enforced. *United States v. Baltimore & Ohio R.R.*, 333 U.S. 169 (1948) (*Baltimore*). In *Baltimore*, a railroad contracted with a private stockyard to use a spur located on the stockyard's property to service other businesses on the line. *Id.* at 171–72. The initial contract permitted unrestricted use of the tracks, provided that the railroad's use did not interfere with the owner's business. *Id.* The agreement was subsequently amended to permit uninterrupted use, but required the railroad to pay repair expenses. *Id.* at 172. The stockyard realized that it was losing business to other stockyards down

the line, so it modified the agreement, requiring that the railroad either stop carrying livestock or pay it a fee equivalent to what it would have collected had the livestock been delivered to it. *Id.* at 173. The railroad decided to stop delivering livestock to other customers; the competitors sued. *Id.* at 174. The Supreme Court held that a noncarrier owner of a rail segment could not regulate by contract the type of commodities that the railroad could transport over the segment because such a restriction would be invalid under the Interstate Commerce Act. *Id.* at 175–78.

There are four critical distinctions here. First, the Tribe is not a private entity with a private contract, but a sovereign with Treaty and federal common law rights to exclude non-Indians from the Reservation, and a federally-issued easement authorizing only limited use of the Reservation. *Mazurie*, 419 U.S. at 557 ("Indian tribes within 'Indian country' are a good deal more than 'private, voluntary organizations.'"). The enforceability of private agreements with railroads is simply outside the scope of this case. Second, the Easement restrictions were not unilaterally imposed by the Tribe, but were proposed by BNSF after lengthy negotiations and approved by DOI in settlement of the Trespass Litigation. Third, in *Baltimore*, the restriction was a restraint on trade that sought only to impose conditions on rail service to competitors; here, the Tribe is not competing with BNSF or the refineries it serves. And finally, in *Baltimore* the restriction did not

exist at the inception, but was added *after* the carrier had started offering

unrestricted common-carrier service on the segment. Here, there was no authorized

use of the Reservation segment that did not contain restrictions.

In contrast to *Baltimore*, federal law that does concern Indian tribes in the

context of federal rail policy makes clear that Indian rights must be considered and

given appropriate deference. *N.M. Navajo Ranchers Ass'n v. ICC*, 702 F.2d 227,

230–33 (D.C. Cir. 1983) (ICC erred in failing to consider violations of IRWA

when granting petition to build new rail line over Indian owned land). Indeed, Title

49—the Title in which ICCTA is codified—expressly provides that "[n]othing in

this Title shall absolve the United States from any responsibility to Indians and

Indian tribes, including responsibilities derived from the trust relationship and any

treaty, executive order, or agreement between the United States and an Indian

Tribe." 49 U.S.C. § 102(f)(2)(B).

As detailed above, "[i]t is well established that treaties should be construed

liberally in favor of the Indians, with ambiguous provisions interpreted to their

benefit. 'Absent explicit statutory language,' this Court accordingly has refused to

find that Congress has abrogated Indian treaty rights." *Oneida II*, 470 U.S. at 247

(internal citations omitted). Given the applicable canons of construction and

federal policy of deference to tribal Treaty rights, the only way to harmonize

ICCTA and the Treaty is to find either that ICCTA does not apply to Indian lands

or that its terms apply only so long as they do not interfere with the Tribe's Treaty rights to exclude or condition entry on specific terms. In other words, ICCTA is effective only within the confines of tribal consent, and cannot be utilized by BNSF to unilaterally expand the scope of that consent against the Tribe's will. The Tribe does not contend that its Treaty-reserved right to exclusive use eclipses all federal laws, but rather that the provisions of ICCTA relied upon by BNSF have not abrogated that right. The Tribe is entitled to seek an injunction to enforce the conditions of the Easement that are rooted in its Treaty and corollary federal statutory and common law rights to exclude or condition entry by non-Indians on Reservation land.

### iii. The Treaty nullifies ICCTA's wholesale application to the Tribe.

Typically, if Congress intends for federal statutes to apply to Indians, it specifically says so. For example, the Hazardous Materials Transportation Act expressly applies to Indian tribes. 49 U.S.C. § 1811(a)(1)–(2). ICCTA does not expressly apply to Indian treaty rights or lands; indeed, neither are mentioned at all. Accordingly, BNSF and its amicus Tesoro rely upon what they describe as "the established rule that federal statutes of general application routinely apply on tribal lands." Br. at 54; Tesoro Br. at 17–18.

But in the district court BNSF referenced the analysis of statutes of general applicability in *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113 (9th Cir.

1985) and its progeny only in passing, in response to the Tribe's motion for reconsideration. ER1110–ER1115. The district court consequently did not address the issue. BNSF waived this argument by failing to adequately raise it below. *Tibble v. Edison Int'l*, 843 F.3d 1187, 1193 (9th Cir. 2016) (en banc); *Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 869 (9th Cir. 2013); *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) ("[A]n issue will generally be deemed waived on appeal if the argument was not raised sufficiently for the trial court to rule on it.") (internal quotations omitted).

BNSF was wise not to rely upon the argument below. While laws of general applicability are construed to apply to Indian tribes, there are three exceptions to this rule: "(1) the law touches 'exclusive rights of self-governance in purely intramural matters'; (2) the application of the law to the tribe would 'abrogate rights guaranteed by Indian treaties'; or (3) there is proof 'by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations." *Donovan*, 751 F.2d at 1116 (quoting *United States v. Farris*, 624 F.2d 890, 893–94 (9th Cir. 1980)). The second exception applies here.

*Donovan* and subsequent cases concern the application of federal worker-protection laws to a tribe's commercial activities. *See Donovan*, 751 F.2d at 1114 (applying OSHA to tribal farm); *United States Dep't of Labor v. Occupational Safety & Health Review Comm'n*, 935 F.2d 182, 186–87 (9th Cir. 1991) (applying

OSHA to tribal sawmill); *Lumber Indus. Pension Fund v. Warm Springs Forest Prods. Indus.*, 939 F.2d 683, 685–86 (9th Cir. 1991) (applying ERISA to tribal sawmill with employee pension fund). In these cases, the tribes cited their sovereign or treaty exclusionary rights to shield their commercial operations from federal oversight, but this Court denied those efforts, finding no connection between the tribes' commercial activities and their treaty rights that could create a sufficient conflict between the federal law and the right to exclude. *See Occupational Safety*, 935 F.2d at 186–87 ("The conflict must be more direct to bar the enforcement of statutes of general applicability.").

Here, there is a direct connection between the Tribe's Treaty-reserved land rights and the Easement conditions that BNSF seeks to eliminate through application of ICCTA. BNSF's unrestricted use of the Reservation would eviscerate the Tribe's right to exclude. To the extent that ICCTA cannot be harmonized with the Treaty, the IRWA and the Easement, and to the extent that BNSF's *Donovan* argument will be considered in this appeal, BNSF's proposed application creates precisely the type of sufficient direct conflict with the Treaty-reserved right that application of ICCTA against the Tribe is barred. *See id.*; *United States v. Smiskin*, 487 F.3d 1260, 1263–64 (9th Cir. 2007) (dismissing indictments under *Donovan* exception because they violated "Right to Travel" provision of Yakama Treaty).

In comparison, in *Occupational Safety*, the tribe did not oppose substantive application of OSHA, but opposed federal officials entering tribal lands to enforce it; this Court recognized that the federal government is implicitly authorized to enforce laws that apply to Indians and may impinge upon tribal exclusionary rights to do so. *Occupational Safety*, 935 F.2d at 186. But BNSF is not a federal official entering the Reservation to enforce federal law; it is a private party seeking to use federal policy to repudiate its prior voluntary commitments to use Reservation land against the Tribe's will. Permitting government inspectors to temporarily enter tribal lands is a far cry from allowing a railroad to permanently occupy the Reservation without restrictions. The access that BNSF seeks would "abrogate rights guaranteed" by the Treaty. *Donovan*, 751 F.2d at 1116. Accordingly, ICCTA's substantive provisions cannot apply to the Tribe or the Reservation— except to the extent and under the conditions that the Tribe and DOI authorize rail use pursuant to a right-of-way issued under IRWA.

## C. The IRWA can be harmonized with ICCTA.

### i. ICCTA did not repeal the IRWA.

As discussed above, BNSF has not shown congressional intent to impliedly repeal the IRWA. Further, the IRWA is a narrow and specific statute applicable to a constrained universe of circumstances: the issuance of easements over Indian trust land. In contrast, "[t]he preemption provision of the ICCTA is broad and general, providing without differentiation for preemption of state and local

regulation of railroad 'rates, classifications, rules, . . . practices, routes, services, and facilities.'" *BNSF*, 904 F.3d at 766. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987) (emphasis omitted) (quoting *Radzanower*, 426 U.S. at 153); *BNSF*, 904 F.3d at 766. Applying this rule of construction, the IRWA as a specific statute will not be nullified by the broad and general ICCTA; they must be harmonized.

### ii. The IRWA expressly authorizes DOI to impose conditions on rights-of-way over tribal land.

In contrast to ICCTA, the IRWA expressly applies to Indians and railroads operating over Indian lands. As BNSF acknowledges, the IRWA was enacted to "simplify and provide uniformity to the law of Indian rights-of-way." COHEN §15.09[4]. But it also required the consent of tribes organized under the Indian Reorganization Act, thereby effectuating Congress's policy of promoting tribal self-governance and self-sufficiency and reinforcing treaty and federal common law rights for exclusive use of reservation lands. *Id.*; 25 U.S.C. § 324.

The IRWA is not simply a "procedural" statute as BNSF contends, but expressly authorizes the Secretary of the Interior to "grant rights-of-way for all purposes, *subject to such conditions he may prescribe*, over and across any lands now or hereafter held in trust by the United States for individual Indians or Indian

tribes . . . and any other lands heretofore or hereafter acquired or set aside for the use and benefit of Indians." 25 U.S.C. § 323 (emphasis added). Those conditions may be imposed on the use of tribal lands as are deemed "necessary for the adequate protection and utilization of the reservation." COHEN §15.09[4]. This power has been delegated to the BIA, which is in turn restricted in that it cannot grant a right-of-way over tribal lands "without the consent of the proper tribal officials." 25 U.S.C. § 324.

The BIA issues regulations under the IRWA. 25 U.S.C. § 328; 25 C.F.R. § 169.1 *et seq*. The currently-enacted regulations confirm that the purpose of the IRWA is "to support tribal self-determination and self-governance by acknowledging and incorporating tribal law and policies . . . and defer to the maximum extent possible to Indian landowner decisions regarding their Indian land." 25 C.F.R. § 169.1(a). The IRWA and its regulations also expressly apply to building *and operating* a railroad over tribal lands. 25 C.F.R. § 169.2; 169.5(a)(1). The BIA has interpreted its statutory directive to have always permitted conditions and restrictions in any easement granted by the BIA. *Star Lake R.R. v. Lujan*, 737 F. Supp. 103 (D.D.C. 1990) (agency's interpretation of its own statutory directives and regulations should be afforded deference and affirmed if not unreasonable). During the comment period on a recent revision of IRWA regulations, the BIA commented that "landowners may negotiate the terms to ensure the right-of-way is

best suited to their needs. Landowners currently have this option, but are often presented with a "take-it-or-leave-it" offer by the potential grantee, and fail to negotiate." 80 Fed. Reg. 72,492 (Nov. 19, 2015).

The BIA is also empowered to enforce the terms of rights-of-way issued. "Any . . . violation of the right-of-way grant or right-of-way document, including but not limited to encroachments beyond the defined boundaries, accidental, willful, and/or incidental trespass, . . . changes in use not permitted in the grant . . . may result in enforcement actions including, but not limited to, cancellation of the grant." 25 C.F.R. 169.401. Enforcement has always been permitted. 33 Fed. Reg. 19,803 (Dec. 27, 1968).

Moreover, although the IRWA does not itself provide for a cause of action against a violator of right-of-way terms, the implementing regulations confirm that tribes as well as DOI may pursue remedies under applicable law. 25 C.F.R. § 169.413 ("An unauthorized use within an existing right-of-way is also a trespass. We may take action to recover possession, including eviction . . . Indian landowners may pursue any available remedies under applicable law. . . ."). The applicable law is clearly enforcement of treaty and federal common law rights relating to *trespass* on Indian lands, not ICCTA, which does not speak to the issue of trespass.

### iii. ICCTA and the IRWA can be harmonized.

BNSF argues that there is no conflict between the IRWA and ICCTA because they operate in different areas: granting and rescinding property rights and addressing obligations of common-carrier by rail, respectively. Br. at 68. But the district court correctly ruled that the intersection of these spheres results in conflict, ER0024–ER0025, because the IRWA authorizes DOI to include restrictions that would interfere with certain common-carrier obligations of railroads.

Indeed, under BNSF's construction of the two statutes, DOI has authority to grant or rescind a right-of-way, including with restrictions, but lacks authority to actually enforce those restrictions once a railroad begins operating. In other words, other than offering carte blanche to railroad operations, DOI's authority is hollow. If DOI cannot enforce its own conditions, then it is toothless, despite the congressional decree otherwise.

BNSF's assumption that the IRWA does not authorize DOI to impose restrictions that interfere with common-carrier obligations is also belied by the context in which the IRWA was enacted. In 1948, when Congress passed the IRWA, the same common-carrier obligations existed. If Congress had intended to limit DOI's power to impose restrictions that impinged on these obligations, it could have done so; instead, it gave broad authorization to include any restrictions DOI deems fit for rights-of-way over Indian lands.

Similarly, BNSF unavailingly argues that right-of-way grants cannot nullify common-carrier obligations because IRWA regulations state that grants "are subject to all applicable Federal laws"; the central issue in this appeal is the extent to which ICCTA is "applicable." Br. at 69; 25 C.F.R. § 169.9(a). It defies reason to suggest that DOI intended a choice-of-law provision in a comprehensive update of its regulations, 80 Fed. Reg. 72,492 (Nov. 19, 2015), to implicitly limit its statutory authority to impose conditions. Instead, this provision must refer to federal laws that would not eliminate very terms of the IRWA itself. In turn, Congress must have considered the IRWA when it enacted ICCTA and would have used language to repeal it if so intended. *Blanchette v. Conn. Gen. Ins. Corp.*, 419 U.S. 102, 134 (1974).

If BNSF's argument prevails, so long as a railroad gets its foot in the door, any DOI-imposed conditions evaporate. Where tribal consent is predicated on such conditions, consent is illusory. Certainly here, had BNSF revealed its view that the bargained-for restrictions were not enforceable, the Tribe would not have consented, and no right-of-way would have issued. The only way that the IRWA can be harmonized with ICCTA is if DOI has authority to enforce all terms in its right-of-way grants over Indian lands. Likewise, as the Easement grantor, the Tribe must have authority to seek judicial enforcement of Easement terms with injunction as an available remedy. 25 C.F.R. § 169.413.

BNSF's "procedural-only" reading of the IRWA advocates for its
"effective" repeal. An effective repeal would "involve the compromise or
abandonment of previously articulated policies, and we would normally expect
some expression by Congress that such results are intended. Indeed, the
expectation that there would be some expression of an intent to 'repeal' is
particularly strong in a case like this one, in which the 'repeal' would extend to
virtually every case to which the statute had application." *United States. v. United
Continental Tuna Corp.*, 425 U.S. 164, 169 (1976). Particularly in light of the
canons of construction applicable to Indians, elimination of remedies afforded to a
tribe under applicable treaties and federal common law for enforcement of
easement conditions imposed on a railroad under the IRWA, would destroy any
meaningful right of the tribe to consent to railroad use of tribal land.

Harmonization must attempt to give effect to the provisions and policies of
each statute; BNSF's harmonization efforts fail to meaningfully preserve central
components of the IRWA. The only way to harmonize the IRWA and ICCTA,
such that both statutes are given effect, is to confine ICCTA and the STB's
authority to regulate rail operations over Indian lands to the terms of the
consensual grants given by the respective tribes under the IRWA. Tribes would
retain sovereignty and control over their own lands and would not become
subservient to the business decisions of non-Indian railroads and shippers unless

they so choose; DOI would retain authority to issue and enforce right-of-ways with restrictions; and the STB would retain authority to regulate rail operations over Indian lands, provided that such regulations and operations conformed to the applicable right-of-way terms.

### iv. Courts have recognized the STB's subservience to IRWA grants.

In practice, where the courts and STB have been confronted with a conflict between a railroad and an Indian tribe, the IRWA consent provisions have been dispositive, without any indication that conditions would be preempted. The *Star Lake* cases emphasize this hierarchy. In those proceedings, the ICC confirmed that its approval was not a substitute for other required permissions, such as easements, to use Indian land. *Star Lake R.R. Co.—Rail Constr. & Operation in Mckinley Cty., New Mexico*, FD 28272, 1987 WL 98276, at *5 (I.C.C. Apr. 10, 1987) ("Our authorization is permissive; applicants will have to obtain the easement or make some other acceptable arrangement before they can construct the line."). Later, the D.C. District Court upheld DOI's revocation of a right-of-way, even after the ICC had approved a railroad's use of the land. *Star Lake R. Co. v. Lujan*, 737 F. Supp. 103 (D.D.C. 1990). Indeed, the ICC deferred to DOI for matters involving tribal affairs, and the STB has continued to acknowledge DOI's responsibility for granting rights-of-way, handling disputes between tribes and grant-holders, and

enforcing those rights. *Alaska R.R. Corp.*, 2010 WL 1266781, at \*562 (S.T.B. Mar. 16, 2010).

> ### v. Harmonizing the IRWA and ICCTA does not interfere with federal rail policies.

Harmonizing the IRWA and ICCTA to confine the STB's authority over Indian lands to the scope of the IRWA-issued rights-of-way would not interfere with the general purposes of ICCTA or undermine the authority of the STB. It simply permits Indian tribes and DOI to impose and enforce limitations against railroads that are applicable to any non-Indian user of tribal lands. There is no risk of a slippery slope into a regulatory patchwork; railroads will remain free to negotiate with tribes as to whether to use tribal land and, if so, the conditions for doing so. *Cf. United States Envtl. Prot. Agency*, 2014 WL 7392860, at \*7 (applying preemption to prevent "patchwork" of unilaterally imposed local regulations).

The Easement in this case is unique; the Tribe is not aware of any other easement containing similar conditions. While BNSF would have this Court believe that enforcing this Easement would bring the entire interstate rail system to a halt, this is nothing more than fearmongering and speculation by BNSF and its amici, who wish to eviscerate the Tribe's rights in order to increase profits. The track in question serves only two customers located at the end of the line—both of which operated for decades with the 25 allotted daily cars and were able to fully obtain fuel stocks through other means.

## IV. The Easement's restrictions are enforceable by injunction.

### A. Federal common law provides for injunctive relief for trespasses on Indian lands.

Federal common law arises "when Congress has not spoken 'in an area comprising issues substantially related to an established program of government operation[, and] . . . federal courts [are] to fill the interstices of federal legislation according to their own standards." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727 (1979) (internal citations omitted). The question of statutory preemption of federal common law "involves an assessment of the scope of the legislation and whether the scheme established by Congress addresses the problem formerly governed by federal common law. When Congress has not spoken to a particular issue, federal common law applies." *Nat'l Audubon Soc. v. Dep't of Water*, 869 F.2d 1196, 1212 (9th Cir. 1988).

This Court has held that federal common law governs claims of trespass over Indian lands. *Milner*, 583 F.3d at 1182 (holding homeowners that erected shoreline defense structures on property owned by Lummi Nation were trespassers and had to remove structures). This law provides that even in the absence of a treaty, a "tribe has the inherent power to exclude non-members from the reservation." *Quechan Tribe of Indians v. Rowe*, 531 F.2d 408, 410 (9th Cir. 1976). This includes "rights to determine who may enter the reservation; to define the conditions upon which they may enter; to prescribe rules of conduct; [and] to expel

those who enter the reservation without proper authority or those who violate

tribal, state or federal laws. . . ." *Id.* at 411. "Remedies for trespass on Indian land

under federal common law include: ejectment and damages; accounting; and

damages." *United States v. Torlaw Realty, Inc.*, 83 F. Supp. 2d 967, 973 (C.D. Cal.

2007).

BNSF claims that the Tribe's federal common law claims and remedies were

displaced by ICCTA, but ICCTA does not mention Indian treaties, tribal lands or

remedies for violation of Tribal rights, and so cannot be read as supplanting this

law. *Cf. City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) (finding Congress

intended to supplant federal common law regarding discharges when it enacted the

Federal Water Pollution Control Act Amendments of 1972 and charged EPA with

developing regulations specific to this practice). Further, ICCTA does not

govern—or authorize—trespass, even by a railroad. Indeed, the IRWA regulations

clarify that unauthorized use of tribal lands—including under an existing right-of-

way—constitutes trespass and authorizes tribes to pursue all available remedies for

such a breach. 25 C.F.R. §§ 169.2, 169.401, 169.413. State law principles—which

federal courts use to analyze federal property rights—confirm the same. *United*

*States v. Park*, 536 F.3d 1058, 1061 (9th Cir. 2008) ("We generally follow state

law to resolve property disputes, such as this issue of interpretation of a [federal]

easement."). Courts look at the plain language of easements to determine the intent

of the parties, and an easement can only "be expanded over time if the express terms of the easement manifest a clear intention by the original parties to modify the initial scope based on future demands. The face of the easement must manifest this clear intent." *Sunnyside Valley Irr. Dist. v. Dickie*, 73 P.3d 369, 374 (Wash. 2003). "A party is privileged to use another's land only to the extent expressly allowed by the easement. Trespass occurs upon the misuse or overburdening of an easement." *Sanders*, 156 P.3d at 882–83. Here, the face of the Easement makes clear that any expansion in use requires prior, written consent of the Tribe, which may be withheld.

And while BNSF has pointed to ICCTA preemption of *state law* trespass claims, all have been based on allegations regarding a railroad's design, construction, and maintenance, *and* presuppose that the railroad's activity is otherwise valid. *See Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1146 (8th Cir. 2015) (claim arising from flooding of property). It cannot be that ICCTA preempts or displaces applicable federal common law in such a way that would allow a railroad to validate its illegal conduct, particularly on trust lands held for the benefit of the Tribe and over which Congress has a special duty. BNSF provides no authority to support this brazen proposition and the Court should not adopt it here.

ICCTA fails to clearly manifest an intent to supplant federal common law remedies available to Indian tribes for trespasses on tribal lands. Accordingly, the

Tribe is entitled to enforce the terms of the Easement and preclude BNSF from running more than 25-cars over the Reservation without its consent.

### B. The availability of other remedies does not affect the Tribe's right to injunctive relief.

As a last-ditch effort to avoid its contractual obligations to the Tribe, BNSF suggests that the availability of other remedies for its wrongful conduct should preclude injunctive relief. But the purported availability of the other remedies that BNSF proposes is not relevant to whether the Tribe has the right to enjoin BNSF's overburdening the Easement. And more importantly, the alternative remedies that BNSF proposes are inadequate.

First, BNSF suggests that the Easement provides for increased rents and monetary damages, not specific performance, despite the fact that the Easement expressly requires BNSF to seek the Tribe's consent *before* exceeding the 25-car limitation in the Easement, indicating that the Easement contemplates prospective relief. BNSF provides no support for this contrary reading. Although BNSF has agreed to pay some increased rents, it has indicated that it would, under ICCTA, oppose any damages award it believed to be too excessive such that it would interfere with its ability to conduct rail service. Br. at 34, n.*. Even if damages alone were acceptable to the Tribe—which they are not—BNSF's willingness to pay only such amounts it deems appropriate would likely result in the Tribe not being made whole from BNSF's willful breach of the Easement.

Second, BNSF suggests that the Tribe can institute abandonment or discontinuance proceedings before the STB. But the Tribe is not seeking to expel BNSF from its land, only to enforce the valid Easement terms. It is unclear why the Tribe would institute additional proceedings before an agency—which has expressly disclaimed interest in adjudicating property rights—to enforce the terms of the Easement that BNSF has willfully breached. Moreover, because harmonization of ICCTA with the IRWA would confine the STB's jurisdiction to the limitations authorized by DOI, such proceedings would be fruitless.

Finally, the Tribe does not seek to completely bar BNSF from using the Easement, but to curtail BNSF's uses that exceed its scope. Unlike BNSF, the Tribe abides by its contractual agreements. It therefore has not sought cancelation of the Easement. Moreover, BNSF's arguments that its common-carrier obligations override Treaty-reserved rights suggest that even if the Easement were cancelled, BNSF would continue to use the railway on the Reservation without limitation, requiring the Tribe to again seek recourse from the courts.

Realizing the goals of ICCTA and meeting the United States' trust obligations to Indian tribes, as set forth in federal common law, the Treaty and the IRWA, can be accomplished only by confirmation from this Court that the Tribe is entitled to injunctive relief to enforce the terms of its federally-approved Easement.

## CONCLUSION

Federal treaties, statutes and common law consistently recognize the right of Indian tribes to exclude and impose conditions on the use of tribal lands by non-Indians. Nothing in ICCTA expressly or implicitly abrogates those rights. Instead, ICCTA and the STB's regulatory authority of rail operations on Indian lands is easily harmonized with Treaty rights to exclude, the IRWA, and federal common law: its authority is confined to the terms of IRWA-issued grants and any restrictive terms contained therein. This Court should reject BNSF's attempt to legitimize its renewed trespass on sovereign, Reservation lands. The orders of the district court should be affirmed.

Respectfully submitted.

Dated: January 7, 2019

TOUSLEY BRAIN STEPHENS PLLC

By: _/s/ Christopher I. Brain_
    Christopher I. Brain, WSBA #5054
    Email: cbrain@tousley.com
    Chase C. Alvord, WSBA #26080
    Email: calvord@tousley.com
    1700 Seventh Avenue, Suite 2200
    Seattle, Washington 98101
    Telephone: 206.682.5600
    Fax: 206.682.2992

OFFICE OF THE TRIBAL ATTORNEY,
SWINOMISH INDIAN TRIBAL COMMUNITY

By:  /s/ Stephen T. LeCuyer
    Stephen T. LeCuyer, WSBA #36408
    Email: slecuyer@swinomish.nsn.us
    11404 Moorage Way
    LaConner, WA  98257
    Telephone:  360.466.1058
    Fax: 360.466.5309

*Attorneys for Swinomish Indian Tribal Community*

**STATEMENT OF RELATED CASES**

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiff-Appellee Swinomish Indian

Tribal Community states that it does not know of any related case pending in this

Court.

Dated: January 7, 2019                    By: _/s/ Christopher I. Brain___
                                               Christopher I. Brain

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**    18-35704

I am the attorney or self-represented party.

**This brief contains 13, 975 words,** excluding the items exempted by Fed. R.
App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.
32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Christopher I. Brain*    **Date**  January 7, 2019
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                      *Rev. 12/01/18*

# CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2019, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: January 7, 2019        By: _/s/ Christopher I. Brain_
                                             Christopher I. Brain

5973/001/529840.1