# MUNGER, TOLLES & OLSON LLP

RONALD L. OLSON
ROBERT E. DENHAM
JEFFREY I. WEINBERGER
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
BRADLEY S. PHILLIPS
GEORGE M. GARVEY
WILLIAM D. TEMKO
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR.*
TERRY E. SANCHEZ
STEVEN M. PERRY
MARK B. HELM
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
GREGORY D. PHILLIPS
KATHLEEN M. M°DOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
JUDITH T. KITANO
JEROME C. ROTH
GARTH T. VINCENT
TED DANE
STUART N. SENATOR
MARTIN D. BERN
ROBERT L. DELL ANGELO
BRUCE A. ABBOTT
JONATHAN E. ALTMAN
KELLY M. KLAUS
DAVID B. GOLDMAN
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
TAMERLIN J. GODLEY
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
LUIS LI
MICHAEL B. DESANCTIS*
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
MARK H. KIM
BRETT J. RODDA
FRED A. ROWLEY, JR.
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
ROSEMARIE T. RING

MELINDA EADES LeMOINE
SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
MISTY M. SANFORD
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
LAURA D. SMOLOWE
ANJAN CHOUDHURY
KYLE W. MACH
HEATHER E. TAKAHASHI
ERIN J. COX
BENJAMIN J. HORWICH
E. MARTIN ESTRADA
MATTHEW A. MACDONALD
BRYAN H. HECKENLIVELY
ELAINE J. GOLDENBERG*
MARK R. YOHALEM
CHAD GOLDER*
GINGER D. ANDERS*
MARGARET G. MARASCHINO
JOHN M. GILDERSLEEVE
ADAM B. WEISS
GEORGE CLAYTON FATHEREE, III
KELLY L. C. KRIEBS
JEREMY A. LAWRENCE
LAURA K. LIN
ACHYUT J. PHADKE
ZACHARY M. BRIERS
JENNIFER M. BRODER
KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
ROSE LEDA EHLER
KENNETH H. TRUJILLO-JAMISON
MARI OVERBECK
JORDAN D. SEGALL
WESLEY T.L. BURRELL
KAREN A. LORANG
CRAIG A. LAVOIE
ELIA HERRERA
JOSHUA S. MELTZER
MARIA JHAI
ADAM P. BARRY
JENNIFER L. BRYANT
ANDREW CATH RUBENSTEIN

560 MISSION STREET

TWENTY-SEVENTH FLOOR

SAN FRANCISCO, CALIFORNIA 94105-3089

TELEPHONE (415) 512-4000

FACSIMILE (415) 512-4077

————

350 SOUTH GRAND AVENUE

FIFTIETH FLOOR

LOS ANGELES, CALIFORNIA 90071-3426

TELEPHONE (213) 683-9100

FACSIMILE (213) 687-3702

————

1155 F STREET N.W.

SEVENTH FLOOR

WASHINGTON, D.C. 20004-1361

TELEPHONE (202) 220-1100

JEFFREY A. PAYNE
HANNAH L. DUBINA
NICHOLAS D. FRAM
JOHN L. SCHWAB
J'ME K. FORREST
ASHLEY D. KAPLAN
JESSICA REICH BARIL
JULIANA M. YEE
JEREMY K. BEECHER
MATTHEW K. DONOHUE
ARIEL C. GREEN
ELIZABETH A. LAUGHTON
EMILY CURRAN-HUBERTY
JORDAN X. NAVARRETTE
JOHN B. MAJOR
LAUREN C. BARNETT
C. HUNTER HAYES
AARON D. PENNEKAMP
TREVOR N. TEMPLETON
SKYLAR D. BROOKS
ELIZABETH R. DYER
SARAH S. LEE
ELIZABETH A. KIM
SUSAN S. HAR
NICHOLAS DUFAU
LAURA M. LOPEZ
MICHAEL C. BAKER
NAJEE K. THORNTON
SARAH G. BOYCE*
MOLLY K. PRIEDEMAN
CELIA R. CHOY*
ADELE M. EL-KHOURI*
COLIN A. DEVINE
DANE P. SHIKMAN
LEXI PEACOCK
MAGGIE THOMPSON
SAMUEL H. ALLEN
ALLISON M. DAY
GIOVANNI S. SAARMAN GONZÁLEZ
JONATHAN S. MELTZER*
SAMUEL JOSÉ DIAZ
LAUREN M. HARDING
NEFI D. ACOSTA
STEPHANIE G. HERRERA
TERESA REED DIPPO
GRANT R. ARNOW
DANIEL BENJAMIN
SARA A. MCDERMOTT
J. MAX ROSEN
M. ELIZA HANEY
RACHEL G. MILLER-ZIEGLER*

ALISON F. KAROL
ANNE K. CONLEY
GRAHAM B. COLE
KATHERINE G. INCANTALUPO
SUSAN M. PELLETIER*
DAVID P. THORESON
DAVID W. MORESHEAD
ANDRE W. BREWSTER III
TERRA D. LAUGHTON
ROWLEY J. RICE
DAHLIA MIGNOUNA*
JEREMY S. KREISBERG*
JOHN D. MAHER
MADELINE D. SWAN
GINA F. ELLIOTT
BRANDON R. TEACHOUT
DAVID W. WALCHAK
SEGUN I. BABATUNDE II
CARSON C. ZHENG
LUCAS J. ARTAIZ
USHA CHILUKURI VANCE
BRIAN J. SPRINGER
JENTRY LANZA
CATHERINE N. GRECH
TYLER HILTON
VINCENT LING

OF COUNSEL

ROBERT K. JOHNSON
ALAN V. FRIEDMAN
PETER A. DETRE
ALLISON B. STEIN
BRAD SCHNEIDER
ERIC P. TUTTLE
PETER E. GRATZINGER
JENNY H. HONG
KIMBERLY A. CHI
DAVID S. HONG
ADAM R. LAWTON
MATTHEW S. SCHONHOLZ
MICHAEL E. GREANEY

E. LEROY TOLLES
(1922-2008)

*ADMITTED IN DC.
ALL OTHERS ADMITTED IN CA

**VIA CM/ECF**

June 19, 2019

The Honorable Michael Daly Hawkins
The Honorable William A. Fletcher
The Honorable Mark J. Bennett
United States Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, California 94119-3939

Re:   *Swinomish Indian Tribal Community v. BNSF Railway Company*,
No. 18-35704 — Response to May 22, 2019 Order

Counsel appreciate the opportunity to respond to the questions

about Appellant's Opening Brief (the "Brief") set forth in this Court's

Order (the "Order"). We understand the gravity of the Court's Order,

and we apologize for statements in our Brief that prompted the

Order.  The duty of candor to the Court is a bedrock of legal ethics and the adversarial process.  We have always been committed to meeting this duty without compromise, and we have never sought to mislead the Court.  We deeply regret that the way we articulated our arguments prompted the questions raised in the Order, and we hope the explanation in this letter will resolve the Court's concerns.

This case is an appeal by permission under 28 U.S.C. § 1292(b).  The certified orders reflected the debatable resolution of a question of first impression in this Court:  ICCTA's effect on remedies available to the Tribe in light of numerous overlapping authorities—federal common law, the Treaty, the Settlement Agreement, the Easement, and IRWA.[1]  We brought our best, good-faith efforts to this highly complex case.  Again, we apologize that statements in our Brief are a source of concern for the Court.  We explain below under the Order's headings why we believe the Brief candidly represents the facts and the law.

---

[1] We use abbreviations and capitalized terms as defined in the Brief.

## I. Substitution of Words in the Easement

The Court asks about Counsel's "substitution, without comment, of 'at a minimum' for 'only'" in "represent[ing] the terms of the easement." Order 2. We did not intend the words "at a minimum" to substitute for "only" in describing the permitted traffic level on the line. Rather, "at a minimum" was meant to summarize the point that one sentence in the Easement undisputedly sets a baseline permitted traffic level, while later sentences address the possibility of increasing that level. The paragraph of the Brief immediately following the quoted sentence elaborates that distinction. Br. 16.

The Easement states:

> Burlington Northern agrees that, unless otherwise agreed in writing, only one eastern bound train, and one western bound train, (of twenty-five (25) cars or less) shall cross the Reservation each day. The number of trains and cars shall not be increased unless required by shipper needs. The Tribe agrees not to arbitrarily withhold permission to increase the number of trains or cars when necessary to meet shipper needs. It is understood and agreed that if the number of crossings or the number of cars is increased, the annual rental will be subject to adjustment in accordance with paragraph 3(b)iii of this Right-of-Way Easement and paragraph 2(b)iii of the Settlement Agreement.

ER0869 (¶ 7(c)).  This provision establishes a 1-train/25-car limit in the first sentence and addresses the possibility of "increased" traffic in the next three sentences.

The statement of concern to this Court reads (with emphasis supplied by the Court):  "The Easement provides that BNSF may run, **at a minimum**, 'one eastern bound train, and one western bound train, (of twenty-five (25) cars or less)' across the rail line each day."  Br. 15 (quoting ER0869).  This statement was meant simply to summarize the facts—undisputed, to our knowledge—that the Easement [1] grants BNSF the right to operate daily service by one train of 25 or fewer cars in each direction, and [2] establishes conditions under which the "number of trains and cars" could "be increased."  Hence, the baseline approved 1-train/25-car level of traffic is what BNSF may run "at a minimum."  The parties dispute the circumstances under which the Easement permits more traffic than that minimum level.

Counsel intended that the Brief's preceding (Br. 2) and surrounding (Br. 16, 17) discussion of the Easement terms and the parties' dispute would supply further context for the quoted sentence.  If we had anticipated that "at a minimum" might be read to suggest

anything different from what is described above—which we did not—we would have eliminated that clause and allowed the immediately following paragraph regarding the circumstances that would permit an increase in traffic (Br. 16) to speak for itself.

## II. Substitution of Words in Cases

### a. *Thompson v. Texas-Mexican Ry. Co.*, 328 U.S. 134 (1946)

The Order asks how Counsel's "insertion, without comment, of the word 'land'" into a quotation drawn from *Tex-Mex* "candidly represents the holding" of that case. Order 3. We inserted the word "land" because we understand *Tex-Mex* to state a general legal principle applicable to all types of contracts, including (as relevant here) land contracts. As the ICC wrote in seeking to intervene in prior litigation between the parties—citing the same portion of *Tex-Mex* that BNSF's Brief cites— "*courts have consistently held* that the [ICC] has the exclusive jurisdiction to permit a carrier to cease operations over a line of railroad and that *regardless of the reason*, railroads may not discontinue their services unless and until authorized by the [ICC]." ER0320 (emphasis added).

That said, as the Order notes, the Supreme Court did not describe the contract at issue in *Tex-Mex* itself as a "land" contract. Rather the Supreme Court's opinion often refers to the contract as a "trackage agreement," and refers variously to the contract's subject as "tracks," "facilities," and "property." Inserting "[land]" was therefore an inapt way to signal our understanding that *Tex-Mex*'s holding applies to an agreement like the Easement. We should instead have referred to the contract without a modifier, or as a "trackage," "facilities," or "property" contract. We should likewise have replaced references to "landowner" and "land" (Br. 71) with "owner" and "property." Below we describe in greater detail the authorities before the Court that are the basis for our belief that *Tex-Mex*'s holding applies equally to land contracts and other types of contracts.

    **1.** *Tex-Mex* arose from a suit by a creditor railroad (Tex-Mex) to enjoin a debtor railroad (Brownsville) and its bankruptcy trustee from using tracks and facilities owned by Tex-Mex. Tex-Mex had previously terminated a contract that granted Brownsville "the right to operate its trains over the tracks of Tex-Mex" and "to make use of terminal facilities of Tex-Mex." 328 U.S. at 136.

*Tex-Mex* addresses several discrete issues, but the analysis pertinent here is under subheading "(2)" of the heading "*Second.*" *Id.* at 144. There, the Court interpreted Section 1(18) of the Interstate Commerce Act, which stated: "[N]o carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity permit of such abandonment." *Id.* The Brief identifies Section 1(18) as bringing the rail line here under the ICC's jurisdiction in 1920 (Br. 14), and Section 1(18) is one ancestor of 49 U.S.C. § 10501(b)'s provision for exclusive STB jurisdiction.

The Supreme Court's holding about Section 1(18) is stated in the sentence quoted by BNSF and reproduced in the Order: "Though the contract were terminated pursuant to its terms, a certificate would still be required under § 1(18)." 328 U.S. at 145. The context makes clear that the "certificate" being referenced is one issued by the ICC permitting abandonment, and that such a certificate was a prerequisite for ceasing rail operations. The Supreme Court introduced that holding

by clarifying that the ICC's jurisdiction attached because the contract implicated rail operations, not because it was a trackage contract:

> Whatever may be the powers of the Commission under the Interstate Commerce Act, rather than § 77 [of the Bankruptcy Act], over the terms of the trackage agreement, it is clear that the Commission has jurisdiction over the operations. Sec. 1(18) embraces operations under trackage contracts, as well as other types of operations.

328 U.S. at 144 (citations omitted).  By contrast, subheading "(3)" in *Tex-Mex*, which addressed the ICC's "new, explicit powers over trackage rights," *id.* at 146, clearly turned on the specific character of the contract as a trackage contract.

Accordingly, Counsel's view is that the Supreme Court's conclusion regarding abandonment is best read to apply equally to all rail operations within the ICC's (now STB's) jurisdiction, regardless of their basis in trackage contracts, land contracts, or otherwise.

**2.** Sources cited in BNSF's briefs likewise read *Tex-Mex* to hold that a landowner cannot (by land contract or otherwise) cause a common carrier to terminate or reassign its service without an abandonment certificate.

**a.** *Smith v. Hoboken Railroad, Warehouse & S.S. Connecting Co.*, 328 U.S. 123 (1946) (cited at Br. 42), was a companion case to *Tex-Mex*—the two unanimous decisions cross-referenced each other and were issued on the same day and authored by the same Justice.

Like *Tex-Mex*, *Smith* involved a common-carrier railroad in bankruptcy proceedings. *Smith* addressed the bankruptcy court's termination of the debtor's lease—that is, a contract for the use of land: "The major part of [the debtor railroad's] right-of-way and line of railroad is held by it under a 99-year lease from respondent." *Id.* at 124; *see id.* n.1 (noting "two additional pieces of land under 99-year leases"). The Supreme Court again addressed the application of Section 1(18). The Court noted a distinction from *Tex-Mex*, in that *Tex-Mex* "entailed complete abandonment of operations by one company over another's lines," whereas in *Smith* "the question [wa]s whether the lessee or the lessor shall perform the service." *Id.* at 130. But the bottom line was the same: An ICC order was required before the rail carrier could abandon operations. *See id.*

*Smith*'s reliance on *Tex-Mex* indicated to Counsel that the Supreme Court itself regarded the rule of *Tex-Mex*—that the ICC must

first pass on abandonment before the termination of a contract can cause a rail carrier to cease common-carrier service—as applying equally to land contracts and trackage contracts.

      **b.**   *City of Des Moines v. Chicago & North Western Railway*, 264 F.2d 454 (8th Cir. 1959) (cited at Br. 13, 42), applied *Tex-Mex* and *Smith* to a public grant rather than a private contract. There, the City contended that it could "have the Railway injunctively ousted from the [City's] street on the basis that the Railway had violated the conditions of the grant by which it originally had been permitted to use the street." *Id.* at 455. The court stated:

> While, as has been noted, [*Tex-Mex*] did not involve tracks and operations in a public street but on private property, it seems obvious that, if disruptions in carrier systems may not occur unless public convenience and necessity will permit, it is as much necessary that authorization should be obtained from the [ICC] for abandonments of lines or operations in public streets as for abandonments of other portions of a railroad's lines or operations.

*Id.* at 457-58. Counsel interpret *City of Des Moines* to reason from the premise that *Tex-Mex* applies to all contracts for "tracks and operations … on private property." *Id.* at 457.

**c.**    In the prior litigation between the Tribe and Burlington Northern (which we also refer to as "BNSF" for convenience), the ICC moved to intervene (*see* Reply Br. 20).  The ICC urged that *Tex-Mex* "held" that the ICC's authority over cessation of service was exclusive "regardless of the reason" asserted against the railroad:

> Accordingly, the courts have consistently held that the [ICC] has the exclusive jurisdiction to permit a carrier to cease operations over a line of railroad and that regardless of the reason, railroads may not discontinue their services unless and until authorized by the [ICC]. *Thompson v. Mexican Ry.*, 328 U.S. 134, 144 (1946); *Meyer v. Jay Street Connecting R.R.*, 259 F.2d 532, 534-535 (2nd Cir. 1958).

ER0320.[2]

---

[2] Similarly, although not cited in BNSF's briefs, modern STB decisions also apply *Tex-Mex* to land contracts.  For example, in *Pinelawn Cemetery*, FD 35468, 2015 WL 1813674 (STB Apr. 20, 2015), a railroad had "leased from Pinelawn a 2.1-acre tract of land" and years later, "Pinelawn went to state court to evict the [railroad, among others]."  *Id.* at *2, *3.  The STB described what *Tex-Mex* "held" about "underlying leases" as follows:  "In [*Tex-Mex*], the Supreme Court long ago held that rail lines cannot be removed from the national rail system without authorization from the ICC even if their underlying leases have expired."  *Id.* at *7.

**b, c.** *CSX Transp. Inc.***, FD 34662, 2005 WL 584026 (STB Mar. 14, 2005);** *Ass'n of Am. R.R.s v. S. Coast Air Quality Mgmt. Dist.***, 622 F.3d 1094 (9th Cir. 2010)**

The Order's questions regarding *CSX* and *AAR* are similar:  Why on page 28 of the Brief did Counsel quote preemption language from those decisions, but "omi[t] … qualifying language referring to 'actions by states or localities'" (*CSX*) or "referring to 'state laws'" (*AAR*)?  Order 4.  The answer is that we presented that context on the following pages of the Brief—for example, the Brief quotes *CSX*'s reference to "states and localities" on the next page (Br. 29), and a page after that, describes *AAR* as holding that "ICCTA broadly preempts state laws" (Br. 30).  As a substantive matter, the Brief argues that the preemption rules in *CSX* and *AAR* apply to the Tribe's claims (which arise from federal common law) in the same manner as they do to state and local law, a position the Brief urges is supported by ICCTA's text and by circuit precedent.

**1.**     The Brief refers in several places to the application of *CSX* and *AAR* to state and local law, and goes on to explain the need for different or additional analysis in cases (like this case) that implicate other federal statutes (including the Treaty).  For example:

- On page 29—the page following the references quoted in the Order—the Brief quotes *CSX*'s statement that ICCTA's preemption provision "divest[s] *states and localities* of a regulatory role" and quotes another STB decision about "preempt[ing] *state and local actions*." Br. 29 (quotation marks omitted, emphasis added).

- On page 30, the Brief cites *AAR* and describes it as "noting that although ICCTA *broadly preempts state laws* that regulate rail transportation, it 'permit[s] the continued application of laws having a more remote or incidental effect on rail transportation.'" Br. 30 (emphasis added, citation omitted, brackets in Brief).

- On page 31, the Brief explains that *AAR* requires different or additional analysis when both ICCTA and another Act of Congress are involved.

- Roughly half of the argument section of the Brief addresses arguments about the interplay of federal statutes— arguments that we agree cannot be answered by the preemption principles in *CSX* and *AAR*. Those discussions

make clear that the typical application of ICCTA can be altered by another federal law. *See* Br. 31-32, 36, 50.[3]

The quotations referenced in the Order reflected the specific point of law that Counsel sought to highlight at that initial step of our argument—namely, that the defining practical characteristics of an ICCTA-preempted remedy are that it is an "'impinge[ment] on the [STB]'s jurisdiction or a railroad's ability to conduct its rail operations'" or "'may reasonably be said to have the effect of managing or governing rail transportation,'" Br. 28 (quoting *CSX*, 2005 WL 584026, at *6; *AAR*, 622 F.3d at 1097) (brackets in Brief). We believe the broader features of the Brief confirm that we intended to be candid about, and neither sought to obscure nor actually obscured, the full context and significance of *CSX* and *AAR*.

---

[3] In addition, BNSF's petition for permission to appeal states that "courts have considered whether ICCTA preempts *state or local* regulations and remedies" (citing, *inter alia*, *AAR*, 622 F.3d at 1097; emphasis added) but that "no federal appellate authority specifically addresses the extent to which ICCTA displaces remedies that would otherwise be available under federal common law." No. 18-80062, Dkt. 1, at 18.

**2.**      The Order suggests a possible underlying concern that decisions about ICCTA preemption of state or local law (such as *CSX* and *AAR*) are not germane to a case arising (as this case does) under federal common law.  (Counsel understand the Tribe to contend that its claims arise under federal common law.  *See* Br. 35-36; Answering Br. 3 ("[I]njunctive relief available under federal common law remains available to the Tribe.").)

BNSF's position is that ICCTA preemption presumptively operates on federal common law claims in the same manner as it does on claims under state or local law.  Counsel accordingly prefaced the discussion of *AAR* and *CSX*—which interpret ICCTA's text—with the observation that ICCTA's express textual "preempt[ion of] the remedies provided under Federal or State law," 49 U.S.C. § 10501(b), "draws no distinctions among remedies that arise under federal common law, state statutes, state common law, or local ordinances," Br. 28.

The Brief later elaborates the argument that ICCTA's preemption provision directly addresses federal common law.  Br. 35-38.  The Brief cites circuit precedent (Br. 38) suggesting that federal interstate commerce law treats federal common law and state law similarly,

preempting both.  In *Alliance Shippers, Inc. v. Southern Pacific Transportation Co.*, 858 F.2d 567 (9th Cir. 1988) (cited at Br. 38), this Court addressed whether "[the plaintiff's] causes of action for price discrimination under federal common law and state statutory law were preempted by the Staggers Act."[4]  *Id.* at 568.  In holding that the federal common law claims were preempted, this Court adopted the reasoning of a Third Circuit case "that allowing a common law remedy for discrimination in rates … would be contrary to the language, purpose, and expressed intent of Congress."  *Id.* at 569.  The Court further held that claims under state statutory law were preempted on the same basis, stating:  "All of the arguments advanced by [plaintiff] were dealt with by the Third Circuit in rejecting the similar contention that the Staggers Act did not preempt common law remedies."  *Id.*

For those reasons, Counsel believe it was reasonable to argue that the Tribe's federal common law claims should be treated similarly to

---

[4] The Staggers Rail Act of 1980 was an intermediate step between prior iterations of the Interstate Commerce Act and ICCTA as it exists today. BNSF would contend that ICCTA preemption is at least as broad as Staggers Act preemption.  *See generally Fayus Enters. v. BNSF Ry.*, 602 F.3d 444, 449-50 (D.C. Cir. 2010) (discussing ICCTA relative to Staggers Act).

claims under state or local law, and hence to rely on the quoted statements from *CSX* and *AAR* about the typical characteristics of remedies that are preempted by ICCTA.

**3.** The Brief also does not obscure the need to apply a different analysis to the interplay of ICCTA and federal statutory law. *Cf.* Answering Br. 27 ("BNSF overlooks the substantial body of law clarifying that ICCTA's preemption language is not absolute."). The Brief introduced that issue (sometimes referred to as "harmonization") two pages after the quotations identified by the Order, stating, "ICCTA preemption has its limits." Br. 30.

The Brief's argument proceeds in two steps. The cited references to *CSX* and *AAR* are located in the discussion of the first step, which aims to explain only how ICCTA typically imposes a broad bar on other "remedies provided under Federal or State law." 49 U.S.C. § 10501(b); *see* Br. 27-30 (Part I.A.1). As noted above, the Brief states that ICCTA's text "draws no distinctions among remedies that arise under *federal common law, state statutes, state common law, or local ordinances*." Br. 28 (emphasis added).

But federal *statutory* law is a different matter, which Counsel separately addressed in the second step, in a section of the Brief describing the limits on ICCTA's preemptive scope. Br. 23 ("ICCTA must be harmonized with remedial authority created by another federal statute."); *see* Br. 30-32 (Part I.A.2). We adopted this two-step framework to reflect the framework used in harmonization precedents that asked [1] how a case would be analyzed if only one federal law were implicated (here, ICCTA); and then [2] whether another federal law would require a different result (here, the Treaty or IRWA). For example, in *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018), which addressed the meaning of the Federal Arbitration Act and whether the National Labor Relations Act (NLRA) offered a "conflicting command," *id.* at 1619, the Supreme Court "beg[a]n with the Arbitration Act and the question of its saving clause," *id.* at 1621 (Part II), and only later turned to the potential influence of the NLRA and the possibility of harmonization, *id.* at 1623 (Part III). Likewise, in *BNSF v. CDTFA*, 904 F.3d 755 (9th Cir. 2018), this Court first addressed ICCTA's "broad preemption provision," *id.* at 760, and "[c]onsidered [ICCTA] in isolation," *id.* at 761, and only later turned to the potential impact of

the Hazardous Materials Transportation Act and harmonization questions, *id.* at 761.[5]

Applying that two-step approach to this case, Counsel sought in Part I.B.1 of the Brief to explain why a restriction on the number of railcars traveling on a line is presumptively preempted by ICCTA because enforcing such a restriction would be a "remed[y]" that would "regulate 'transportation by [a] rail carrier[].'" *See* Br. 33 (quoting 49 U.S.C. § 10501(b)). Part I.B.2 then elaborates on BNSF's view that "the recognized limits on ICCTA preemption"—including "harmonizing various Acts of Congress"—do not change that result here. Br. 35. And the final 28 pages of the Argument detail BNSF's position that the Treaty (Part II), the Easement (Part III), and IRWA (Part IV) do not require a different result.

Counsel believe that this framework is reasonable. To assess the interplay of two laws that have not been the subject of joint analysis, it

---

[5] Counsel recognize that in *CDTFA*, this Court emphasized references to state and local law in prior ICCTA preemption cases. 904 F.3d at 760. We infer that the emphasis was designed to sharpen the contrast between the initial preemption question viewing ICCTA "in isolation" and the Court's later harmonization inquiry. We intended the Brief's two-step analytical framework to similarly distinguish those issues.

is often necessary to draw upon precedent addressing one law or the other in isolation. Here, cases regarding ICCTA's preemption of state and local law are highly relevant to the first step (determining what ICCTA alone would require), even though further analysis is required at the second step (whether another federal law requires a different result). Moreover, the first step alone can sometimes be sufficient to reject the preemption argument.

4. Responding to the Court's inquiry has led Counsel to appreciate, however, that we could have made explicit when first citing *CSX* and *AAR* that, even though those cases arose in a distinct context involving state and local law, BNSF contends they nonetheless supply the appropriate principles of law in this case. We regret not taking that approach.

d. ***S. Pac. Transp. Co.—Abandonment Exemption—In Mineral & Lyon Counties, Nev.*, AB 12, 1991 WL 40203 (ICC Mar. 12, 1991)**

The Order asks how Counsel's "omission of the language" in *Southern Pacific* "requiring [the Army] to 'obtain a right-of-way across the Reservation'" following entrance of an abandonment order "candidly represents the full context" in that case. Order 5 (citing Br. 44). That

language was omitted because it was not relevant to the practical point illustrated by *Southern Pacific* at that part of the Brief—that, after abandonment, a rail carrier may properly agree by contract to restrictions on service. Moreover, the two paragraphs of the Brief immediately following the quoted language state that the Tribe would be free to pursue cancellation of the right-of-way if the STB authorized abandonment. That statement makes clear that BNSF recognizes and endorses the implication of the omitted language, which is that post-abandonment operations must rely on a right-of-way approved by the Tribe.

The cited *Southern Pacific* decision arose from a lengthy dispute between an Indian tribe and a railroad. As BNSF's Reply Brief explains (pp. 11-14), that dispute provides a useful reference point here in several respects. But in the passage referenced in the Order, Counsel cited *Southern Pacific* only to illustrate the single, practical point made in the sentence preceding the citation: An abandonment order from the STB "would allow [BNSF] to agree by contract to absolute restrictions on the number of cars or the types of goods that it will transport across the rail line." Br. 43-44. We sought to explain how the Tribe could

properly pursue the outcome it desires (limitation of rail traffic) through an administrative remedy (STB order of abandonment or discontinuance).

*Southern Pacific* illustrates this point because there, the rail line was removed from the interstate rail network through administrative abandonment, but could still be used in private contract service for a single shipper (the Army). The need for a right-of-way was not relevant to that narrow proposition about contract service. We did not intend to imply that BNSF could conduct contract service on the line here post-abandonment regardless of the existence of a valid right-of-way. Rather that section of the Brief sought to establish the opposite—that is, to explain how the Tribe could restrict service.

Other ICC or STB decisions about abandonment of lines and conversion into private use would have equally illustrated the generic point that contract service is available after abandonment. *E.g.*, *Abe Fairmont, LLC*, AB 6, 2017 WL 3568520, at *3 (STB Aug. 16, 2017) (describing how, "[f]ollowing discontinuance and abandonment," one shipper on the line "would receive contract service by BNSF"). Counsel opted to cite *Southern Pacific* because the decision had already been

cited in the prior paragraph and because it has factual similarities to the present dispute.

## III. Characterization of Plaintiff-Appellee's Arguments

### a. Treaty

The Order asks Counsel to explain how our statement that the Tribe "disclaimed the Treaty as determinative of its claims" "candidly represents the content of [the Tribe's] argument." Order 5-6. In the cited passages, Counsel sought to draw an initial contrast between, on the one hand, the Tribe's position that the Easement (not the Treaty) is the basis for its affirmative claims, and, on the other hand, the District Court's decision to rely on the Treaty (not the Easement) to reject BNSF's preemption defense. We did not intend to suggest that the Tribe had forsworn all Treaty-based (or Easement-based) arguments. This is shown by our extended discussions of the Treaty and Easement that follow the quoted sentence of the Brief. Rather, we simply understood the Tribe to have stated that its affirmative claim rests on the Easement, not the Treaty.

1. The District Court's ruling on reconsideration focused on the Treaty, reasoning that "[t]he correct analysis when considering the

Tribe's treaty-based federal common law claim" was "whether Congress intended to repeal the Treaty of Point Elliott when it enacted the ICCTA." ER0009; *see* ER0011 ("The Tribe's contract and trespass claims arise under federal law and are based on the right of exclusive use granted by the Treaty of Point Elliott.").

Because Counsel understood the Tribe to base its affirmative claim on the Easement, we sought to contrast the District Court's approach with the fact that "the Tribe itself has pointed to the specific agreement between the parties—the Easement." Br. 47. As the Order itself notes, the Tribe wrote: "[T]he Tribe asserts only a narrow claim for trespass *based upon BNSF's violation of the specific limitations in the Easement Agreement*...." ER0044 (emphasis added). The Tribe also wrote: "Resolution of the Tribe's actual claims does not require any adjudication of the Tribe's treaty rights separate and apart from the language of the Easement Agreement, *because it is the Easement Agreement that the Tribe alleges (and the Court has determined) that BNSF has violated*." ER0044 (emphasis added). On the basis of those same statements, we understood the Tribe *not* to base its affirmative claim on the Treaty itself, and therefore we stated that "the

Tribe … has disclaimed the Treaty as determinative of its claims."  Br.

47.  The Tribe in fact criticized BNSF below for attempting "to

transform this lawsuit from a relatively straight-forward case about

overburdening the easement based on the terms of the Easement

Agreement into a completely different litigation about a different

agreement—the Treaty of Point Elliott."  ER0044.

2.    BNSF's position is that because ICCTA "preempt[s] …

remedies," 49 U.S.C. 10501(b), the preemption inquiry should focus on

whatever affirmative remedy is sought.  Thus, if the Tribe's affirmative

claim is based upon a violation of the Easement, then questions about

BNSF's preemption defense should similarly be answered by reference

to the Easement.  And, conversely, if the Tribe's affirmative claim is not

based upon a violation of the Treaty, then questions about BNSF's

preemption defense should similarly not be answered by reference to

the Treaty.  To make that point, Counsel sought to highlight the tension

between the District Court's Treaty-based preemption reasoning and

the Tribe's Easement-based claim.

This was, however, only a threshold position to which Counsel

devoted a single introductory paragraph, out of nineteen paragraphs

addressing the Treaty in the Brief. *See* Br. 45-56. And the Tribe's response directly confronted BNSF's argument: It urged "a distinction between the Tribe's *claim* for breach of the Easement and its underlying Treaty and common law *right* to exclude and enjoin non-consensual conduct on the Reservation as a remedy." Answering Br. 35-36 (emphasis in original). BNSF disagrees with the Tribe's suggested approach. *See* Reply Br. 22-26. But regardless of how this Court resolves that issue, we understood the Tribe to ask that its affirmative claims be determined by reference to the Easement, not by reference to the Treaty. We believe that understanding was reasonable.

### b.  <u>Monetary Claims</u>

The Order primarily identifies the following sentence: "The Tribe also **seeks increased rent**, which BNSF agrees it owes; the parties agreed to bifurcate this issue of monetary relief, which is subject to arbitration under the Easement." Order 6 (quoting Br. 18). *First*, the Order asks Counsel to explain the characterization of the Tribe as seeking "increased rent" when "Appellee stated it sought damages, not increased rent," below. Order 6-7. The Brief acknowledges that the Tribe seeks "monetary damages." Br. 18. We referred separately to

"increased rent" (for past use above the traffic level in the Easement) because it is a form of monetary relief that we infer the Tribe seeks, and that BNSF agrees it owes. *Second*, the Order states that "Appellee also contested that the arbitration clause of the Easement Agreement applies." Order 6. Counsel share that understanding of the Tribe's position, and we apologize if the Brief implied that the parties agree on the scope of arbitrable issues under the Easement. The very reason that monetary relief and arbitrability issues are not before this Court in this interlocutory appeal is that the parties' dispute about arbitrability prompted an early agreement to bifurcate and defer those issues.

1.      As just noted, the Tribe's claim for damages is not directly at issue in this Court. The District Court bifurcated and deferred issues related to damages at the motion-to-dismiss stage in 2015. Accordingly, monetary relief was not directly addressed in the summary judgment, reconsideration, or clarification orders that are presented to this Court on interlocutory appeal. But we briefly discussed monetary relief in the Procedural History to provide background context, to concede BNSF's liability for rent, and because we thought it proper to later acknowledge potential collateral implications of the Court's decision addressing

injunctive relief for the Tribe's claims for monetary relief.  *See* Br. 34 n.\*.  We did not attempt to describe the parties' positions on monetary relief in the detail that would have been required if those positions were material to the issues presented on appeal.  Some further background is therefore necessary in addressing the Court's concerns.

The Easement contemplates arbitration of certain issues:  "It is understood and agreed that if the number of crossings or the number of cars is increased, the annual rental will be subject to adjustment in accordance with paragraph 3(b)iii of this Right-of-Way Easement and paragraph 2(b)iii of the Settlement Agreement."  ER0869.  In turn, the referenced paragraph 3(b)iii of the Easement describes the mechanism for rental adjustment, including arbitration if necessary.  ER0864.

In its motion to dismiss, BNSF argued to the District Court that the Tribe's claims for monetary relief must be pursued in arbitration.  Dkt. 8 at 19-21.  The Tribe argued that arbitration was not appropriate because, "[h]aving failed to utilize the process for increasing traffic, BNSF cannot be allowed to invoke a remedy that, if applicable at all to traffic increases, is applicable only as one final step in the mutual process for agreeing to increases in traffic."  Dkt. 11 at 24:5-8.

The parties agreed to defer BNSF's arbitration argument by bifurcating issues related to arbitration and monetary relief. *See* ER1045:10-14; ER1066:4-8. The District Court memorialized that agreement "to bifurcate issues related to damages." ER0034:9-10. Correspondingly, the Tribe's initial disclosure under Federal Rule of Civil Procedure 26(a)(1)(A)(iii) ("a computation of each category of damages claimed") stated only: "The issue of damages has been bifurcated and deferred until after a determination on liability." Plaintiff's Initial Disclosures at 11:2-3 (Oct. 20, 2015) (excerpt attached as Exhibit A).

In short, the Tribe's claims for monetary relief were bifurcated without first resolving any disputes over the proper labels, measures, or forums for those claims. Consequently, as the Brief notes, "the parties have not yet briefed or developed a record" on "the Tribe's claims for monetary relief." Br. 34 n.*.

2. Turning to the Court's first concern, the Court states that the Tribe sought damages, not increased rent. Counsel agree that the Tribe seeks damages, and that is expressly stated in the sentence of the Brief immediately preceding the sentence quoted in the Order. *See* Br.

17-18 ("The Tribe's Complaint requests … monetary damages for trespass and breach of the Easement.").  As indicated by the word "also," the reference to "increased rent" in the following sentence was intended to supplement, not supersede, BNSF's acknowledgement that the Tribe seeks "damages" for BNSF's use of the Easement in excess of the 1-train/25-car level.

Counsel do not view "damages" and "rent" as mutually exclusive. We understand the Tribe's position to be that rent BNSF had previously paid was *only* for the use specified in the Easement (of one train of 25 cars or less) and *did not* include any rent for past use in excess of that level.  We therefore infer that at least one component of the monetary relief sought by the Tribe would be a *retrospective* (and clearly non-preempted) remedy of increased rent, measured as the difference between [1] the rent BNSF has already paid; and [2] the fair market value of rent for the increased use of the right-of-way during the period when BNSF's operations have exceeded the 1-train/25-car level.  We believe that labeling that relief as "increased rent" is a reasonable shorthand in a case alleging trespass.  *See, e.g.*, *Owens v. Layton*, 133 Wash. 346, 347-48 (1925) (describing the "market rental value of the

premises" as the appropriate measure of "general damages" for trespass in that case).

The Tribe may have interpreted the Brief's reference to "increased rent" as a reference to a remedy for the Tribe's *prospective* claims. *See* Answering Br. 15 n.3. Counsel did not intend to imply that the Tribe sought increased *future* rent due to increased use of the right-of-way; as seems plain from the Tribe's pursuit of injunctive relief, the Tribe seeks to *limit* future use of the right-of-way. (Of course, if an injunctive remedy is unavailable to the Tribe, and BNSF's use of the right-of-way continues at current levels, then BNSF would owe the Tribe increased rent for future as well as prior use.)

Ultimately, Counsel believe that any dispute over the meaning of "increased rent" is not material to the issues before the Court and is the product of a lack of development of the record on monetary relief—a hindrance that BNSF specifically acknowledged (Br. 34 n.*).

**3.**     This Court's second stated concern is that the Tribe "contested that the arbitration clause of the Easement Agreement applies." Order 6. Counsel agree that the Tribe took that position. Because arbitrability was contested, we should have qualified the final

clause of the quoted language by inserting "in BNSF's view" so that the phrase read "the parties agreed to bifurcate this issue of monetary relief, which _in BNSF's view_ is subject to arbitration under the Easement." We assure the Court that any suggestion that the Tribe and BNSF were in accord on this point was inadvertent and resulted only from cursory treatment of an issue that is not on appeal.

The situation is somewhat different with respect to the other sentence quoted in the Order: "Because the Easement provides that disputes about the appropriate rent must be resolved through binding arbitration, ER0864-ER0865 ¶3(b)(iii), the parties in the district court agreed to bifurcate issues regarding monetary relief for later resolution, ER0034." Br. 41. Although Counsel could have again inserted "in BNSF's view," we believe the statement as written was a fair (albeit extremely abbreviated) account of the district court proceedings: The Easement provides for arbitration of at least some issues related to rent, and a dispute over whether the Tribe's particular claims are arbitrable is what precipitated bifurcation. Additional detail about the parties' conflicting positions on arbitrability seemed unnecessary when

the only purpose of the statement was to apprise the Court of remedies that were not directly presented on appeal.

## IV.   <u>Characterization of Prior Negotiations</u>

The Order refers to two passages in the Brief that urge BNSF's interpretation of the Easement and its negotiating history—one describing BNSF's 1989 negotiating position as "due to its common-carrier obligations" (Br. 16), and the other arguing that the Tribe acknowledged those obligations by accepting language addressing an increase in traffic "when necessary to meet shipper needs" (Br. 58 (quoting ER0869 ¶ 7(c))).  Order 7.  The Order states, "At no point [in a quoted paragraph of negotiation correspondence] did [BNSF] mention its 'common carrier obligations.'"  Order 8.  Although the parties dispute the meaning of the Easement and its negotiating history, Counsel believe the interpretation advanced in the Brief is reasonable because, *inter alia*, [1] BNSF did expressly state its common-carrier obligations to the Tribe on the cited page of the record (Br. 58 (citing ER0921)), and [2] BNSF implicitly invoked its common-carrier obligations by using phrases such as "shipper needs," which the STB associates with the common-carrier obligation.

1. In the 1989 letter to the Tribe, in the paragraph immediately preceding the paragraph quoted in the Order, BNSF stated its common-carrier obligation:

> I am sure that you are aware that all cars handled have to be classified, packaged, and loaded, in accordance with the DOT-FRA Rules and Regulations. These rules and regulations for handling hazardous materials have been developing for more than 140 years and *as a common carrier railroad, Burlington Northern is obliged* to handle such cars properly classified, package [sic] and loaded to all destinations.

ER0921 (emphasis added).

That reference to the railroad's obligations "as a common carrier railroad" immediately addressed a proposal that BNSF "inform the Tribe in advance of the shippers and contents of railroad cars crossing Reservation lands." ER0920-ER0921. But Counsel read the reference to "a common carrier railroad" as also setting the context for the next paragraph's response to a proposed "limitation on the number of cars" (ER0921)—that is, BNSF was resisting various proposals from the Tribe because they would be difficult or impossible to reconcile with the railroad's common-carrier duties.

**2.** Moreover, Counsel read the paragraph quoted in the Order standing alone—and the "shipper needs" standard proposed by BNSF (ER0924) and incorporated in the Easement (ER0869)—to *implicitly* invoke the railroad's common-carrier obligations. We believe the common-carrier obligation is the most logical basis for BNSF's unequivocal statement: *"We cannot agree* to a single train limitation, or to a limitation on the number of cars." ER0921 (emphasis added). BNSF explained: "At times, depending upon business at the refineries, *we must have flexibility* with regard to the number of cars." ER0921 (emphasis added).

Counsel, like BNSF's regulator, take those phrases as hallmarks of the common-carrier obligation. For example, the STB has explained that "the purpose of the *common carrier obligation* is to meet the service *needs of shippers*." *Md. Transit Admin.*, FD 34975, 2008 WL 4281987, at *4 (STB Sept. 17, 2008) (emphasis added). Similarly, the agency has observed: "[I]f [certain freight railroads] are to retain the ability to carry out their statutory *obligation to provide common carrier service* upon reasonable request, [they] *must have the flexibility* to adjust the level of train traffic over particular line segments in *response to shipper*

*demands* and changing market conditions." *CSX Corp. etc.—Control &*
*Operating Leases/Agreements*, FD 33388, 2001 WL 92978, at *18 (STB
Feb. 1, 2001) (emphasis added, internal quotation marks omitted).

**3.** Counsel accordingly believe that this negotiating history and
the Easement itself reasonably support our argument that the parties
agreed in the Easement to allow BNSF to fulfill its common-carrier
obligations. *E.g.*, Br. 58. BNSF recognizes that the Tribe maintains
that "BNSF never informed the Tribe that it believed its common-
carrier obligations would be implicated" (Answering Br. 11) and
correspondingly argues that the Easement embodies a different
agreement. It is for this Court to decide whether the interpretation of
the Easement is material to the resolution of this appeal, and if so, how
to interpret it. But in the briefing, we advanced a good-faith argument
for BNSF's interpretation of the record and cited the corresponding

record support at ER0921.  We believe that counsel for the Tribe has

done the same for the Tribe's interpretation.[6]

*  *  *

Again, Counsel apologize for the statements that prompted the

Order, and we thank this Court for the opportunity to address them.

Should the Court have further questions, we would welcome the

opportunity to respond in writing or orally.

---

[6] The Order emphasizes BNSF's 1989 statement, "If more trains should
start operating (which we doubt)."  Order 7 (quoting ER0921).
Inasmuch as current Counsel did not make that statement, we are
unsure if the Order seeks a substantive discussion of that
representation.  In brief, we interpret that statement as a factual
prediction about whether shippers would demand increased service, not
an expression of "doubt" about whether BNSF was legally obligated to
provide such increased service.

Respectfully submitted,

DLA PIPER LLP (US)
701 Fifth Ave., Suite 6900
Seattle, WA 98104
Telephone: (206) 839-4800

MUNGER, TOLLES & OLSON LLP
560 Mission St., 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

_____
Stellman Keehnel

_____
Benjamin J. Horwich

_____
Andrew R. Escobar

_____
Teresa A. Reed Dippo

_____
Jeffrey B. DeGroot

MUNGER, TOLLES & OLSON LLP
1155 F St. NW, Seventh Floor
Washington, DC 20004
Telephone: (202) 220-1100

_____
Sarah G. Boyce

*Attorneys for Defendant-Appellant*
*BNSF Railway Company*

38

Respectfully submitted,

DLA PIPER LLP (US)
701 Fifth Ave., Suite 6900
Seattle, WA 98104
Telephone: (206) 839-4800

Stellman Keehnel

Andrew R. Escobar

Jeffrey B. DeGroot

MUNGER, TOLLES & OLSON LLP
560 Mission St., 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

Benjamin J. Horwich

Teresa A. Reed Dippo

MUNGER, TOLLES & OLSON LLP
1155 F St. NW, Seventh Floor
Washington, DC 20004
Telephone: (202) 220-1100

Sarah G. Boyce

*Attorneys for Defendant-Appellant*
*BNSF Railway Company*

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SWINOMISH INDIAN TRIBAL
COMMUNITY, a federally recognized Indian
Tribe,

Plaintiff,

v.

BSNF RAILWAY COMPANY, a Delaware
corporation,

Defendant.

NO. 2:15-cv-00543-RSL

**PLAINTIFF'S INITIAL
DISCLOSURES PURSUANT TO
FRCP 26(a)(1)**

Pursuant to FRCP 26(a), Plaintiff makes the following initial disclosures.  These

disclosures are based on the information currently available to Plaintiff.

FRCP 26a(i):

Individuals with knowledge who are members of or employed by Swinomish Indian

Tribal Community (the "Tribe"):

      1.     Allan Olson, General Manager
           c/o Tousley Brain Stephens PLLC
           1700 Seventh Avenue, Suite 2200
           Seattle  WA  98101

Mr. Olson has knowledge regarding the trespass litigation and negotiation of the

Swinomish-Burlington Northern Settlement Agreement dated September 24, 1990 (the

"Settlement Agreement") and the Burlington Northern Right-of-Way-Easement July 19, 1992

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

FRCP 26(a)(iii):

The issue of damages has been bifurcated and deferred until after a determination on liability.

FRCP 26(a)(iv):

Not applicable.

DATED this 20th day of October, 2015.

TOUSLEY BRAIN STEPHENS PLLC

By: _/s/ Christopher I. Brain_
    Christopher I. Brain, WSBA #5054
    cbrain@tousley.com
    Paul W. Moomaw, WSBA #32728
    pmoomaw@tousley.com
    1700 Seventh Avenue, Suite 2200
    Seattle, Washington 98101
    Telephone: 206.682.5600

OFFICE OF THE TRIBAL ATTORNEY, SWINOMISH
INDIAN TRIBAL COMMUNITY

By: _/s/ Stephen T. LeCuyer_
    Stephen T. LeCuyer, WSBA #36408
    slecuyer@swinomish.nsn.us
    11404 Moorage Way
    LaConner, WA 98257
    Telephone: 360.466.1058
    *Attorneys for Plaintiff*

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 | I hereby certify that on October 20, 2015, I served the foregoing document upon the |
| 3 | individuals listed below via email: |
| 4 | |
| 5 | Stellman Keehnel, WSBA #9309 |
| | Stellman.keehnel@dlapiper.com |
| 6 | Andrew Escobar, WSBA #42793 |
| | Andrew.escobar@dlapiper.com |
| 7 | Jeffrey DeGroot, WSBA #46839 |
| | Jeff.degroot@dlapiper.com |
| 8 | DLA Piper LLP |
| 9 | 701 Fifth Avenue, Suite 7000 |
| | Seattle  WA  98104 |
| 10 | DATED at Seattle, Washington, this 20th day of October, 2015. |
| 11 | |

_/s/ Christopher I. Brain_

Christopher I. Brain, WSBA #5054
cbrain@tousley.com
Attorneys for Plaintiff
TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
Tel:    206.682.5600
Fax:    206.682.2992

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 18-35704

I am the attorney or self-represented party.

**This brief contains** | 6,995 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

◉ complies with the length limit designated by court order dated | May 22, 2019 | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Benjamin J. Horwich | **Date** | Jun 19, 2019

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/2018*