No. 18-35704

# In the United States Court of Appeals for the Ninth Circuit

**SWINOMISH INDIAN TRIBAL COMMUNITY,**
**a federally recognized Indian Tribe,**

*Plaintiff-Appellee,*

v.

**BNSF RAILWAY COMPANY,**
**a Delaware corporation,**

*Defendant-Appellant.*

*On Appeal by Permission Under 28 U.S.C. § 1292(b) of*
*Orders of the United States District Court for the*
*Western District of Washington, Case No. 2:15-cv-543-RSL*
*The Honorable Robert S. Lasnik, United States District Judge*

## DEFENDANT-APPELLANT'S PETITION FOR REHEARING OR REHEARING EN BANC

Donald B. Verrilli, Jr.
Sarah G. Boyce
MUNGER, TOLLES &
OLSON LLP
1155 F St. NW, 7th Floor
Washington, DC 20004
Telephone: (202) 220-1100
Facsimile: (202) 220-2300

Benjamin J. Horwich
Teresa Reed Dippo
MUNGER, TOLLES &
OLSON LLP
560 Mission St., 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

*Attorneys for Defendant-Appellant BNSF Railway Company*

## TABLE OF CONTENTS

Page

INTRODUCTION AND RULE 35(b) STATEMENT ................................... 1

BACKGROUND ........................................................................... 6

REASONS FOR GRANTING REHEARING ............................................. 9

    A.    The Panel's Focus on Tribal *Rights* Conflicts with Supreme Court Precedent that Demands Evaluating the *Remedies* and *Forum* Congress Provided ......................... 9

    B.    The Panel's "Harmonization" Analysis Conflicts with the Supreme Court's, this Circuit's, and Other Circuits' Precedent ..................................................................... 15

    C.    The Panel's Unprecedented Holding Threatens the Free Flow of Western Commerce .......................................... 20

CONCLUSION ........................................................................... 22

STATUTORY ADDENDUM .................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alliance Shippers, Inc. v. Southern Pacific Transportation Co.,*
    858 F.2d 567 (9th Cir. 1988)..................................................................14

*Ass'n of American Railroads v. South Coast Air Quality
    Management District*, 622 F.3d 1094 (9th Cir. 2010)...................15, 19

*BNSF Railway v. California Department of Tax &
    Fee Administration*, 904 F.3d 755 (9th Cir. 2018)..............5, 16, 17, 22

*California National Guard v. Federal Labor Relations
    Authority*, 697 F.2d 874 (9th Cir. 1983)..............................................16

*Chicago & North Western Transportation Co. v.
    Kalo Brick & Tile Co.*, 450 U.S. 311 (1981) ........................................6

*City of Auburn v. U.S. Government*, 154 F.3d 1025 (9th Cir. 1998).......19

*City of Des Moines v. Chicago & North Western Railway,*
    264 F.2d 454 (8th Cir. 1959)..................................................................13

*City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) ................................11

*City of Sherrill v. Oneida Indian Nation,*
    544 U.S. 197 (2005) ...............................................4, 9, 10, 11

*eBay v. MercExchange, LLC*, 547 U.S. 388 (2006) ...................................9

*Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ...................4, 15, 16

*Friberg v. Kansas City Southern Railway,*
    267 F.3d 439 (5th Cir. 2001)..................................................................20

*G.&T. Terminal Packaging Co. v. Consolidated Rail Corp.,*
    830 F.2d 1230 (3d Cir. 1987) ................................................................14

*Nigg v. United States Postal Service*, 555 F.3d 781 (9th Cir. 2009).......16

# TABLE OF AUTHORITIES
## (continued)

*Oneida County. v. Oneida Indian Nation*, 470 U.S. 226 (1985) ............ 11

*Oneida Indian Nation v. Oneida County*, 414 U.S. 661 (1974) ............. 12

*Pace v. CSX Transportation, Inc.*, 613 F.3d 1066 (11th Cir. 2010) ........ 20

*PCS Phosphate Co. v Norfolk Southern Corp.*,
  559 F.3d 212 (4th Cir. 2009) .................................................... 17, 19, 21

*Railroad Ventures, Inc. v. STB*, 299 F.3d 523 (6th Cir. 2002) ............... 18

*Riffin v. STB*, 733 F.3d 340 (D.C. Cir. 2013) ............................................ 2

*Smith v. Hoboken R.R. Warehouse & S.S. Connecting Co.*,
  328 U.S. 123 (1946) ................................................................... 13

*Thompson v. Texas Mexican Railway*, 328 U.S. 134 (1946) ................... 13

*United States v. Baltimore & Ohio Railroad*,
  333 U.S. 169 (1948) ................................................................... 18

## REGULATORY DECISIONS

*Burlington Northern & Santa Fe Railway*, FD 33740,
  2003 WL 21062875 (STB May 13, 2003) ................................................ 6

*Hanson Natural Resources Co.*, FD 32248,
  1994 WL 673712 (ICC Nov. 15, 1994) ................................................. 18

*United States Environmental Protection Agency*,
  FD 35803, 2014 WL 7392860 (STB Dec. 29, 2014) ............................. 20

STATUTES, REGULATION, AND RULE

ICC Termination Act of 1995,
   Pub. L. No. 104-88, 109 Stat. 803 (1995) .................................... *passim*

   49 U.S.C. § 10501(b)......................................................... *passim*

   49 U.S.C. § 10501(b)(1) ......................................................... 14

   49 U.S.C. § 11101(a)......................................................... 2, 20

Indian Right-of-Way Act, 25 U.S.C. §§ 323-328 ............................. *passim*

Transportation Act of 1920, § 402, 41 Stat. 477 ...................................... 6

Treaty of Point Elliott, Jan. 22, 1855, 12 Stat. 927 ........................ *passim*

28 U.S.C. § 2321......................................................................... 16

28 U.S.C. § 2342(5) ...................................................................... 16

49 U.S.C. § 10501(d) (1982)......................................................... 14

25 C.F.R. § 169.413......................................................................... 8, 12

Fed. R. App. P. 35(b) ..................................................................... 1

## INTRODUCTION AND RULE 35(b) STATEMENT

The Panel has issued the first appellate decision ever—in a century of exclusive federal agency regulation of interstate railroads—holding that a court may use federal common law to issue an injunction regulating the amount of traffic on a common-carrier rail line. Congress has decreed that remedies of that sort lie only before a single expert federal agency. That is because common-carrier railroads are an indispensable link in the Nation's supply chain, and disputes over their service are ill-suited to bilateral litigation when they affect the shippers who send goods, the public that consumes those goods, the rail carrier itself, and the places the railroad passes through. The Panel, however, never mentions the phrase "common carrier."

The responsible agency was historically the Interstate Commerce Commission ("ICC"), and is now the Surface Transportation Board ("STB") under the ICC Termination Act of 1995 ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803 (1995). ICCTA is crystalline: "The jurisdiction of the [STB] over…transportation by rail carriers…is exclusive," and "the remedies provided under [ICCTA] with respect to regulation of rail

transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b).

Here, Plaintiff-Appellee Swinomish Indian Tribal Community (the "Tribe") invokes its rights under [1] a Treaty between the United States and the Tribe's predecessors; [2] the Indian Right-of-Way Act, 25 U.S.C. §§ 323-328 ("IRWA"); and [3] an Easement issued under IRWA that allows Defendant-Appellant BNSF Railway Company ("BNSF") to run "one eastern bound train, and one western bound train, (of twenty-five (25) cars or less)" daily, 5ER0869, on a common-carrier rail line near the edge of the Tribe's reservation. The Tribe seeks an injunction enforcing that condition "specifying the maximum number of trains and cars" transiting the line, Op.32. But shippers served by the line— refineries producing a substantial share of Washington State's gasoline—require more cars. Shippers and the public have rights too: Under ICCTA, 49 U.S.C. § 11101(a), BNSF is a common carrier, owing "an absolute duty to provide rates and service over the [l]ine upon reasonable request," *Riffin v. STB*, 733 F.3d 340, 347 (D.C. Cir. 2013) (quotation marks omitted) (discussing Section 11101(a)).

As significant as the Tribe's sovereign rights are, the present question is not about those rights (or shippers' rights or the public's interest), or the ultimate merits of whether to restrict traffic on the rail line. Rather, the question is what remedies exist in what forum to vindicate those rights. Certainly, the Tribe is entitled to materially increased rent for increased traffic (and any disagreement there could be litigated or arbitrated without regulating the line's operation). But where, as here, a litigant seeks an order actually regulating transportation by a rail carrier, ICCTA speaks clearly and directly: The STB's "jurisdiction…is exclusive" and "the remedies provided under [ICCTA]…are exclusive." 49 U.S.C. § 10501(b). That statute says the Tribe's injunctive claim cannot proceed in court. The Panel's contrary decision warrants further review because it conflicts with controlling authority, and has enormous importance for both the vital rail line at issue and the public's broader interest in the free flow of commerce.

*First*, the Panel conflates the question of the Tribe's "right to exclude" (Op.21, 22, 35, 36) with the question of where and how the Tribe may enforce that right. That approach disregards the Supreme Court's holding—in a case rejecting an Indian tribe's federal common

law claim for injunctive relief—that "[t]he substantive questions whether the plaintiff has any right or the defendant has any duty, and if so what it is, are very different questions from the remedial questions whether this remedy or that is preferred, and what the measure of the remedy is." *City of Sherrill v. Oneida Indian Nation* (*Oneida III*), 544 U.S. 197, 213 (2005) (quotation marks omitted). The Panel neither acknowledges *Oneida III* nor confronts the question whether ICCTA's plain terms "preempt the *remedies*," 49 U.S.C. § 10501(b) (emphasis added), of federal common law "with respect to regulation of rail transportation," *id.*

*Second*, the Panel erroneously evaluates the relationship among ICCTA, the Treaty, and IRWA. Operating correctly, "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, [a] Court is not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quotation marks omitted). But the Panel does not "give effect to" ICCTA, and instead concludes that ICCTA has no application here simply because it neither "repeals

[IRWA]" (Op.30) nor "abrogates" the Tribe's "right...to exclude non-Indians from Indian lands" (Op.35).

As Judge Ikuta observed in dissent in a recent case involving ICCTA and another federal law, "[o]bviously, this does not harmonize the statutes, it merely chooses [other laws] over ICCTA." *BNSF Ry. v. Cal. Dep't of Tax & Fee Admin.* (*CDTFA*), 904 F.3d 755, 777 (9th Cir. 2018) (Ikuta, J., dissenting in part). In subordinating ICCTA to other laws, the Panel creates conflicts with precedent from the STB, this Court, other Circuits, and the Supreme Court.

*Third*, a decision of consequence for the only rail line serving major refineries might alone warrant en banc attention. But the decision's precedential effect may be much greater still: The decision ignores shippers, whose interests the ICC and STB have guarded for a century. It disserves the public interest by nullifying Congress's grant of jurisdiction to that expert regulator—whose views this Court has not invited, but which may be informative. And it creates uncertainty about the status of the many rail lines crossing Indian lands. Rehearing is warranted.

# BACKGROUND

**1.** This case concerns a rail line near the edge of the Tribe's reservation, which has been the subject of intermittent but serious controversy since its construction 130 years ago. *See* Op.4-17. BNSF's predecessor was operating on the line when Congress amended the Interstate Commerce Act to bring the entirety of the interstate rail network under exclusive federal regulatory control. *See* Transportation Act of 1920 § 402, 41 Stat. 477-78 (amending Interstate Commerce Act § 1(18)); *see Burlington N. & Santa Fe Ry.*, FD 33740, 2003 WL 21062875, at *4-6 (STB May 13, 2003). Today, ICCTA is the backbone of the Interstate Commerce Act, which the Supreme Court has described as "among the most pervasive and comprehensive of federal regulatory schemes." *Chicago & Nw. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981).

The rail line is the subject of the Easement, which was entered into under IRWA in 1991 and provides:

> [O]nly one eastern bound train, and one western bound train, (of twenty-five (25) cars or less) shall cross the Reservation each day. The number of trains and cars shall not be increased unless required by shipper needs. The Tribe agrees not to arbitrarily withhold permission to

> increase the number of trains or cars when necessary to
> meet shipper needs.

Op.10-11. The line is the only one serving refineries that depend on

inbound service for crude oil and other feedstock, and outbound service

to their customers; limiting or stopping rail service would severely

impact their ability to produce fuel to meet consumer needs. *See* BNSF

Opening Br. 17; Tesoro Amicus Br. 1-7. In recent years, due to the

refineries' needs, BNSF has significantly exceeded the one-train/25-car

level stated in the Easement. Op.12-13.

    **2.** The Tribe sued BNSF on various claims "grounded in federal

common law," 1ER0005, seeking, as relevant here, "injunctive relief

limiting train traffic in accordance with the [Easement]," Op.16. On

cross-motions for partial summary judgment, the district court held

that ICCTA would not preempt injunctive relief. *See id.* This Court

permitted an interlocutory appeal. Op.5. "BNSF's petition and appeal

pose one question: Whether the ICCTA precludes the use of injunctive

relief to enforce the terms of the Easement Agreement." Op.17.

    **3.** The Panel affirmed. It observed that "[u]nder federal

common law, Indian tribes have the right to exclude non-Indians and

non-tribal members from their lands," Op.21; that "[t]he Treaty

specifically provides that the Tribe has a right to exclude non-Indians from the Reservation," Op.22; and that "[r]egulations under [IRWA] provide that any unauthorized use of an existing right-of-way constitutes trespass for which a Tribe may 'pursue any available remedies under applicable law, including applicable tribal law,'" Op.23 (quoting 25 C.F.R. § 169.413).

Considering ICCTA's relevance to this case, the Panel initially stated that "[t]o the extent two federal laws appear to conflict, we attempt to harmonize them." Op.27. But it then stated that "the specific question before us is whether § 10501(b) of the ICCTA repeals the Indian Right of Way Act." Op.30. The Panel found no intention to repeal, Op.30-35, in part because it concluded the Easement does not "operate as a 'regulation' within the meaning of the ICCTA," Op.31. Ultimately, the Panel "reconcile[ed]" ICCTA and IRWA by holding that "tribes retain sovereign authority to control their own lands and to enforce the terms of right-of-way easement agreements," while "the STB retains authority under the ICCTA to regulate rail operations over Indian lands," but only "so long as [its] regulations are consistent with the terms of a normal easement granted under [IRWA]." Op.35.

Finally, the Panel held "that the Tribe's treaty-based right to exclude and condition a third-party's presence on the Reservation has not been abrogated by the ICCTA." Op.36.

## REASONS FOR GRANTING REHEARING

### A. The Panel's Focus on Tribal *Rights* Conflicts with Supreme Court Precedent that Demands Evaluating the *Remedies* and *Forum* Congress Provided

The question presented here is "[w]hether the ICCTA precludes the use of injunctive relief to enforce the terms of the Easement Agreement." Op.17. That is a question about remedies, not rights. In whatever way the Tribes' rights are ultimately reconciled with shippers' and the public's rights to service—issues that will eventually be decided—the issue before this Court has always been *where* and *how* the Tribe may enforce its rights. The Panel's emphasis on the Tribe's underlying rights, at the expense of analyzing remedies and forum, led it to underappreciate the exclusive remedies that Congress provided in the exclusive forum of the STB.

1. "[T]he creation of a right is distinct from the provision of remedies for violations of that right." *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 392 (2006). Thus, the Supreme Court held in *Oneida III* that a tribe's rights and a tribe's remedies present different questions:

"There is a sharp distinction between the *existence* of a federal common law right to Indian homelands and how to *vindicate* that right." 544 U.S. at 213 (quotation marks omitted). "The distinction between a claim or substantive right and a remedy is fundamental." *Id.* (quotation marks omitted).

The Panel did not follow this precedent. It discussed the Tribe's "right to exclude" in detail. Op.21, 22, 35, 36. But no discussion of that right can answer what the Tribe's *remedy* is, and where it lies. The Panel's passing references to the Tribe's remedy—"an injunction" (Op.5), a "right to sue" (Op.22), a "right to enforce" (Op.36), or "injunctive relief" (Op.37)—come without substantive detail.

**2.** Properly distinguishing between rights and remedies, the Tribe has an administrative remedy before the STB, but not an injunctive remedy in court.

The Tribe brings federal common law claims. *See* Op.22 ("Tribes have a federal common law right to sue to protect their possessory interests in their lands."); 2ER0233 (Tribe's motion for reconsideration below, arguing that "the Court is fully empowered to grant the Tribe injunctive relief under federal common law").

"[W]hen Congress addresses"—through a statute like ICCTA—"a question previously governed by a decision rested on federal common law[,] the need for such an unusual exercise of lawmaking by federal courts disappears." *City of Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981); *cf. Oneida III*, 544 U.S. at 220 (refusing to recognize federal common law equitable claim by tribe, in part because "Congress has provided a [statutory administrative] mechanism for the [relief sought] that takes account of the interests of others with stakes" in the matter). "In determining whether a federal statute pre-empts common-law causes of action, the relevant inquiry is whether the statute '[speaks] *directly* to [the] question' otherwise answered by federal common law." *Oneida Cty. v. Oneida Indian Nation*, 470 U.S. 226, 236-37 (1985) (brackets in original) (quoting *Milwaukee*, 451 U.S. at 315).

ICCTA speaks directly indeed to whether a federal common law injunction is available in court to regulate traffic on the rail line: That judicial remedy is unavailable because "[t]he jurisdiction of the [STB] over…transportation by rail carriers…is *exclusive*," and "the remedies provided under [ICCTA] with respect to regulation of rail transportation are *exclusive* and preempt the remedies provided under

*Federal* or State law." 49 U.S.C. § 10501(b) (emphasis added). By refusing to find preemption of federal common law, or federal statutes, or federal treaties, the Panel drains all meaning from Section 10501(b)'s reference to "Federal…law."

IRWA does not clash with ICCTA because it creates no remedy here, simply allowing "remedies under applicable law," 25 C.F.R. § 169.413. As for the Treaty, the Panel asserts that "[u]nder long established principles of federal Indian law, treaties are enforceable in equity against third parties." Op.22-23. But "principles of federal Indian law" are principles of *federal common law* subject to Congress's power to specify the forum and remedy for treaty enforcement. *See Oneida Indian Nation v. Oneida Cty.*, 414 U.S. 661, 674 (1974) (explaining, in assessing a tribe's action to enforce possessory rights, "absent federal statutory guidance, the governing rule of decision would be fashioned by the federal court in the mode of the common law").

Thus, in plain text uncontradicted by any other Act of Congress, ICCTA says *three times* that the Tribe's injunctive claim is misplaced: It is not brought in the "exclusive" forum. It does not invoke the

"exclusive" set of remedies.  And it instead seeks a "preempt[ed]…

remedy provided under Federal…law."  49 U.S.C. § 10501(b).[1]

**3.** Failing to heed ICCTA's text creates conflicts with a raft of

appellate precedent.

On the question of forum, courts have long recognized that the

national policy of uniform rail regulation requires that the ICC (now

STB) must pass first on the continuation of common-carrier service

when another party asserts a superior right to property or facilities

used by the carrier.  *See, e.g.*, *Smith v. Hoboken R.R. Warehouse & S.S.*

*Connecting Co.*, 328 U.S. 123, 130, 133 (1946) (federal bankruptcy

proceeding to terminate rail carrier's lease must await ICC

consideration); *Thompson v. Tex. Mexican Ry.*, 328 U.S. 134, 144-45,

151 (1946) (similar as to agreement to use tracks and facilities; "the

court below should have stayed its hand and remitted the parties to the

[ICC]"); *City of Des Moines v. Chicago & Nw. Ry.*, 264 F.2d 454, 457 (8th

---

[1] BNSF's briefs explain how ICCTA's administrative remedies would operate in this context (*see* Opening Br. 10-14, 41-44; Reply Br. 5-6, 10-14), and also how ICCTA does *not* necessarily affect monetary claims in the same way it affects injunctive claims (*see* Opening Br. 34 n.*).

Cir. 1959) (city's ouster of railroad must await ICC consideration). ICCTA statutorily recognizes this settled rule of agency primacy.

Likewise, on the question of remedy, the Panel's refusal to recognize that ICCTA preempts federal common law remedies conflicts with decisions from this Circuit and the Third Circuit analyzing ICCTA's immediate predecessor statute, the Staggers Rail Act. By "ma[king] clear that the only remedies regarding rail rates are those provided by federal statute[]," Congress rejected judge-made remedies against common carriers, "whether…arising under state or federal common law." *G.&T. Terminal Packaging Co. v. Consol. Rail, Corp.*, 830 F.2d 1230, 1234, 1235 (3d Cir. 1987); *accord Alliance Shippers, Inc. v. S. Pac. Transp. Co.*, 858 F.2d 567, 568-69 (9th Cir. 1988) (per curiam). Just as the ICC had exclusive jurisdiction over "remedies…with respect to…rates" there, 49 U.S.C. § 10501(d) (1982), the STB has exclusive jurisdiction here over "transportation" and "remedies…with respect to…routes, services, and facilities of [rail] carriers," 49 U.S.C. § 10501(b)(1).

**B.    The Panel's "Harmonization" Analysis Conflicts with the Supreme Court's, this Circuit's, and Other Circuits' Precedent**

The Panel also erred, and created numerous conflicts, in its analysis of the relationship among ICCTA, IRWA, and the Treaty.

1.    "Our rules aiming for harmony over conflict in statutory interpretation grow from an appreciation that it's the job of Congress by legislation, not [courts] by supposition, both to write the laws and to repeal them." *Epic Sys.*, 138 S. Ct. at 1624. "If an apparent conflict exists between ICCTA and a *federal* law, then the courts must strive to harmonize the two laws, giving effect to both laws if possible." *Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist.* (*AAR*), 622 F.3d 1094, 1097 (9th Cir. 2010).

The Panel recites (Op.27-28) but does not implement these harmonization principles. Instead, it restates the issue as whether ICCTA repealed IRWA or abrogated the Treaty, titling its analyses "Repeal" (Op.27) and "Abrogation" (Op.35). But BNSF does not claim here that ICCTA repeals IRWA or abrogates the Treaty. Rather, BNSF urges that ICCTA's remedial framework can coexist with IRWA's provisions for granting easements across tribal lands and the Treaty's

grant of a right to exclude:  The STB can evaluate the Tribe's substantive rights and decide (subject to judicial review, 28 U.S.C §§ 2321, 2342(5)) if they prevail over the competing right of shippers and the public to common-carrier service.  *See supra*, note 1.

The Panel treats the lack of an intent to repeal or abrogate as a sufficient reason for giving no effect to ICCTA, impermissibly "pick[ing] and choos[ing] among congressional enactments," *Epic Sys.*, 138 S. Ct. at 1624 (quotation marks omitted).  But elsewhere, this Court has correctly gone to great lengths to explore ways statutes might "not [be] in irreconcilable conflict."  *Nigg v. U.S. Postal Serv.*, 555 F.3d 781, 788 (9th Cir. 2009) (examining relationship between general overtime law and compensation law specific to postal workers).  And it has rightly rejected a proffered "attempt to harmonize…two statutes" that "would tend to render the existence of part of [one statute] meaningless."  *Cal. Nat'l Guard v. FLRA*, 697 F.2d 874, 879 (9th Cir. 1983).

**2.**    This issue of ICCTA harmonization is recurring.  The Panel's error here is the same error that prompted Judge Ikuta to dissent in *CDTFA*, stating that the majority there had "blunder[ed] in its application of longstanding rules for harmonizing federal statutes."  904

F.3d at 771 (Ikuta, J., dissenting in part).  That interpretive dispute did not affect *CDTFA*'s outcome, and *CDTFA* implicated ICCTA in a somewhat different context (rates, rather than common-carrier transportation).  But the principle was the same:  Using another statute to limit ICCTA's effect "would require altering ICCTA's language," and "does not harmonize the statutes, it merely chooses [the other statute] over ICCTA."  *Id.* at 777.

3.      By choosing IRWA and the Treaty over ICCTA, the Panel creates a cascade of conflicts with decades of precedent on federal law governing interstate commerce.  These conflicts arise because the Panel denies the ordinary meaning of Congress's words:  An injunction "specifying the maximum number of trains and cars" transiting a rail line, Op.32, is a "remed[y]…with respect to regulation of rail transportation" and therefore "preempt[ed]," 49 U.S.C. § 10501(b).

*First*, the Panel holds that the Easement is not "regulation," by analogy to the principle that "voluntary agreements between private parties 'are not presumptively regulatory acts' subject to the ICCTA's preemption provision."  Op.31 (quoting *PCS Phosphate Co. v Norfolk S. Corp.*, 559 F.3d 212, 218 (4th Cir. 2009)).  But the Panel breaks from all

prior authority by omitting the critical limitation on that principle: If

the agreement compromises the ability of the railroad to offer common-

carrier service, then it is *not* voluntary from shippers' perspective, it is

*not* enforceable, and it *does* invade the STB's responsibilities. *See, e.g.*,

*United States v. Baltimore & Ohio R.R.*, 333 U.S. 169, 177-78 (1948)

(holding that trackage contract between a landowner and a rail carrier

that would impair shippers' rights to common-carrier service is void);

*R.R. Ventures, Inc. v. STB*, 299 F.3d 523, 560 (6th Cir. 2002) (upholding

STB decision that contract was unenforceable insofar as it

"unreasonably interfere[d] with" the railroad's "future fulfillment of

common carrier obligations"); *Hanson Nat. Res. Co.*, FD 32248, 1994

WL 673712, at *2, *28 (ICC Nov. 15, 1994) ("[C]ontractual restrictions

that unreasonably interfere with…common carrier operations will be

deemed void as contrary to public policy.").

*Second*, the Panel's decision is in overwhelming tension with this

and other Circuits' understanding of ICCTA's preemption of state law.

Congress knows what it means for one law to "preempt" another, so its

choice to "preempt the remedies provided under Federal or State law,"

49 U.S.C. § 10501(b), shows that ICCTA's displacement of federal and

state law are similar, if not exactly congruent.[2]  The Panel itself relies

principally on a case about preemption of state law as a useful

guidepost.  *See* Op.30-32 (discussing *PCS Phosphate*).

The appropriate test in such cases is whether the regulation "may

reasonably be said to have the effect of managing or governing rail

transportation."  *AAR*, 622 F.3d at 1097 (quotation marks omitted).

The injunction sought here would obviously have that effect.  The

Panel's attempt to leave the STB's authority half-alive—"the STB

retains authority" over economic matters "such as rates for service,"

Op.35—only sharpens the conflict:  This Court's seminal ICCTA

preemption decision rejects the "argument that, through the ICCTA,

Congress only intended preemption of economic regulation of the

railroads."  *City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1030 (9th Cir.

---

[2] Counsel's effort to convey this point in BNSF's opening brief is the
subject of the Panel's criticism of Counsel's treatment of *AAR* and
similar authorities, Op.24-26.  Counsel apologize for quoting those
authorities on pages 28-29 of BNSF's opening brief in a way that
created a misimpression about their application, and for not qualifying
those authorities' application until pages 30-32 of that brief (which
explained that "ICCTA preemption has its limits," Br. 30, because,
when another federal law is involved, "'the court must strive to
harmonize the two laws, giving effect to both laws if possible,'" Br. 31
(quoting *AAR*, 622 F.3d at 1097)).

1998).  Other Circuits have likewise held that ICCTA preempts "remedies involving the operation of [a] track," *Pace v. CSX Transp., Inc.*, 613 F.3d 1066, 1070 (11th Cir. 2010), or "impact[ing], in such areas as train speed, length and scheduling, the way a railroad operates its trains," *Friberg v. Kansas City S. Ry.*, 267 F.3d 439, 443 (5th Cir. 2001).

*Third*, the Panel ignored the STB's views on harmonization:  If federal law is "being used to regulate rail operations directly or being applied in a discriminatory manner against railroads," it can be preempted if it produces a conflict with federal rail policy.  *United States EPA*, FD 35803, 2014 WL 7392860, at *7 (STB Dec. 30, 2014) (discussing federal environmental laws).  That exactly describes this case:  The Tribe seeks to apply the Easement to "regulate [BNSF's] rail operations directly," *id.*, at the expense of BNSF's fundamental common-carrier duty in 49 U.S.C. § 11101(a).  Yet the Panel never discusses (and never solicited) the STB's views before shrinking that agency's ostensibly "exclusive" jurisdiction.

## C.   The Panel's Unprecedented Holding Threatens the Free Flow of Western Commerce

The Panel is the first ever to approve regulation of railroad operations by a court through injunction, rather than by the exclusive

federal agency designated by Congress. Numerous cases make clear that, because of the broad public interest involved, the STB is the first stop on any path to restricting or eliminating a common carrier's service. *See supra*, pp. 13-14. The Panel thus sidelines interstate railroads' federal regulator and steers a vital channel of national commerce into uncharted territory. *See* BNSF Reply Br. 14-16. The Court may wish to invite the views of the STB (and other interested agencies) before adhering to the Panel's decision.

Beyond the vital rail line here, the decision threatens enormous consequences for the public that depends on the continued service of the many rail lines crossing Indian lands. *See* AAR Amicus Br. 15. Nothing in the logic of the Panel's opinion limits what a tribal easement might regulate—commodities carried? rates charged? shippers forbidden? Although future litigants facing such issues will doubtless seek to distinguish the Panel's decision, nothing in the Panel's opinion limits its consequences.

Especially troubling is the Panel's reliance on *PCS Phosphate* to validate the enforceability of an agreement restricting common-carrier service. If the panel is correct, then the fears of the numerous shipper

amici will be realized: "[A] railroad could simply sign a contract with a tribe that prohibits transporting hazardous materials across the reservation, then invoke that agreement to decline carriage of the materials." ACC Amicus Br. 19. That has never been the law, and the Panel's decision upends shippers' expectations without mentioning their rights to common-carrier service.

In short, the Panel's opinion, like the *CDTFA* majority opinion, forces ICCTA to take a backseat to every other federal law, even though ICCTA's terms are unusually plain. This Court is two steps down a path that weakens the uniform federal control of rail carriers that has allowed this quintessential channel of interstate commerce to serve the Nation so well. The Court should reconsider.

## CONCLUSION

The petition for rehearing should be granted.

Respectfully submitted.

DATED: March 30, 2020      By:   */s/ Benjamin J. Horwich*
                                    Benjamin J. Horwich

MUNGER, TOLLES & OLSON LLP
    Donald B. Verrilli, Jr.
    Benjamin J. Horwich
    Sarah G. Boyce
    Teresa Reed Dippo

# STATUTORY ADDENDUM

**49 U.S.C. § 10102 provides in relevant part:**

In this part—

**(1)** "Board" means the Surface Transportation Board;

\* \* \*

**(5)** "rail carrier" means a person providing common carrier railroad transportation for compensation, but does not include street, suburban, or interurban electric railways not operated as part of the general system of rail transportation;

\* \* \*

**(9)** "transportation" includes—

**(A)** a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

**(B)** services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property; \* \* \*

**49 U.S.C. § 10501(b) provides:**

**(b)** The jurisdiction of the Board over—

**(1)** transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

**(2)** the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

**49 U.S.C. § 11101(a) provides:**

**(a)** A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall provide the transportation or service on reasonable request. A rail carrier shall not be found to have violated this section because it fulfills its reasonable commitments under contracts authorized under section 10709 of this title before responding to reasonable requests for service. Commitments which deprive a carrier of its ability to respond to reasonable requests for common carrier service are not reasonable.

# Form 11. Certificate of Compliance for Petitions for Rehearing or Answers

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 18-35704


I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for panel rehearing/petition for rehearing en banc/answer to petition is *(select one)*:

[X] Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,200.

*(Petitions and answers must not exceed 4,200 words)*

**OR**

[ ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** */s/ Benjamin J. Horwich*          **Date** March 30, 2020

# PANEL OPINION

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SWINOMISH INDIAN TRIBAL
COMMUNITY, a federally
recognized Indian Tribe,
                    *Plaintiff-Appellee*,

v.

BNSF RAILWAY COMPANY, a
Delaware corporation,
                    *Defendant-Appellant.*

No. 18-35704

D.C. No.
2:15-cv-00543-RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted May 14, 2019
Seattle, Washington

Filed March 4, 2020

Before: Michael Daly Hawkins, William A. Fletcher,
and Mark J. Bennett, Circuit Judges.

Opinion by Judge W. Fletcher

## SUMMARY[*]

### Indian Law

The panel affirmed the district court's interlocutory orders denying defendant BNSF Railway Co.'s motion for summary judgment on Swinomish Indian Tribal Community's claim that BNSF violated a right-of-way and easement agreement limiting train traffic across the Tribe's reservation.

The district court held that BNSF violated the terms of the easement agreement, issued pursuant to the Indian Right of Way Act, and the Tribe was entitled to injunctive relief.

The panel held that the Interstate Commerce Commission Termination Act did not repeal the Indian Right of Way Act and did not defeat the Tribe's right to enforce conditions in the easement agreement. The panel further held that the ICCTA did not abrogate the Treaty of Point Elliott and the Tribe's treaty-based federal common law right to exclude and condition a third party's presence on, and use of, reservation lands. Finally, the panel held that the Tribe had the right to pursue injunctive relief to enforce the terms of the easement agreement. The panel remanded the case to the district court.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Benjamin J. Horwich (argued) and Teresa A. Reed Dippo, Munger Tolles & Olson LLP, San Francisco California; Sarah G. Boyce, Munger Tolles & Olson LLP, Washington, D.C.; Stellman Keehnel, Andrew R. Escobar, and Jeffrey B. DeGroot, DLA Piper LLP (US), Seattle, Washington; for Defendant-Appellant.

Christopher I. Brain (argued) and Chase Alvord, Tousley Brain Stephens PLLC, Seattle, Washington; Stephen T. LeCuyer, Office of the Tribal Attorney, La Conner, Washington; for Plaintiff-Appellee.

Thomas H. Dupree Jr. and David A. Schnitzer, Gibson Dunn & Crutcher LLP, Washington, D.C.; Kathryn D. Kirmayer and Timothy J. Strafford, Association of American Railroads, Washington, D.C.; for Amicus Curiae Association of American Railroads.

Philip J. Bezanson, Bracewell LLP, Seattle, Washington, for Amicus Curiae Tesoro Refining & Marketing Company LLC.

Jeffrey M. Harris, Consovoy McCarthy Park PLLC, Arlington, Virginia; Allison Starmann, Deputy General Counsel, American Chemistry Council, Washington, D.C.; Richard Moskowitz, General Counsel, American Fuel & Petrochemical Manufacturers, Washington, D.C.; Andrew S. Miles, Senior Counsel, American Petroleum Institute, Washington, D.C.; Daryl L. Joseffer and Michael B. Schon, U.S. Chamber Litigation Center, Washington, D.C.; Peter C. Tolsdorf and Leland P. Frost, National Association of Manufacturers, Washington, D.C.; Katie Sweeney, National Mining Association, Washington, D.C.; for Amici Curiae

American Chemistry Council, American Fuel & Petrochemical Manufacturers, American Petroleum Institute, Chamber of Commerce of the United States of America, National Association of Manufacturers, and National Mining Association.

Robert W. Ferguson, Attorney General; Julian H. Beattie, Assistant Attorney General; Laura Watson, Senior Assistant Attorney General; Office of the Attorney General, Olympia, Washington; Letitia James, Attorney General, Albany, New York; Ellen F. Rosenblum, Attorney General, Salem, Oregon; for Amici Curiae Washington State, New York, and Oregon.

Jan E. Hasselman and Ashley N. Bennett, Earthjustice, Seattle, Washington, for Amici Curiae Suquamish Tribe, Tulalip Tribes, and Quinault Indian Nation.

---

**OPINION**

W. FLETCHER, Circuit Judge:

Over one hundred years ago, the predecessor to BNSF Railway Co. ("BNSF") built a railroad line across the Reservation of the Swinomish Indian Tribal Community ("Tribe") without the Tribe's permission. In the 1970s, the Tribe and the United States brought suit against the railroad for trespass. That litigation eventually resulted in a Settlement Agreement and an Easement Agreement. As a result of those Agreements, BNSF applied for and obtained a right-of-way across the Reservation, issued by the Department of the Interior under the Indian Right of Way Act of 1948. The right-of-way incorporates the terms of the Easement Agreement. BNSF agreed to a daily maximum of

one train in each direction, with a maximum number of rail cars, unless the Tribe agreed in writing to an increase in that number. BNSF also agreed to submit to the Tribe annual reports of the cargo carried by the trains.

In 2011, the Tribe learned that BNSF was violating the parallel terms of the right-of-way and the Easement Agreement by running more trains and cars across the Reservation than permitted by its terms. BNSF had also failed for many years to submit to the Tribe the required annual cargo reports. The Tribe requested that BNSF comply with the terms of the Agreement. BNSF refused. The Tribe then sued BNSF in federal district court.

BNSF argued in the district court that the Interstate Commerce Commission Termination Act ("ICCTA") preempts the Easement Agreement. The district court disagreed, holding in several orders that the ICCTA does not defeat the Tribe's right to an injunction to enforce the Agreement. The district court reserved for later decision the terms of any injunction, as well as the Tribe's right to recover damages.

We granted interlocutory review of the district court's orders under 28 U.S.C. § 1292(b). We affirm.

## I. Factual and Procedural Background

The Swinomish Indian Tribal Community is a federally recognized Indian Tribe organized under the Indian Reorganization Act of 1934, 25 U.S.C. § 5123. The Tribe is a successor to signatories of the Treaty of Point Elliott of 1855, 12 Stat. 927 ("Treaty"). The Treaty established the Swinomish Reservation on Fidalgo Island in Washington

State, roughly halfway between the towns of Burlington and Anacortes. The Tribe's reservation land is held in trust for the Tribe by the United States.

In about 1889, the Seattle and Northern Railway Company—a predecessor to BNSF—began constructing a railroad line across the northern part of the Reservation. The Tribe objected. W.H. Talbott, the U.S. Indian Agent of the Tulalip Agency, Washington Territory, investigated. Based on Talbott's findings, the U.S. Attorney for Washington Territory was "directed to institute proceedings to prevent the building of the railroad across the said Indian reservation." It is unclear whether the U.S. Attorney ever instituted proceedings.

In response, on December 21, 1889, the Seattle and Northern Railway Company petitioned the U.S. Department of the Interior ("DOI") for permission and a right-of-way to build the railroad line across the Reservation. On April 26, 1890, the Acting Commissioner for the Office of Indian Affairs in DOI sent a letter denying the petition. The letter advised the Company that "in all cases where right of way for railroads through Indian reservations is not provided for by treaties or agreements by the United States with the Indians, congressional action is necessary to ratify agreements by railway companies with the Indians for such right of way &c." There is no indication that the Seattle and Northern Railway Company ever obtained permission or approval from the Tribe, the Department of the Interior, or Congress to build a railroad line across the Reservation. The Seattle and Northern Railway Company built the line nonetheless. The Company and its successors have continued to use the line ever since.

In about 1970, the Tribe contacted Burlington Northern Railroad Company ("Burlington Northern")—a successor to the Seattle and Northern Railway Company and the immediate predecessor of BNSF—concerning Burlington Northern's continuing use of the Tribe's land for its railroad line.  The Tribe was unsuccessful in attempts to negotiate a settlement with Burlington Northern.  In August 1977, the Tribe asked the United States, in its role as trustee, to bring suit against Burlington Northern seeking damages and removal of the line.

Under threat of litigation, on September 27, 1977, Burlington Northern filed an application with the Western Washington Agency of the Bureau of Indian Affairs ("BIA"), seeking a railroad right-of-way across the Reservation.  The Indian Right of Way Act of 1948, 62 Stat. 17, 25 U.S.C. §§ 323–28, "empower[s]" the Secretary of the Interior to "grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across any lands now or hereafter held in trust by the United States for individual Indians or Indian tribes, communities, bands, or nations."  25 U.S.C. § 323.  Under the Act, "[n]o grant of a right-of-way over and across" a tribe's land "shall be made without the consent of the proper tribal officials."  25 U.S.C. § 324.  Such consent "may impose restrictions or conditions" on the grant of a right-of-way.  25 C.F.R. § 169.107 (2016). "[A]ny restrictions or conditions automatically become conditions and restrictions in the grant."  *Id.*; *see also* 25 C.F.R. § 169.125 (2016) ("The grant [of a right-of-way] will incorporate the conditions or restrictions set out in the Indian landowners' consents."); 25 C.F.R. § 161.15 (1968). The Indian Right of Way Act explicitly applies to railroad rights-of-ways.  *See, e.g.*, 25 C.F.R. § 169.5(a)(1) (2016) ("This part covers rights-of-way over and across Indian or

BIA land, for uses including but not limited to . . . (1) Railroads."); 25 C.F.R. § 161.23 (1968).

Without conceding that its line ran across Reservation land, Burlington Northern acknowledged that the Tribe had not consented to a right-of-way as required under the Indian Right of Way Act of 1948. Burlington Northern stated in its application that it was instead applying under the "Act of March 2, 1899," 25 U.S.C. § 312 ("1899 Act"). The 1899 Act provided for grants of rights-of-way for railroads through Indian reservations. It did not require permission of a tribe, but it did require compliance with its various provisions, including payment of compensation to the tribe. Burlington Northern had not previously applied for a right-of-way under the 1899 Act and had never compensated the Tribe.

The Western Washington Agency of the BIA forwarded Burlington Northern's application to the Portland Area Director of the BIA. The Agency's cover memorandum stated, *inter alia*, that "local review finds this case to be lacking under current CFR regulations in that . . . [t]he landowners have not concurred. In fact the [T]ribe . . . has gone on record . . . requesting removal of said railroad." On October 17, 1978, the Agency denied Burlington Northern's application due to lack of tribal consent.

Burlington Northern appealed to the Portland Area Director, arguing that tribal consent was not required. On May 4, 1979, the Area Director affirmed the decision of the Western Washington Agency, concluding that for tribes organized under the Indian Reorganization Act of 1934, tribal consent was required before the United States could alienate their interests in trust lands, regardless of whether application was made under the Indian Right of Way Act or the 1899

Act. Burlington Northern appealed the Area Director's decision to the Assistant Secretary for Indian Affairs. The Assistant Secretary affirmed the decision of the Area Director.

On October 12, 1979, Burlington Northern filed a complaint in federal district court seeking to compel the Secretary of the Interior to grant a right-of-way across the Reservation. *See Burlington N., Inc. v. Andrus et al.*, No. C79-1199V (W.D. Wash., filed Oct. 15, 1979). The Tribe intervened, and the parties filed cross-motions for summary judgment. The district court deferred consideration of the motions until our court issued a ruling in a factually similar case, *Southern Pacific Transportation Co. v. Watt*, 700 F.2d 550 (9th Cir. 1983). We held there that tribal consent is a condition precedent to a grant of a railroad right-of-way across tribal lands. After our decision, the district court entered judgment against Burlington Northern. Burlington Northern had appealed to our court but dismissed its appeal after the Supreme Court denied certiorari in *Southern Pacific*.

Meanwhile, on July 18, 1978, the Tribe filed a trespass action against Burlington Northern in district court seeking damages and an injunction requiring removal of the railroad line from the Reservation. *See Swinomish Tribal Cmty. v. Burlington N., Inc*., Case No. C78-429V (W.D. Wash., filed July 18, 1978) ("Trespass Litigation"). The United States intervened on the side of the Tribe in 1983. The Interstate Commerce Commission ("ICC"), the predecessor to the Surface Transportation Board, had also sought leave to intervene. The ICC argued that it had "exclusive jurisdiction to determine whether the abandonment" of the railroad—that is, the Tribe's request that Burlington Northern remove the railroad entirely—was "in the national interest." The district

court denied the ICC's motion as premature, noting that the motion could be renewed if and when the question of remedy arose.

In 1989, after over a decade of litigation, the Tribe, the United States, and Burlington Northern reached a settlement. The parties' agreement was formalized in a Settlement Agreement and an Easement Agreement. In 1991, the BIA approved the Settlement Agreement and granted a right-of-way under the Indian Right of Way Act, consistent with the terms specified in the Easement Agreement.

Under the settlement, Burlington Northern agreed to apply to the BIA for a right-of-way consistent with the terms and conditions specified in the Easement Agreement. Burlington Northern also agreed to a one-time payment of $125,000 "for all rent, damages and compensation of any sort, due for past occupancy of the right-of-way from date of construction in 1889 until January 1, 1989." It agreed to pay thereafter an annual rental fee of at least $10,000, subject to periodic increases based on the Consumer Price Index and changes in property values. In turn, the Tribe agreed to consent to the right-of-way subject to the specified terms.

The Easement Agreement and corresponding right-of-way grant Burlington Northern the right to run a specified maximum number of trains, with a maximum number of cars, across the Reservation, unless the Tribe agrees in writing to an increase. The relevant language provides:

> Burlington Northern agrees that, unless otherwise agreed in writing, only one eastern bound train, and one western bound train, (of twenty-five (25) cars or less) shall cross the

Reservation each day.  The number of trains and cars shall not be increased unless required by shipper needs.  The Tribe agrees not to arbitrarily withhold permission to increase the number of trains or cars when necessary to meet shipper needs.  It is understood and agreed that if the number of crossings or the number of cars is increased, the annual rental will be subject to adjustment . . . .

During negotiations leading up to the agreements, Burlington Northern had written in a June 22, 1989, letter that it "doubt[ed]" that it would operate more trains than the agreed-upon amount, but that it might need to "[o]n occasion."

The Easement Agreement also requires Burlington Northern to submit annual cargo reports to the Tribe:

Burlington Northern will keep the Tribe informed as to the nature and identity of all cargo transported by Burlington Northern across the Reservation.  Initially, Burlington Northern shall prepare a summary of all such commodities expected to cross the Reservation and the quantities of such commodities.  Thereafter, the disclosure shall be updated periodically as different products, or commodities, are added or deleted. Such updates shall occur at least annually.  The disclosure updates shall identify any previously shipped cargo that is different in nature, identity or quantity from the cargo described in previous disclosures.  Burlington Northern will comply strictly with all Federal

and State Regulations regarding classifying, packaging and handling of rail cars so as to provide the least risk and danger to persons, property and the natural environment of the Reservation.

The right-of-way and Easement Agreement have an initial term of forty years, with two twenty-year extensions at Burlington Northern's option. The right-of-way and Easement Agreement therefore terminate no later than 2071.

The railroad line and underlying right-of-way run across the northern part of the Reservation and next to the Tribe's primary economic development enterprises, including a casino, a lodge, a Chevron service station and convenience store, and an RV park. According to the Tribe, "[h]undreds of guests and employees are present at the economic development facilities at all times, 24 hours a day, 7 days a week." "This economic development infrastructure serves as the primary financial source for funding of the Tribe's essential governmental functions and programs."

The railroad line crosses a swing bridge over the Swinomish Channel and a trestle bridge across Padilla Bay, both of which are within the Reservation. Both bodies of water connect directly to the Puget Sound (the Salish Sea), where the Tribe has treaty rights to fish at its usual and accustomed fishing grounds and stations. *See United States v. Washington*, 459 F. Supp. 1020, 1049 (W.D. Wash. 1978).

A. Events Giving Rise to Present Action

In October 2011, the Tribe learned from Skagit County government documents that Tesoro Refining & Marketing

Company, LLC, an oil company with a refinery on March Point, adjacent to Anacortes, intended to ship crude oil in 100-car "unit trains" across the Reservation every other day using BNSF trains. On October 18, 2011, the Tribe sent a letter to BNSF, Burlington Northern's successor, reminding BNSF of its obligation to obtain written approval from the Tribe for any increases in rail traffic above the maximum level specified in the Easement Agreement. BNSF did not respond to the letter.

In September 2012, the Tribe learned from a local news article that BNSF had begun to run 100-car trains across the Reservation. BNSF later admitted to running six 100-car unit trains in each direction across the Reservation every week. On September 27, 2012, the Tribe sent a letter to BNSF notifying BNSF that the increased rail traffic violated the Easement Agreement and requesting information from BNSF.

BNSF responded to the Tribe almost five months later. BNSF confirmed in its answering letter that throughout 2012, it had run "locals" averaging between 27.8 and 28.5 cars six times per week between Burlington and the March Point refinery. BNSF wrote further that beginning in September 2012, it had run sixty-two additional unit trains (about one every other day) of "approximately 102 cars in each direction." Finally, BNSF wrote that it "anticipate[d] that in the near term, unit trains may increase from four to six times weekly to as much as ten times weekly." BNSF had not previously asked, and did not now ask, the Tribe's permission to run its new 100-car unit trains across the Reservation.

In a letter to BNSF dated November 25, 2014, the Tribe complained that BNSF had violated the Easement Agreement not only by exceeding the number of trains and rail cars, but

also by failing to report to the Tribe the particularly dangerous nature of the crude oil, from North Dakota's Bakken formation, that was carried by the unit trains:

> The Tribe, like the public generally, has learned that Bakken crude oil being transported by rail—which the Tribe informally understands is being transported by rail to the Tesoro refinery on March Point—poses a potentially far greater risk to human life, health and communities than some other crude oils because of its propensity to catastrophically combust. . . . [T]he BNSF easement across the Reservation is in close physical proximity to central elements of the Tribe's economic development infrastructure, including the Casino, Lodge, Chevron and RV park.

In the fifteen-page, single-spaced letter, the Tribe described numerous recent catastrophic spills and fires in the United States and Canada resulting from derailment of trains carrying Bakken crude oil.

The Tribe quoted from a report prepared by the U.S. Department of Transportation, addressing the unusual hazards of rail transportation of Bakken crude oil. According to the report:

> The number and type of petroleum crude oil railroad accidents described below that have occurred during the last year is startling, and the quantity of petroleum crude oil spilled as a result of those accidents is voluminous in

comparison to past precedents. Due to the volume of crude oil currently being shipped by railroads, the demonstrated recent propensity for rail accidents involving trains transporting crude oil to occur, and the subsequent releases of large quantities of crude oil into the environment and the imminent hazard those releases present, this Order requires that railroads take the action described above . . . . Releases of petroleum crude oil, subsequent fires, and environmental damage resulting from such releases represent an imminent hazard . . . presenting a substantial likelihood that death, serious illness, severe personal injury, or a substantial endangerment to health, property, or the environment may occur.

U.S. Dep't of Transp., Emergency Restriction/Prohibition Order, Docket No. DOT-OST-2014-0067, at 4 (May 7, 2014).

The letter recounted two recent derailments of BNSF unit trains carrying Bakken crude. One derailment was in North Dakota. It resulted in a spill of "approximately 400,000 gallons" of crude oil and "a significant fire." The other derailment was in Seattle. The train had been on its way to the March Point refinery and would have crossed the Swinomish Reservation. The letter acknowledged that BNSF trains travel slowly when crossing the Reservation, but noted that the train derailed in Seattle while traveling at a speed of less than five miles per hour. The Easement Agreement limits the speed of BNSF's trains when crossing the Reservation to less than ten miles per hour.

In communications with BNSF, the Tribe repeatedly requested that BNSF abide by the Easement Agreement. BNSF consistently refused to do so. BNSF also repeatedly failed to provide annual cargo reports to the Tribe.

## B. Federal District Court Proceedings

On April 7, 2015, the Tribe filed suit in district court against BNSF seeking a declaratory judgment that BNSF had breached, and was continuing to breach, the Easement Agreement; injunctive relief limiting train traffic in accordance with the Agreement; and damages for trespass and breach of contract. BNSF's answer contended that the Tribe's claims were preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. § 10501 *et seq*. The parties filed cross-motions for summary judgment.

In a series of orders dated January 13, 2017, June 8, 2017, and March 15, 2018, the district court ruled against BNSF. It held that BNSF had "breached the terms of the Easement Agreement by failing to make annual disclosures regarding the cargo it was carrying across the reservation and by increasing the number of trains and cars traversing the reservation without first seeking to obtain the Tribe's written assent." The court held that the Tribe has a treaty-based interest in its Reservation land under BNSF's tracks, and that the ICCTA does not "preempt" the Easement Agreement or remedies for its breach. The district court did not rule on the specifics of injunctive relief. It held only that injunctive relief was available. The district court reserved for later decision the Tribe's request for damages.

BNSF moved to certify the district court's summary judgment and related orders for interlocutory appeal. The district court certified its orders for appeal, and BNSF petitioned our court for permission. BNSF's petition and appeal pose one question: Whether the ICCTA precludes the use of injunctive relief to enforce the terms of the Easement Agreement. We granted permission to appeal under 28 U.S.C. § 1292(b).

## II.  Standard of Review

We review the district court's summary judgment decision de novo. *See, e.g.*, *Tulalip Tribes v. Suquamish Indian Tribe*, 794 F.3d 1129, 1133 (9th Cir. 2015).

## III.  Analysis

The district court held that BNSF violated the terms of the Easement Agreement. BNSF contends the district court erred because the ICCTA preempts the Agreement, the underlying federal common law, the Treaty of Point Elliott, and Indian Right of Way Act. We agree with the district court.

### A.  The Easement Agreement

The Easement Agreement specifies a maximum number of trains and rail cars, which can be increased only with the written permission of the Tribe. For the convenience of the reader, we again provide the relevant text:

> Burlington Northern agrees that, unless otherwise agreed in writing, only one eastern bound train, and one western bound train, (of twenty-five (25) cars or less) shall cross the

> Reservation each day.  The number of trains and cars shall not be increased unless required by shipper needs.  The Tribe agrees not to arbitrarily withhold permission to increase the number of trains or cars when necessary to meet shipper needs.  It is understood and agreed that if the number of crossings or the number of cars is increased, the annual rental will be subject to adjustment . . . .

The Agreement also required Burlington Northern to inform the Tribe "as to the nature and identity of all cargo transported by Burlington Northern across the Reservation. . . . [T]he disclosure shall be updated periodically as different products, or commodities, are added or deleted.  Such updates shall occur at least annually."

BNSF does not now contest that it has violated, and is continuing to violate, the terms of the Agreement.  Rather, BNSF contends that the Tribe's right to enforce the Agreement and seek injunctive relief is preempted by the ICCTA.

## B.  Preemption by the ICCTA

The Interstate Commerce Commission Termination Act of 1995 "abolished the [Interstate Commerce Commission], revised the Interstate Commerce Act, and transferred regulatory functions under that Act to the [Surface Transportation Board]." *DHX, Inc. v. Surface Transp. Bd.*, 501 F.3d 1080, 1082 (9th Cir. 2007).  The ICCTA contains a broad preemption provision:

(b) The jurisdiction of the Board over—

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located entirely in one State,
>
> is exclusive.  Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).

This provision of the ICCTA expressly preempts "a wide range of *state and local* regulation of rail activity." *Ass'n of Am. R.R.s v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1096–97 (9th Cir. 2010) (emphasis added).  "It is difficult to imagine a broader statement of Congress's intent to preempt *state* regulatory authority over railroad operations." *City of Auburn v. United States*, 154 F.3d 1025, 1030 (9th Cir. 1998) (citation omitted) (emphasis added).

The Supremacy Clause provides that the Constitution, the laws of the United States, and all treaties "shall be the supreme Law of the Land."  U.S. CONST., art. VI, cl. 2.  Pursuant to the Supremacy Clause, "federal law may preempt state law."  *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991).  Under this doctrine, "state laws that 'interfere with, or are contrary to the laws of [C]ongress, made in pursuance of the constitution' are invalid."  *Id.* (quoting *Gibbons v. Ogden*, 22 U.S. 1 (1824)).  When a federal law conflicts with a state or local law, the state or local law simply must give way.

The preemption provision of the ICCTA also grants the Surface Transportation Board ("STB") exclusive authority over *federal* regulatory authority.  *See DHX, Inc.*, 501 F.3d at 1082.  However, if there is a conflict between the ICCTA and another federal law, we do not use the analytic framework applicable to federal preemption of state and local regulation.  Indeed, the term "preempt," when applied to a conflict between federal laws, is a bit of a misnomer.  The usual terms employed in analyzing a conflict between federal laws are repeal and abrogation.  *Cf. County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 240 (1985) ("[W]e hold that the Oneidas' right of action under federal common law was not pre-empted by the passage of the Nonintercourse Acts.").

Under the usual terminology, "federal statutes do not *preempt* other federal statutes."  *Ray v. Spirit Airlines, Inc*., 767 F.3d 1220, 1224 (11th Cir. 2014); *see also Baker v. IBP, Inc*., 357 F.3d 685, 688 (7th Cir. 2004).  When a "case involves the interplay between two statutory schemes created by Congress for different reasons and at different times," we typically ask whether the later statute *repeals* the prior one.  *Ray*, 767 F.3d at 1224; *see also, e.g.*, *Morton v. Mancari*,

417 U.S. 535, 549 (1974) (analyzing whether the Equal Employment Opportunities Act of 1972 implicitly repealed Section 12 of the Indian Reorganization Act of 1934).

Similarly, under the terminology usually employed, federal laws do not "preempt" treaties.  The usual term is "abrogation."  When a later-enacted federal statute conflicts with a treaty, we typically examine whether the statute explicitly or implicitly abrogates the treaty.  *See, e.g.*, *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 412–13 (1968); *United States v. Smiskin*, 487 F.3d 1260, 1264 (9th Cir. 2007).

1.  Federal Law Underlying the Easement Agreement

There are three sources of federal law underlying the Easement Agreement:  federal common law, the Treaty of Point Elliott, and the Indian Right of Way Act.

Under federal common law, Indian tribes have the right to exclude non-Indians and non-tribal members from their lands, and the commensurate right to grant admission to, or use of, their lands on such terms as the tribes see fit to impose.  "[A] hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands . . . ."  *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141 (1982); *Window Rock Unified Sch. Dist. v. Reeves*, 861 F.3d 894, 899 (9th Cir. 2017), *as amended* (Aug. 3, 2017) ("The Supreme Court has long recognized that Indian tribes have sovereign powers, including the power to exclude non-tribal members from tribal land."), *cert. denied*, 138 S. Ct. 648 (2018).  Tribes possess inherent sovereign authority "[t]o determine who may enter the reservation; to define the conditions upon which they may enter; to prescribe rules of conduct; [and] to expel

those who enter the reservation without proper authority." *Quechan Tribe of Indians v. Rowe*, 531 F.2d 408, 411 (9th Cir. 1976); *see also Merrion*, 455 U.S. at 144 ("When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its ultimate power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry."). Tribes have a federal common law right to sue to protect their possessory interests in their lands. *See County of Oneida*, 470 U.S. at 235–36 ("In keeping with these well-established principles, we hold that the Oneidas can maintain this action for violation of their possessory rights based on federal common law.").

The Treaty of Point Elliott was one of many treaties signed by the federal government in 1854 and 1855 with the tribes surrounding Puget Sound, under which tribes were guaranteed reservation lands for their exclusive use. *See Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 662 (1979) ("*Fishing Vessel*") ("[C]ertain relatively small parcels of land were reserved for their exclusive use."). The Treaty specifically provides that the Tribe has a right to exclude non-Indians from the Reservation. *See* Treaty of Point Elliott, 12 Stat. 927, at Art. II (1859). The Treaty is "self-enforcing." *See Fishing Vessel*, 443 U.S at 693 n.33 ("The State has . . . argued that absent congressional legislation the treaties involved here are not enforceable. This argument flies directly in the face of Art. XIII of the treaties . . . ."); *see also Skokomish Indian Tribe v. United States*, 410 F.3d 506, 513 (9th Cir. 2005) (en banc) ("The Supreme Court has held that the Treaty of Point No Point and similar treaties are 'self-enforcing' and thus do not require implementing legislation to form the basis of a lawsuit."). Under long-established principles of federal Indian law, treaties are enforceable in equity against third

parties. *See, e.g.*, *United States v. Winans*, 198 U.S. 371, 377 (1905); *United States v. Washington*, 853 F.3d 946, 961 (9th Cir. 2017); *Skokomish Indian Tribe*, 410 F.3d at 513; *United States v. Washington*, 157 F.3d 630, 657 (9th Cir. 1998).

The Indian Right of Way Act provides that the "Secretary of the Interior . . . is empowered to grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across any lands . . . held in trust by the United States for . . . Indian tribes . . . ." 25 U.S.C. § 323. "No grant of a right-of-way over and across any lands belonging to a tribe organized under the Act of June 18, 1934 [the Indian Reorganization Act] . . . shall be made without the consent of proper tribal officials." *Id.* at § 324. It is undisputed that the Swinomish Indian Tribal Community was organized under the Indian Reorganization Act. Regulations under the Indian Right of Way Act provide that any unauthorized use of an existing right-of-way constitutes trespass for which a Tribe may "pursue any available remedies under applicable law, including applicable tribal law." 25 C.F.R. § 169.413; *see also* 25 C.F.R. § 169.401 ("Any . . . violation of the right-of-way grant or right-of-way document, including but not limited to encroachments beyond the defined boundaries, accidental, willful, and/or incidental trespass, unauthorized new construction, changes in use not permitted in the grant, and late or insufficient payment may result in enforcement actions including, but not limited to, cancellation of the grant.").

## 2.  Preemption, Repeal, and Abrogation

BNSF argues that the ICCTA "preempts" the treaty-based federal common law that allows tribes to exclude non-Indians from Indian land.

In support of its argument, BNSF wrote in its brief:

> Consistent with the statutory text, "[e]very court that has examined [Section 10501(b)] has concluded that [its] preemptive effect . . . is broad and sweeping," *forbidding* "impinge[ment] on the [STB]'s jurisdiction or a railroad's ability to conduct its rail operations." *CSX Transp., Inc.*, FD 34662, 2005 WL 584026, at *6 (STB Mar. 14, 2005) . . . .

BNSF Brief at 28 (emphasis added; alterations in original). BNSF misrepresented what the STB wrote in *CSX Transportation*. The actual text of *CSX Transportation* reads as follows:

> Every court that has examined the statutory language has concluded that the preemptive effect of section 10501(b) is broad and sweeping, and that it *blocks actions by states or localities* that would impinge on the Board's jurisdiction or a railroad's ability to conduct its rail operations[.]

*CSX Transp.*, 2005 WL 584026, at *6 (emphasis added). BNSF would have the reader understand that the STB had written that the preemptive force of the ICCTA is the same, whether it conflicts with federal law or with state or local law. By replacing the words "blocks actions by states or localities" with the word "forbidding," BNSF removed the qualification STB included in the actual text.

One paragraph later, BNSF wrote:

> This Court, too, has held that ICCTA squarely preempts *remedies* that "may reasonably be said to have the effect of managing or governing rail transportation." *Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097 (9th Cir. 2010)[.]

BNSF Brief at 28–29 (emphasis added). BNSF again misrepresented what was written. The actual text of *Association of American Railroads* reads as follows:

> As stated by our sister circuits, ICCTA "preempts *all 'state laws* that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation.'"

*Ass'n of Am. R.R.s*, 622 F.3d at 1097 (emphasis added). Again, BNSF would have the reader understand that our court had written that the preemptive force of the ICCTA is the same, whether it conflicts with federal law or with state law. By replacing the words "all state laws" with the word "remedies," BNSF removed the qualification we included in our actual text and at the same time introduced a concept ("remedies") not included in the text.

These misrepresentations would lead the unwary reader to understand that the STB and our court have both read the ICCTA to preempt broadly, without distinction between state and local law, on the one hand, and federal law, on the other.

Such an understanding would, of course, benefit BNSF in this litigation.  However, such an understanding is not supported by the decisions whose language is quoted in part by BNSF.

After oral argument in this case, our panel ordered BNSF's attorneys to explain the manner in which they quoted these cases in their brief.  In their letter in response, after defending their selective quotations from *CSX Transportation* and *Association of American Railroads*, BNSF's attorneys wrote, "Responding to the Court's inquiry has led Counsel to appreciate, however, that we could have made explicit when first citing *CSX* and *AAR* that, even though these cases arose in a distinct context involving state and local law, BNSF contends they nonetheless supply the appropriate principles of law in this case.  We regret not taking that approach."  We, in turn, regret that BNSF's attorneys wrote only that they "could have made explicit," and that they "regret not taking that approach," instead of acknowledging straightforwardly that they misrepresented in their brief what the STB and our court had written in those cases.  We expect better from the attorneys who appear before us.

The "preemption" question under the ICCTA, with respect to federal law, is really two questions.  First, to the degree that there may be a conflict between the two statutes, did the ICCTA repeal the Indian Right of Way Act?  Second, did the ICCTA abrogate treaty-based federal common law and the Treaty of Point Elliott, which allow tribes to exclude non-Indians from their reservations?  We take those questions in turn.

## A.  Repeal

When a later-enacted statute does not expressly repeal existing federal law, we ask whether the later-enacted statute implicitly repeals earlier law.  "[R]epeals by implication are not favored." *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936).  "The intention of the legislature to repeal 'must be clear and manifest.'" *United States v. Borden Co*., 308 U.S. 188, 198 (1939) (citation omitted); *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 575 (9th Cir. 2000). "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Mancari*, 417 U.S. at 550; *see Branch v. Smith*, 538 U.S. 254, 273 (2003) ("An implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter Act covers the whole subject of the earlier one and is clearly intended as a substitute." (citations and internal quotation marks omitted)); *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 381 (1996) ("The rarity with which we have discovered implied repeals is due to the relatively stringent standard for such findings, namely, that there be an irreconcilable conflict between the two federal statutes at issue." (citations and internal quotation marks omitted)).  "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Mancari*, 417 U.S. at 551.

To the extent two federal laws appear to conflict, we attempt to harmonize them.  Both our court and the STB have done so when the ICCTA has appeared to conflict with

another federal law.  *See, e.g.*, *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 761 (9th Cir. 2018); *Ass'n of Am. R.R.s*, 622 F.3d at 1097 ("If an apparent conflict exists between ICCTA and a *federal* law, then the courts must strive to harmonize the two laws, giving effect to both laws if possible.");  *Bos. & Me. Corp. & Town of Ayer, Mass.*, No. 33971, 2001 WL 458685, at *6 n.28 (S.T.B. Apr. 30, 2001) ("[I]f two Federal statutes are 'capable of coexistence,' the statutes should be harmonized and each should be regarded as effective unless there is a 'positive repugnancy' or an 'irreconcilable conflict' between the laws." (quoting *Matsushita Elec. Indus. Co.*, 516 U.S. at 381)); *see also U.S. Envtl. Prot. Agency*, FD 35803, 2014 WL 7392860, at *7 (S.T.B. Dec. 29, 2014) ("[A]ctions taken and regulations enacted under . . . federal statutes may directly conflict with the purposes and regulatory scheme under the Interstate Commerce Act.  When such a conflict occurs, the Board or a court must determine whether the two federal statutes and their applicable regulatory schemes can be harmonized.").

In the context of a statute that touches on federal Indian law, such as the Indian Right of Way Act, there is an additional canon of construction:   "[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (citations omitted); *Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 340 (9th Cir. 1996) ("Courts have uniformly held that treaties, statutes and executive orders must be liberally construed in favor of establishing Indian rights.  Any ambiguities in construction must be resolved in favor of the Indians. These rules of construction are rooted in the unique trust relationship between the United

States and the Indians." (citations and internal quotation marks omitted)).

The ICCTA was enacted in 1995. The Act served Congress's purpose of "substantially deregulat[ing] the railroad industry," with an eye toward promoting competition, by preempting "a wide range of state and local regulation" that directly managed rail activity. *Ass'n of Am. R.R.s*, 622 F.3d at 1096–97; *DHX, Inc.*, 501 F.3d at 1082–83 (discussing the Act). Despite the broad "preemption" language of § 10501(b) of the ICCTA, and consistent with the jurisprudence on "implicit repeals," courts and the STB have routinely held that the ICCTA does not repeal particular federal statutes and the remedies provided thereunder. They have harmonized the ICCTA with these other federal statutes, giving effect to both. *See, e.g.*, *BNSF Ry. Co.*, 904 F.3d at 761–62 (harmonizing the Hazardous Materials Transportation Act and holding that fees permitted in that Act are not preempted by the ICCTA); *Ass'n of Am. R.R.s*, 622 F.3d at 1098 ("[T]o the extent that state and local agencies promulgate EPA-approved statewide plans under federal environmental laws (such as 'statewide implementation plans' under the Clean Air Act), ICCTA generally does not preempt those regulations because it is possible to harmonize the ICCTA with those federally recognized regulations."); *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 522–23 (6th Cir. 2001) (holding Congress did not intend for the ICCTA to repeal the Federal Railway Administration's authority under the Federal Railway Safety Act to regulate rail safety); *BNSF Ry. Co. v. Albany & E. R.R. Co.*, 741 F. Supp. 2d 1184, 1196–98 (D. Or. 2010) (holding that the ICCTA does not displace the Sherman Act); *Ass'n of Am. R.R.s v. S. Coast Air Qual. Mgmt. Dist.*, 2007 WL 2439499, at \*5 (C.D. Cal. Apr. 30, 2007) ("The District is correct that the ICCTA does not

preempt the [Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*].”); *Holland v. Delray Connecting R.R. Co.*, 311 F. Supp. 2d 744, 747–52 (N.D. Ind. 2004) (holding that the ICCTA does not repeal the Coal Industry Health Benefits Act); *Bos. & Me. Corp. & Town of Ayer, Mass.*, 2001 WL 458685, at *6 n.28 (“[N]othing in section 10501(b) is intended to interfere with the role of state and local agencies in implementing Federal environmental statutes, such as the Clean Air Act [and the federal clean water statutes].”); *Auburn & Kent, WA*, 2 S.T.B. 330, 337, 1997 WL 362017 (July 2, 1997) (same), *aff’d sub nom. City of Auburn v. United States*, 154 F.3d 1025 (9th Cir. 1998).

The specific question before us is whether § 10501(b) of the ICCTA repeals the Indian Right of Way Act.  For several reasons, we conclude that it does not.

First, the ICCTA’s preemption applies to “regulation” of railroads.  49 U.S.C. § 10501(b) (“[T]he remedies provided under this part with respect to *regulation* of rail transportation are exclusive and preempt the remedies provided under Federal or State law.” (emphasis added)).   “The STB’s interpretation of this provision . . . likewise focuses on the regulatory nature of the remedies preempted.”   *PCS Phosphate Co, Inc. v. Norfolk S. Corp.*, 559 F.3d 212, 218 (4th Cir. 2009) (internal citation omitted).  Pursuant to the Indian Right of Way Act, if a tribe consents, the Secretary of the Interior may issue a right-of-way easement granting rights of entry to the tribe’s trust land.  Without a valid right-of-way easement agreement, any railroad crossing a tribe’s land is doing so illegally and is trespassing.  *See, e.g.*, *United States v. S. Pac. Transp. Co.*, 543 F.2d 676, 699 (9th Cir. 1976) (“*Southern Pacific*”).   Right-of-way easements under the Indian Right of Way Act are voluntary agreements between

a tribe and a railroad, approved by the United States in its role as trustee, that grant the railroad access to a tribe's land subject to certain conditions. While it is conceivable that a right-of-way issued under the Indian Right of Way Act could operate as a "regulation" within the meaning of the ICCTA, the Easement Agreement in this case has not resulted in such a right-of-way; nor have the parties pointed to a right-of-way issued under the Indian Right of Way Act that could operate in such a way.

Consistent with this conclusion, both courts and the STB have held in the state-law context—where true preemption, not repeal, applies—that voluntary agreements between private parties "are not presumptively regulatory acts" subject to the ICCTA's preemption provision. *PCS Phosphate*, 559 F.3d at 218. As the Fourth Circuit has written, "Voluntary agreements between private parties, however, are not presumptively regulatory acts, and we are doubtful that most private contracts constitute the sort of 'regulation' expressly preempted by the statute." *Id.* at 218. The Fourth Circuit concluded that "[t]he history and purpose of the ICCTA support the view that Congress did not intend to preempt all voluntary agreements concerning rail transportation." *Id.* at 219. The court went on to hold that a right-of-way easement agreement between a mine owner and a railroad in which the railroad promised to pay to relocate its railroad line in the future, if necessary to accommodate the landowner's operations, was enforceable and was not preempted by the ICCTA.

Nor does enforcement of the Easement Agreement constitute an "unreasonable interference" with rail transportation such that it is impliedly preempted by the ICCTA. *See id.* at 220–21. In holding that the ICCTA did

not preempt the right-of-way easement agreement between the mine owner and railroad, the Fourth Circuit explained that "the determination of whether the action constitutes 'an unreasonable interference' requires a factual assessment of the effect of providing the claimed remedy." *Id.* at 221. Here, the conditions imposed by the Agreement—specifying the maximum number of trains and cars—do not unreasonably interfere with rail transportation. The parties reached the Agreement after extensive negotiation, during which BNSF represented that it "doubted" it would exceed the agreed-upon maximum. *See id.* (finding relevant that the "relocation agreements were freely negotiated between sophisticated business parties" and the "agreements envisioned this exact circumstance"). Further, the terms expressly provide that the "Tribe agrees not to arbitrarily withhold permission to increase the number of trains or cars when necessary to meet shipper needs." Thus, we decline to hold that injunctive relief pursuant to the Easement Agreement is categorically an unreasonable interference with rail transportation.

Second, nothing in the text of the ICCTA or its legislative history indicates that Congress intended that the ICCTA repeal the Indian Right of Way Act or remedies thereunder. *See Mancari*, 417 U.S. at 550 ("There is nothing in the legislative history . . . that indicates affirmatively any congressional intent to repeal the 1934 preference."). The text of the ICCTA does not mention tribes or the Indian Right of Way Act in the context of rail transportation. *See* ICC Termination Act of 1995, Pub. L. No. 104–88, 109 Stat. 803. It mentions tribes only once, and in an entirely different context. *See* 49 U.S.C. § 13902(b)(1) and (b)(8) (providing for registration of Indian tribes as "motor carriers" under the ICCTA). Further, the ICCTA included "conforming

amendments" to dozens of other statutes, but none to the Indian Right of Way Act. *See* ICC Termination Act of 1995, Pub. L. No. 104–88, §§ 311–408, 109 Stat. 803, 943–55. Nor does the ICCTA's legislative history include any discussion of tribes or the Indian Right of Way Act. *See, e.g.*, H.R. Conf. Rep. 104–422 (Dec. 18, 1995); S. Rep. 104–176 (Nov. 21, 1995); H.R. Rep. 104–311 (Nov. 6, 1995); *see also PCS Phosphate*, 559 F.3d at 219 (discussing the legislative history).

Congress was well aware of the Indian Right of Way Act when it enacted the ICCTA. *See Frank's Landing Indian Cmty. v. Nat'l Indian Gaming Comm'n*, 918 F.3d 610, 616 (9th Cir. 2019) ("We assume Congress is knowledgeable about existing law pertinent to the legislation it enacts, *see South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 351 (1998) . . . ."). Regulations promulgated under the Indian Right of Way Act expressly provide that the Act applies to railroads. *See* 25 C.F.R. § 169.5(a)(1) ("This part covers rights-of-way over and across Indian and BIA land, for uses including but not limited to the following: (1) Railroads; . . . ."). When the ICCTA was enacted, federal courts, the Department of the Interior, and the Interstate Commerce Commission—the predecessor to the STB—had applied the Indian Right of Way Act to railroads for decades. *See, e.g.*, *Star Lake R.R. Co.—Rail Constr. & Operation in Mckinley Cty., N.M.*, FD 28272, 1987 WL 98276, at \*5 (I.C.C. Apr. 10, 1987) ("Our authorization is permissive; applicants will have to obtain the easement or make some other acceptable arrangement before they can construct the line."); *Star Lake R.R. Co. v. Lujan*, 737 F. Supp. 103 (D.D.C. 1990) (upholding DOI's termination of a railroad's right-of-way, despite the fact that the ICC had approved the railroad's use of the land); *see also Southern Pacific*, 543 F.2d at 690–93

(discussing prior Acts); *Alaska R.R. Corp.*, 2010 WL 1266781, at *562 (S.T.B. Mar. 16, 2010) (a 2010 draft environmental impact statement by the STB recognizing that the Indian Right of Way Act applies, and stating that DOI is "responsible for granting rights-of-way and handling disputes between [Alaska Native landowners] and [railroad] holders of rights-of-way" and ensuring "allotees are properly notified . . . and their lawful rights observed as prescribed in 25 CFR Part 169."). Thus, neither the text nor legislative history of the ICCTA provides any indication that Congress intended to repeal any part of the Indian Right of Way Act, let alone any "clear and manifest" indication. *Borden Co*., 308 U.S. at 198.

Third, Title 49 of the U.S. Code, in which the ICCTA is codified, explicitly provides, "Nothing in this title shall absolve the United States from any responsibility to Indians and Indian tribes, including responsibilities derived from the trust relationship and any treaty, executive order, or agreement between the United States and an Indian Tribe." 49 U.S.C. § 102(f)(2)(B). The Indian Right of Way Act is a statutory mechanism by which the United States fulfills some of those responsibilities.

Fourth, the Indian Right of Way Act applies to a "very specific situation": the issuance of right-of-way easements that permit third parties to use a tribe's trust land, consistent with the conditions of that agreement. *Mancari*, 417 U.S. at 550. The ICCTA, on the other hand, applies to railroads broadly. *See also BNSF Ry. Co.*, 904 F.3d at 766 ("The preemption provision of the ICCTA is broad and general, providing without differentiation for preemption of state and local regulation of railroad 'rates, classifications, rules . . . , practices, routes, services, and facilities.'"). "Where there is no clear intention otherwise, a specific statute will not be

controlled or nullified by a general one, regardless of the priority of enactment." *Mancari*, 417 U.S. at 550–51; *BNSF Ry. Co.*, 904 F. 3d at 766.

Finally, "[i]n the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Mancari*, 417 U.S. at 550. The ICCTA and the Indian Right of Way Act are easily reconcilable. On the one hand, tribes retain sovereign authority to control their own lands and to enforce the terms of right-of-way easement agreements issued pursuant to the Indian Right of Way Act. The Department of the Interior retains authority to issue and enforce right-of-way agreements, including any agreed-upon conditions negotiated between a tribe and a railroad. On the other, the STB retains authority under the ICCTA to regulate rail operations over Indian lands, such as rates for service, so long as those regulations are consistent with the terms of a normal easement granted under the Indian Right of Way Act. Harmonizing the Indian Right of Way Act and the ICCTA in this way does not unreasonably interfere with the purposes of the ICCTA, with the authority of the STB, or with rail transportation. *See* 49 U.S.C. § 11101(a).

## B. Abrogation

The ICCTA abrogates neither the general treaty-based federal common law right of tribes to exclude non-Indians from Indian lands nor the explicit right to exclude contained in the Treaty of Point Elliott. It is established law that we will not hold that Congress abrogated Indian treaty rights absent unambiguous language to that effect. *See Trans World Airlines, Inc. v. Franklin Mint Corp*., 466 U.S. 243, 252 (1984) ("Legislative silence is not sufficient to abrogate a

treaty."); *Cook v. United States*, 288 U.S. 102, 120 (1933) ("A treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed."); *see also Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 808 (9th Cir. 2011) ("[W]e first acknowledge the long-standing rule that Indian tribes possess inherent sovereign powers, including the authority to exclude . . . unless Congress clearly and unambiguously says otherwise."). "[T]he intention to abrogate or modify a treaty is not to be lightly imputed to the Congress." *Menominee Tribe*, 391 U.S. at 412. "What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *United States v. Dion*, 476 U.S. 734, 739–40 (1986); *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999).

There is no such abrogating language in the ICCTA. The ICCTA and its legislative history do not mention Indian treaties or treaty rights at all, let alone the Treaty of Point Elliott. We affirm the district court and hold that the Tribe's treaty-based right to exclude and condition a third party's presence on the Reservation has not been abrogated by the ICCTA.

## IV.  Conclusion

We affirm the district court. We hold that the Interstate Commerce Commission Termination Act does not repeal the Indian Right of Way Act and does not defeat the Tribe's right to enforce conditions in a right-of-way easement agreement issued pursuant to the Right of Way Act. We hold further that the ICCTA does not abrogate the Treaty of Point Elliott

and the Tribe's treaty-based federal common law right to exclude and condition a third party's presence on, and use of, Reservation lands.  Finally, we hold that the Tribe has the right to pursue injunctive relief to enforce the terms of the Easement Agreement.

We remand to the district court for further proceedings consistent with this opinion.

**AFFIRMED and REMANDED.**